PRECEDENTIAL

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT

———————————

No. 04-9003

———————————

JACK FOSTER OUTTEN, JR.

v.

RICK KEARNEY, Warden, Sussex Correctional Institute;
ATTORNEY GENERAL OF THE STATE OF DELAWARE

Jack F. Outten, Jr.,
Appellant

———————————

Appeal from the United States District Court
for the District of Delaware
(D.C. Civil Action No. 98-cv-00785)
District Judge: Honorable Sue L. Robinson

———————————

Argued July 27, 2006

Before: RENDELL, AMBRO and FUENTES, <u>Circuit Judges</u>

(Opinion filed: September 28, 2006)

Ricardo Palacio, Esquire
Andrew D. Cordo, Esquire
Ashby & Geddes
222 Delaware Avenue
17th Floor, P.O. Box 1150
Wilmington, DE   19899

John P. Deckers, Esquire (Argued)
800 North King Street, Suite 302
Wilmington, DE   19801

Counsel for Appellant

Thomas E. Brown (Argued)
   Deputy Attorney General
Department of Justice
Delaware State Office Building
820 North French Street
Carvel Office Building
Wilmington, DE   19801

Counsel for Appellee

———————————

OPINION OF THE COURT

———————————

AMBRO, <u>Circuit Judge</u>:

Jack Foster Outten, Jr., was convicted by a Delaware jury

2

of, *inter alia*, first-degree murder and sentenced to death. His direct appeals and post-conviction claims in state court were unsuccessful. Outten then filed in federal court a 28 U.S.C. § 2254 petition for a writ of *habeas corpus*, which the United States District Court for the District of Delaware denied. We conclude that trial counsel's failure to conduct a reasonable investigation of Outten's background in anticipation of his capital sentencing violated his Sixth Amendment right to effective assistance of counsel. Thus, we reverse and remand this case for resentencing.

## I.    Factual and Procedural Background

### A.    *The Murder of Willie Mannon*

We recite only briefly the pertinent facts of this case as set forth by the District Court, *Outten v. Snyder*, Civ. No. 98-785-SLR, 2004 U.S. Dist. LEXIS 5546 (D. Del. Mar. 31, 2004) (*Outten IV*), and the Delaware Superior Court, *State v. Outten*, No. C.R.A. IN-92-01-1144, 1997 WL 855718 (Del. Super. Ct. Dec. 22, 1997) (*Outten II*). (All city or town references are in Delaware.) Outten, his cousins Steven and Nelson Shelton, and Nelson's girlfriend, Christina Gibbons, spent the afternoon of January 11, 1992, drinking beer at Nelson and Gibbons's home in Newark. After consuming approximately one and one-half cases of beer, the four drove to Clemente's Bus Stop, a local tavern located on Route 13 south of Wilmington.

3

After separating for a short time, Outten, the Sheltons, and Gibbons eventually reconvened and went to Hamill's Pub in Elsmere, and then to Fat Boys Bar in New Castle. At Fat Boys Bar, the three men began playing pool while Gibbons sat at the bar counter alone. She began conversing and drinking with sixty-two year old Wilson "Willie" Mannon, who had arrived at the bar earlier that same day. Ultimately, Mannon left with Gibbons and the three men.

Mannon's body was discovered along a road in a deserted area of East Wilmington at approximately 11:00 a.m. on January 12, 1992. He was found lying on his back with his legs crossed and the top of his head shattered. Mannon's pockets were turned inside-out, and loose change, his empty wallet, and his identification cards were scattered nearby. A broken ballpeen hammer handle rested a few feet away from his body and the head of that hammer was located behind a nearby fence along the road.

Nelson Shelton and Gibbons were stopped by New Castle County police later that morning. The officers sought to question Nelson on an unrelated charge. He was taken to police headquarters and found to be in possession of two gold rings that were Mannon's. His winter jacket also appeared to be stained with blood.

Gibbons accompanied Nelson to the police station. While there, she provided statements to New Castle County and

4

Wilmington law enforcement officers implicating Outten and Steven Shelton in the robbery and murder of Mannon. Gibbons recounted that she had been at a bar the previous night with Outten and the Shelton brothers, and that, at the end of the night, the four of them left in Nelson's car with an "older man" named Willie. From the bar, they drove to a "boat yard," where the older man was beaten with a hammer and an object she thought was a sink. According to Gibbons, Outten struck the man with the sink and Steven kicked him. She was adamant that Nelson, though present, was not involved. Gibbons also told police that the sink was discarded along Interstate 95 after the murder.

The next day, January 13, 1992, Gibbons spoke about Mannon's murder to her social worker, Sandra Nyce. The story she recounted to Nyce differed significantly from her prior statements to the police. Indeed, she implicated Outten and both Shelton brothers in the beating and murder, telling Nyce that all three men had taken turns hitting Mannon and that they had killed a "nice old man."

### B.    *The Trial Court Proceedings*

Acting quickly, on January 21, 1992, a Delaware grand jury indicted Outten and the Sheltons for Mannon's death. They were charged with, *inter alia*, first-degree murder, first-degree conspiracy, first-degree robbery, and possession of a deadly weapon during the commission of a felony. The defendants were tried together in the Delaware Superior Court in New

5

Castle County in January–February 1993. Gibbons, who in addition to providing multiple contradictory accounts of the murder during the investigation gave conflicting testimony at trial, was the State's principal witness.[1]  After deliberating for two days, the jury convicted the defendants of all offenses as charged.

A penalty hearing was held on March 3–5, 1993. Counsel for both Outten and Steven Shelton made opening statements.  One of Outten's counsel—there were two[2]—told the jury its decision was simple: choose life or death.  He also stated that he and his co-counsel were there "to beg for the life of [their] client."  Steven's counsel, by contrast, stated, "My client has instructed me to advise you that we will not be begging for his life in this case."

---

[1]During her initial testimony, Gibbons implicated only Outten and Nelson Shelton in the murder of Mannon.  She retook the stand, however, and conceded that her prior testimony had been false, and testified that all three defendants had participated in the beating and killing of Mannon.  For a comprehensive account of Gibbons's various statements to investigators and the jury, *see Outten IV*, 2004 U.S. Dist. LEXIS 5546, at *9–13.

[2]Outten was represented by the same two attorneys at trial and on direct appeal.  *Outten II*, 1997 WL 855718, at *76 n.188.  For the remainder of this opinion, any reference to Outten's trial counsel means both attorneys unless the context requires otherwise.

The State then presented evidence of Outten's past criminal history. That evidence included: a house burglary conviction; seven convictions for non-violent crimes including forgery, issuance of a bad check, misdemeanor theft, felony theft, and criminal impersonation; his family court record; and his probation violations.

Thereafter, Outten presented his mitigation case to the jury.[3] He called as witnesses his mother (Carol Outten), two

---

[3]Nelson Shelton presented no evidence in mitigation. He was sentenced to death, waived all appeals and/or post-conviction remedies, and was executed on March 17, 1995. Steven Shelton, after extensive colloquies with the trial court, presented only limited evidence in mitigation. In allocution (here, speaking directly to the jury), Steven stated:

> Ladies and gentlemen of the jury, I stand before you not to plead for my life. I feel that's wrong and improper and basically disrespectful to the victim's family and to mine. The State has painted a picture, and that picture is not very pretty, pertaining to me and my co-defendants. And I would just like to present to the jury a different side or a different meaning to Steven Shelton. The State has pictured me as being a monster, as being a rapist, as being a violent individual, but as you heard from my family, that's not so. The State only presents one side of

7

sisters (Robin Outten and Amanda Hart), brother (John Outten), friend (Ruperto Sanchez), and a former girlfriend and the mother of two of his children (Karen Julian).

Outten's mother testified first. She described Outten's relationship with his father, Foster Outten, as his father was dying of cancer. *Outten II*, 1997 WL 855718, at *21. According to Mrs. Outten, Outten had stayed in his parents' home in order to care for his father for the last two years of his life. *Id*. He continued to assist his father even when he was completely bed-ridden. *Id*. Mrs. Outten depicted her husband as a "very strict" man who "punished [the] children as he saw fit." *Id*. She indicated that Outten had "started off in school okay but got into truancy trouble," and only made it to the eleventh grade. *Id*. Mrs. Outten also discussed her son's criminal history, including his prior convictions for assault. On cross-examination, she confirmed that Outten had physically

---

the picture. There's two sides to every story. And the State just presents a negative side. The jury has found me guilty of these allegations, and now it's the jury's turn to render a verdict. And that verdict is either life in jail or death. Again, I'm not here to plead for my life, but just ask the jury to be fair in their decisions. That's all I have to say.

*Outten II*, 1997 WL 855718, at *25–26.

8

attacked his sister Amanda.  *Id*.

Outten's sister Robin testified next.  She also explained that Outten had cared for his father toward the end of his life. *Id*.  She stated that "Outten was very upset by his father's death and cried like she had never seen before."  *Id*.  Robin told the jury that Outten had a child with Karen Julian in 1991, but the baby had died shortly after birth.  *Id*.  "[T]his too," she said, "was most upsetting to Outten."  *Id*.  On cross-examination, Robin admitted that she had accrued "theft and misdemeanor convictions," and that those crimes "also involv[ed] Outten." *Id*.

Ruperto Sanchez, a family friend, testified that he observed "Outten being upset when his baby died."  *Id*.  He also "mentioned the good relationship Outten had with his father." *Id*.  On cross-examination, Sanchez stated that he had been convicted in 1991 of a misdemeanor offense involving both Robin and Outten.  *Id*.

Amanda Hart, another of Outten's sisters, then testified. "She described . . . [a physical altercation that occurred] in 1989 between Outten and [Karen] Julian."  *Id*.  According to Hart, Outten punched her in the eye when she attempted to intercede. *Id*.  An affidavit of probable cause signed by Hart and introduced by the prosecution on cross-examination indicated that Outten had caused damage to her residence as well.  *Id*. Hart stated that there were times that she and Outten had lived

9

together.  During those times, Outten was "helpful to her and others," and treated her infant children well.  *Id.* at *22.  She also discussed "how Outten took care of his father in the last years of his illness."  *Id*.

Karen Julian then took the stand.  She and Outten had lived together for about four-and-a-half years prior to his arrest for the underlying offense.  *Id*.  According to Julian, Outten had been working as a roofer, but had been laid off four to six weeks before the murder.  *Id*.  She also "told the jury that Outten had not completed an alcoholic rehabilitation program because he would not give the names of others who had broken some rules."  *Id*.

Outten's final witness was his older brother, John.  He testified that "[t]heir father became blind in one eye and suffered a speech impediment as a result of [a] mugging" that occurred in 1974.  *Id*.  John also told the jury that "Outten seemed to suffer the worst from their father's frustration" with his impaired condition.  *Id*.  It was John's opinion that his brother's relationship with their father "caused Outten to start stealing."  *Id*.

Outten also spoke directly to the jury in allocution.  He described his family as "close-knit," but did state that he had been "semi-abused."  *Id*.  According to Outten, "his father 'chastened' him, making him run away."  *Id*.  Outten also reviewed his extensive criminal record, characterizing himself

as "mischievous." *Id*. He "pointed out to the jury that his convictions were for non-violent offenses, such as forgery, theft and criminal mischief." *Id*. Outten described himself as a "kleptomaniac" and admitted that he drank alcohol and took drugs. *Id*. He explained that he "had a regular roofing job and started his own company," but "[h]e stole . . . to buy tools needed for [his] work." *Id*. In closing, Outten told the jury that he was caring, sharing, loving and honest—not cold, calculating, ruthless or heartless. *Id*. at *23. It was his opinion that "his good qualities outweighed the bad." *Id*.

Beyond the above recounted testimony, trial counsel did not introduce at the sentencing hearing any additional mitigating evidence or documents (*i.e.*, child protective service records, mental health records, school records). Nor is there any indication that Outten's extensive social or psychiatric history was presented comprehensively by an expert, family member or counsel.

In his closing, the prosecutor remarked:

Another thing that judges, for me, the importance of what you do and what this all means is the remorse that has been shown in this case in the words of Jack Outten in allocution and Steven Shelton in allocution. And they told you or paid lip service that they had concerns for the families of the victim, but what did you hear about their

11

> remorse for their acts?  What did you hear about
> that concern for the families of the victim whose
> life was taken innocently, without any wrong that
> he caused any of these individuals?

*Id*. at *45.  Outten's counsel did not object to these comments.

Consistent with the state death penalty statute in effect at the time of the sentencing hearing, 11 Del. C. § 4209, the jury unanimously found beyond a reasonable doubt the existence of three aggravating factors: (1) the murder was committed during a robbery, *id*. § 4209(e)(1)(j), (2) a motive for the murder was pecuniary gain,[4] *id*. § 4209(e)(1)(o), and (3) the victim was over sixty-two years old, *id*. § 4209(e)(1)(r).  Moreover, by a vote of seven to five, the jury found by a preponderance of the evidence that the aggravating circumstances outweighed the mitigating circumstances presented by Outten.  As a result, the jury recommended a sentence of death.

In sentencing Outten, the trial judge acknowledged that he had proposed four factors in mitigation: Outten's age, his lack of violent felonies, his family status, and his amenability to lesser sanctions than death.  According to the judge, Outten's relative youth (he was thirty) was diminished by his extensive

---

[4]Interestingly, Mannon had no money with him at the time of the murder but he was wearing the rings found in Nelson Shelton's possession on the morning of January 12, 2003.

appearances in the criminal justice system.   The judge also concluded that Outten's long-standing substance abuse problem and the evidence of alcohol consumption on the evening of the murder were diminished as mitigation by his failure to complete substance abuse programs.   The judge did recognize that the father's disability, alcohol abuse, and strictness had a negative effect on Outten.   Ultimately, however, the judge independently concluded that the aggravating circumstances outweighed the mitigating circumstances and, on April 30, 1993, sentenced Outten to death for the murder of Mannon.   (The jury also found, by a vote of eight to four, that aggravating circumstances outweighed the mitigating circumstances presented by Steven Shelton.   The judge independently agreed with the jury's recommendation,  sentencing him to death as well.)

### C.        Outten's Direct Automatic Appeal

Pursuant to 11 Del. C. § 4209(g), an automatic appeal was taken to the Delaware Supreme Court.  On appeal, Outten argued that (1) the Superior Court erred by refusing to grant a severance of his trial from that of his co-defendants; (2) the State's use of a peremptory challenge to strike an African-American juror from the jury violated *Batson v. Kentucky*, 476 U.S. 79 (1986); and (3) the Superior Court erred by not allowing him to introduce extrinsic evidence in support of the credibility of one of his witnesses at trial.  *Outten v. State*, 650 A.2d 1291, 1293 (Del. 1994) (*Outten I*).  The Delaware Supreme Court rejected each of Outten's claims and, accordingly, affirmed his

13

conviction and sentence.  *Id*. at 1298–1300, 1301–02.

## D.      *Outten's State Post-Conviction Proceedings*

Outten next filed an amended motion for post-conviction relief in the Delaware Superior Court, arguing that his counsel was ineffective during both the guilt and penalty phases of his trial proceedings.  He specifically contended that counsel erred by failing to (1) conduct an adequate pre-trial investigation, (2) move for severance of his guilt phase from that of his co-defendants, (3) provide proper advice concerning his right to take the witness stand, (4) move for severance of his penalty phase from that of his co-defendants, (5) adequately investigate and prepare mitigating evidence, and (6) move for a new trial.  *Outten II*, 1997 WL 855718, at *76.

Outten requested an evidentiary hearing on his post-conviction claims.  *Id*. at *26.  The Superior Court ruled that an expansion of the trial record was necessary for it to adequately address the issues presented.[5]  *Id*.  Thus, "Outten's counsel was asked to respond in affidavit form to a series of Court questions."  *Id*.  Those questions concerned the following subjects:

---

[5]According to the Superior Court, this was so because "[t]he contentions raised against Outten's trial counsel implicated decisions they made and reasons for those decisions which were not in the trial record."  *Outten II*, 1997 WL 855718, at *26.

14

(1) the list of witnesses for the penalty hearing that petitioner alleges was given to counsel and not investigated, discussions about such witnesses with petitioner, and decisions made by counsel about which witnesses to produce; (2) the efforts, if any, to investigate petitioner's court and school records; (3) any decision made by counsel on how to present petitioner at the penalty hearing; (4) whether there was a conscious decision to sever the penalty hearing [from that of the Sheltons]; (5) whether advice was given to petitioner not to testify during the guilt phase; (6) the substance of petitioner's testimony had he elected to testify; (7) whether counsel was aware of petitioner's telephone call from the bar to his girlfriend the night of the murder; (8) whether counsel had discussed petitioner's relationship with his father beyond the last year of his father's life; (9) whether there was a conscious decision not to have a psychiatric examination of petitioner for use during the penalty hearing; (10) what role petitioner took in any of the above decisions; (11) the reasons counsel did not join in Nelson Shelton's motion to sever the guilt phase [from the penalty hearing]; and (12) whether counsel was aware that petitioner cashed a check on the night of the murder at a location other than the one testified to by Gibbons.

15

*Outten IV*, 2004 U.S. Dist. LEXIS 5546, at *25–26. Outten's trial counsel jointly responded by affidavit as directed. *Id*. at *26. Outten and the State, respectively, filed answers to that affidavit. *Id*. After reviewing those newly submitted materials, the Superior Court concluded that an evidentiary hearing was unwarranted. *Outten II*, 1997 WL 855718, at *26. It also denied Outten's amended motion for post-conviction relief. *Id*. at *92.

Outten appealed to the Delaware Supreme Court the ruling of the Superior Court, contending, *inter alia*, that it erred by not holding an evidentiary hearing. *Outten v. State*, 720 A.2d 547, 551 (Del. 1998) (*Outten III*). He also argued that the Superior Court abused its discretion in denying his post-conviction claims of ineffective assistance of counsel. *Id*. at 551–58. The Supreme Court of Delaware disagreed, and affirmed the denial of Outten's request for post-conviction relief. *Id.* at 558. The Superior Court reinstated his death sentence and set the date of execution for March 18, 1999.

### E.    *Outten's District Court Habeas Proceedings*

On December 28, 1998, Outten filed in the United States District Court for the District of Delaware a 28 U.S.C. § 2254 *pro se* petition for a writ of *habeas corpus*, a 28 U.S.C. § 2251 motion to stay the state court proceedings, and a motion to proceed *in forma pauperis*. *Outten IV*, 2004 U.S. Dist. LEXIS 5546, at *2. The Court granted a stay of execution and the

16

motion to proceed *in forma pauperis*. *Id*. It also entered an order appointing counsel and setting a schedule to file an amended petition. *Id*.

In October 1999, Outten filed his first amended *habeas* petition to clarify his grounds for relief. *Id*. at *2–3. He also filed a motion to supplement the record with the expert report of a post-conviction mitigation specialist, Lori James-Monroe, and a motion for an evidentiary hearing on his ineffective assistance of counsel claims during both the guilt and penalty stages of the trial proceedings. *Id*. at *3.

In August 2000, Outten filed his second amended *habeas* petition. He also motioned the Court for an evidentiary hearing to expand the record as to "(1) claims relating to [Gibbons]; (2) a claim relating to trial counsel's failure to present a coherent case of mitigation at sentencing; and (3) a claim relating to [Outten's] allocution at sentencing." *Id*. at *3–4. The District Court held a limited hearing on Outten's guilt phase issues, but refused to allow him to cross-examine trial counsel concerning their efforts to prepare for, investigate, and present a case in mitigation at sentencing. *Id*. at *4. It did, however, allow Outten to supplement the record with documents retrieved by James-Monroe and noted below.

James-Monroe is a University of Maryland-trained social worker who specializes in forensic matters, including mitigation in capital cases, and other mental health and psycho-social

17

stresses.  In preparing her expert report, she interviewed Outten, his mother (Carol Outten), his wife (Kathryn Outten), his sisters (Robin Outten and Amanda Hart), his brother (John Outten), his friends (Debbie Coryell, Mary Owens, Kathy Belford, Karen Julian), and a Delaware Division of Child Protective Services employee (George Plerhopoles).  She also examined the following documents: Outten's first amended petition for *habeas* review, the psychiatric report of Dr. John O'Brien, III, William Penn High School records, Child Protective Service records, Governor Bacon Mental Health Center records, Delaware Correctional Center records, Family Court records, and the transcript of trial counsel's mitigation presentation to the jury on March 2, 1993.

In connection with the last item, James-Monroe opined that, "[i]n her professional opinion, no mitigation theme was prepared and only 'sketchy' family dynamics were introduced in the way of testimony.  There was no extensive personal history presented by an expert, family member or counsel."  James-Monroe Report, App. at 170.  She also uncovered "[t]he following mitigation information [that] was not reported during the original penalty phase, although readily available with minimal investigation efforts."  *Id.* at 176.

### Family Issues

•     Outten was reared by his parents, Carol and Foster Outten.  Outten's deceased father, Foster,

18

was "abusive and scary."  According to Carol, Foster "physically abused her from the time they met in 1962, until approximately 1973."  "[H]is physical assaults on her transferred to the children and everyone in the home felt the emotional abuse."  He "would control everyone through his violent rages brought on by drinking."  Carol explained "that she wanted to leave him or at least call the police, but he threatened on many occasions to kill her and the children."

• According to Carol, she

typically worked the 4 p.m. – 12 a.m. shift at the [P]ost [O]ffice.  Therefore, the children were left in the care of their father until she arrived home.  Many times [when she arrived] she found the children in corners of the home afraid to move . . . . [M]any times the children would have been there all day and gone without food or completing their homework.

She recalled that on one occasion [Outten's sister] Amanda had a "black and blue" bruise on her forehead from falling asleep in the corner.  Carol stated that Foster implemented this practice because he did not want to "be bothered by the

19

children while he drank and watched television."

- Carol would often

    gather the children and leave their home
    after one of her husband's rages or abusive
    actions.  Many times they did not have
    anywhere to go and would walk the streets
    or seek shelter in an abandoned home or
    apartment lobby.  They would return home
    hours later, hoping that Foster had "passed
    out from drinking."

- "Each Outten child has stories concerning the
    rage of their [sic] father and their [sic] mother's
    inability to protect them."  For instance, Outten
    "recalled an incident when the children and Mrs.
    Outten returned from an outing.  Foster
    immediately grabbed John [Outten's brother] and
    began choking him.  Foster exclaimed, 'you left
    the dog tied up, I am going to show you how it
    feels to choke to death.'"  When James-Monroe
    questioned John concerning this event, "he
    immediately began to sob."  After he stopped
    crying he stated:

    Dad said[,] "I want you to feel what the
    dog felt."  He was choking me so hard.

> Mom tried to stop him.  He was drunk and had a bottle of rum sticking out of his pocket.  I fell to the floor and I think I was unconscious for a little while.  I'm not sure [who] called the police, but I remember we went to [F]amily [C]ourt because of this incident.  They were going to lock my father up for maybe two years.  After hearing that my mother dropped the charges.  I left home after that.

- In 1974, Foster was attacked and mugged and, as a result of those injuries, was diagnosed with aphasia—an acquired disorder caused by brain damage that affects an individual's ability to communicate.

> Not being able to function as he did in the past caused Foster . . . to become more aggressive and abusive.  In addition, he became depressed and his drinking increased.  The depressed moods coupled with intensified drinking led to . . . suicidal ideation and suicide attempts.  Many times the children would find him [o]n the floor passed out from taking an overdose of his medication or after slitting his wrist . . . .  The family felt helpless, hopeless and

21

guilty, while resenting and being angered by his abuse.

- Outten has one brother, John, and two sisters, Amanda and Robin. Each has suffered from alcoholism and/or drug addiction. None of the children completed high school.

- Outten has fathered three children, Crystal, Foster Jack, and Shane. "He maintains contact with his daughter through letter writing." Foster Jack and Shane are from the union of Outten and Karen Julian. Shane resides in Pennsylvania and Foster Jack is deceased.

### Neurologic Issues

- During her investigation, James-Monroe discovered that, while pregnant with her children, Carol drank regularly. "This is through her own admission." In addition to regular drinking, Foster physically and mentally abused her. The physical abuse included "body blows and punches [to] her body and face." According to James-Monroe, "[a]lcohol consumption during pregnancy coupled with physical abuse . . . have detrimental and long lasting effects on unborn children."

22

- Outten suffered two head trauma injuries as a child.  During the first incident, Outten's mother pushed him into the side of a porcelain tub, causing him to strike his head and, as a result, lose consciousness.  The second incident, which also resulted in a loss of consciousness and required medical attention, occurred when he was struck in the head with a wrench.

## School Performance

- Outten's school records indicated that he was initially placed in a class for the learning disabled in 1976 at the age of ten.  "It is documented that this referral was necessary due to his hyperactivity and intellectual ability.  In the eighth grade, . . . Outten was reading on a third grade level."  A 1980 evaluation stated:

> Jack is currently functioning at a low average level of intelligence.  The difference between his verbal I.Q. part of the test and the performance section was significantly favoring the latter. . . . [His] [p]oorest score (retarded level) was obtained in the area of concentration.

- Dr. David Pearl, a school psychologist who

23

evaluated Outten, noted the following in 1982:

> [Jack] was restless, moved his legs back and forth, had difficulty maintaining eye contact and gave the general impression that his problems were "none of my business." He did mention that he had been on medication for hyperactivity but had stopped taking the pills about a year ago. He also noted that he had difficulty relating to his father, [and] was frequently physically abused by him . . . . Jack made only cursory attempts to complete the House-Tree-Person drawings and the [s]entence completion test. His drawings were very small and located at the very top of the page on the left hand side[,] which is indicative of a restricted personality, frustrated in his attempts to attain goals which seem unattainable.

• After numerous foster care and treatment facility placements, Outten withdrew from school in the eleventh grade and never graduated from high school.

**Psychological Issues**

24

- Outten was a victim of violence.  Specifically, he

    was the victim of childhood abuse at the hands of his father.  According to Outten, Mr. Plerhopoles [Divison of Family Services staff], and family friends, Outten's father . . . was an alcoholic who constantly controlled his family with physical and emotional abuse . . . .  Outten suffered and ran away from home at the age of sixteen.  After running away, he was taken in by [a foster] family.

- After Outten ran away from home, a series of events ensued.  He continued to stay with the [foster] family.    James-Monroe notes that, "[w]hile being cared for by the [foster] family, [Outten's foster mother] began to have inappropriate sexual contact with . . . [him]." According to Outten, she "initiated the contact by placing his hand on her breast.  She coerced the sixteen-year-old to perform oral sex and fondle her." [Outten's foster father] discovered this and, in July 1982, asked that Outten be removed from his home.

- Outten was then placed in the Franklin Street Shelter for run-away children, where he remained

25

for five days before the staff asked that he be
removed.  He was then sent to Camelot Group
Home, a facility for troubled children.  By August
1982, he was committed to the Governor Bacon
Health Center.  According to Mr. Plerhopoles,
Governor Bacon had the public reputation of
being the "dumping ground for [children] that no
one wanted or knew what to do with."

• Outten was released from Governor Bacon and
returned home to his family in August 1983.
Representatives of Governor Bacon described him
as "depressed and hopeless," with "difficulty
expressing his feelings."

• Outten suffered two major losses in his life—the
death of his father and the death of his young son,
Jack Foster.  Outten's father died of bone cancer
in 1991.  Despite all of the abuse he suffered at
the hands of his father, Outten cared for Foster
entirely during the last six months of his life.
According to James-Monroe, "[i]t is not
uncommon for abused children and adult
survivors to develop attachments to those who
abuse and neglect them, relationships they will
strive to maintain even at the sacrifice of their
own well-being."  In July 1991, Outten fathered a
child with Karen Julian, Jack Foster.  The baby

26

only lived fourteen days before dying of many complications. According to the Outten family, "Julian was using illicit drugs during her pregnancy[,] which resulted in the non-development of certain of the child's organs."

**Substance Abuse**

•     Outten was a substance abuser. He

> admitted to the use of alcohol, amphetamines, marijuana, crack cocaine, LSD, and the intravenous use of powder cocaine. His immediate family [and friends] acknowledged this use. . . . Outten's drug use began at the age of 10 with 'sneaking' some of his father's liquor. In addition, he was able to drink with neighbors. . . . By the age of 14, he was smoking marijuana, which eventually led to intravenous cocaine use and late stages of alcoholism. . . . His substance abuse continued until the date of the underlying offense.

*Id*. at 176–81.

James-Monroe's report detailing the above-described

27

mitigation evidence not investigated or presented at sentencing notwithstanding, the District Court denied relief on all of the claims raised in Outten's § 2254 petition.  With respect to trial counsel's duty to investigate, the Court concluded that "trial counsel's overall defense strategy of portraying [Outten] as loving, caring, and non-violent," combined with the hope "that the jury would have reservations about [Outten's] involvement in the murder[,] . . . was [a] strategy choice . . . within the range of professionally reasonable judgment." *Outten IV*, 2004 U.S. Dist. LEXIS 5546, at *48–50.

Despite its denial of *habeas* relief, the District Court did grant a certificate of appealability as to three claims pertaining to Outten's sentencing: whether trial counsel were ineffective (1) in their investigation and presentation of mitigating evidence, (2) for failing to seek severance of Outten's penalty phase from that of the Shelton brothers, and (3) for failing to object to the prosecutor's comments concerning Outten's allocution to the jury.

## II.    Jurisdiction and Standard of Review

The District Court had jurisdiction over Outten's *habeas* petition under 28 U.S.C. § 2254.  We have jurisdiction over his appeal pursuant to 28 U.S.C. §§ 1291, 2253.  Because the District Court did not hold an evidentiary hearing on Outten's sentencing claims, we review its legal conclusions *de novo*. *Duncan v. Morton*, 256 F.3d 189, 196 (3d Cir. 2001).

28

Outten's petition for *habeas* relief from his state court sentence is governed by the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), 28 U.S.C. §§ 2241–2254. AEDPA circumscribes our consideration of Outten's claims; federal *habeas* relief will only be granted if the state court decision being challenged "was contrary to, or involved an unreasonable application of, clearly established federal law, as determined by the Supreme Court of the United States." 28 U.S.C. § 2254(d)(1). In *Williams v. Taylor*, 529 U.S. 362 (2000), the Supreme Court held that a state court decision is "contrary to" clearly established federal law if it (1) "contradicts the governing law set forth in [the Supreme] Court's cases" or (2) "confronts a set of facts that are materially indistinguishable from a decision of [the Supreme] Court and nevertheless arrives at a [different] result." *Id*. at 405–06. An "unreasonable application" of Supreme Court precedent occurs: (1) "if the state court identifies the correct governing legal rule from [the Supreme] Court's cases but unreasonably applies it to the facts of the particular state prisoner's case;" or (2) if it "either unreasonably extends a legal principle from [Supreme Court] precedent to a new context where it should not apply or unreasonably refuses to extend that principle to a new context where it should apply." *Id*. at 407.

Our review of Outten's claims under AEDPA is a two-step process that proceeds as follows. First, we "'identify the applicable Supreme Court precedent and determine whether it resolves . . . [Outten's] claim[s].'" *Hackett v. Price*, 381 F.3d

29

281, 287 (3d Cir. 2004) (quoting *Werts v. Vaughn*, 228 F.3d 178, 197 (3d Cir. 2000)); *see also Matteo v. Superintendent, SCI Albion*, 171 F.3d 877, 888 (3d Cir. 1999) (*en banc*). In performing this inquiry, "it is not sufficient for [Outten] to show merely that his interpretation of Supreme Court precedent is more plausible than the state court's; rather, [Outten] must demonstrate that Supreme Court precedent requires the contrary outcome." *Hackett*, 381 F.3d at 287 (quoting *Werts*, 228 F.3d at 197). "If we determine that the state court decision is not 'contrary to' the applicable Supreme Court precedent, then we are required to advance to the second step in the analysis—whether the state court decision was based on an 'unreasonable application of' Supreme Court precedent." *Werts*, 228 F.3d at 197 (quoting *Matteo*, 171 F.3d at 888). In doing so, "we are not authorized to grant *habeas corpus* relief simply because we disagree with the state court's decision or because we would have reached a different result if left to our own devices." *Id*. Instead, "the state court's application of Supreme Court precedent must have been objectively unreasonable," that is, "[t]he federal *habeas* court should not grant the petition unless the state court decision, evaluated objectively and on the merits, resulted in an outcome that cannot reasonably be justified under existing Supreme Court precedent." *Hackett*, 381 F.3d at 287 (internal quotations omitted).

## III.    Merits

### A.    *Applicable Supreme Court Precedent: Strickland*

### *v. Washington*

As instructed by *Williams*, we begin our analysis by identifying and discussing the applicable Supreme Court precedent. It is well-settled that "the legal principles that govern claims of ineffective assistance of counsel [were established by the familiar two-pronged test of] *Strickland v. Washington*, 466 U.S. 668 (1984)." *Wiggins v. Smith*, 539 U.S. 510, 521 (2003). It is also "past question that . . . *Strickland* qualifies as 'clearly established [f]ederal law, as determined by the Supreme Court of the United States.'" *Williams*, 529 U.S. at 391.

Under the first prong of *Strickland*, a petitioner must show that trial counsel's performance was deficient. *Strickland*, 466 U.S. at 687. The proper standard for attorney performance is that of "reasonably effective assistance," as defined by "*prevailing professional norms*." *Id*. at 687–88 (emphasis added). In other words, Outten must establish that counsel's representation fell below an objective standard of reasonableness. *Id*. Moreover, counsel's reasonableness must be assessed on the facts of the particular case, viewed as of the time of counsel's conduct. *Id*. at 689.

*Strickland*'s second prong requires a petitioner to show that "the deficient performance prejudiced the defense." *Id*. at 687. The prejudice component requires Outten to demonstrate "that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have

31

been different." *Id*. at 694.

## B.    *Failure to Investigate*

The first category of Outten's ineffective assistance of counsel challenges relates to his trial attorneys' investigation and preparation for the sentencing hearing after his conviction. Outten's primary argument is that his attorneys failed adequately to investigate potentially mitigating evidence, especially the effect of his troubled personal and psychiatric background. He also contends that his attorneys' proffered strategy—to reargue his innocence at sentencing—was legally impermissible, and thus no strategy whatsoever. The Delaware Supreme Court determined that Outten could not show that counsel's performance was deficient. *Outten III*, 720 A.2d at 553.

### 1.    <u>Was Counsel's Limited Investigation Reasonable?</u>

In accord with our two-pronged inquiry, we consider whether counsel's investigation was reasonable. According to the trial counsel's joint affidavit, submitted in response to the written interrogatories posed by the Delaware Superior Court, preparations for Outten's penalty-phase hearing began approximately one month prior to the guilt-phase proceedings. *See* Trial Counsel Aff., App. at 158.  Counsel conceded that their investigation was cursory, as it consisted simply of a letter to Outten asking him to provide "the names of potential penalty

32

phase witnesses." *Id*. Nothing else was done by way of investigation except for the conduct of limited discussions with Outten and his mother. *See id*. at 159 (stating that "[a]fter discussing with Mr. Outten his school history[,] . . . we confirmed his assessment with his mother and it was determined that nothing in his school background would be helpful to . . . [Outten] in either the guilt or penalty phases of the [t]rial. As a result of our discussions *it was determined no[t] to investigate the records.*" (emphasis added)); *see also id*. at 160 (explaining that, "as indicated previously[,] based upon the information supplied by Mr. Outten and his mother[,] it was determined not to pursue the area of psychiatric or psychological disorders").

Trial counsel's affidavit also reveals that, much like their counterparts in *Strickland*, *Williams*, and *Wiggins*, Outten's attorneys "attempt[ed] to justify their limited investigation as reflecting a tactical judgment not to present mitigating evidence at sentencing and to pursue an alternative strategy instead." *Wiggins*, 539 U.S. at 521 (rejecting the state's defense of counsel's decision to retry guilt at the sentencing phase); *Williams*, 529 U.S. at 373 ("reject[ing] the argument that counsel's failure to conduct an adequate investigation had been a strategic decision to rely almost entirely on the fact that Williams had voluntarily confessed"); *see also Strickland*, 466 U.S. at 673. Counsel here specifically viewed the defense strategy as an effort to convince the jury that "Outten was loving and generous, showing no signs of prior violent behavior," and thus incapable of murder.

33

> It was determined that we would present Jack to the [j]ury as a [y]oung man capable of a loving and caring existence. A man who had no history of violence. A man who was capable of holding a job and support[ing] a family. . . .
>
> It was determined that all negatives, abusive childhood, truancy and school problems would be counterproductive. The theme throughout the guilt phase and the penalty phase was to remain consistent, that is, Jack Outten did not commit the murder. It was determined that this could best be carried out by presenting Outten as we did.

Trial Counsel Aff., App. at 158. Trial counsel further stated that "[i]t is conceded that an expert could have been retained to develop a mental crutch (conclusion is reached based on experience)[;] however, it was determined that a consistent defense of not offering excuses for Outten's actions but *a continued denial was in his best interest*." *Id*. at 163 (emphasis added).

Simply stated, defense counsel's penalty-phase strategy was to argue to the jury—which had convicted Outten of murder unanimously and beyond a reasonable doubt—that he was a good guy and that his life should be spared because he was actually innocent. *See id*. at 159 (stating that "[i]t was

determined that we should stick with our original theory, *Jack was innocent*, as supported by his penalty phase witnesses" (emphasis added)); *id*. at 160 (explaining that "[t]he determination was *to represent Jack as a party not involved in the murder* at the trial phase and to *maintain that position throughout the penalty phase* so as to retain credibility with the jury" (emphasis added)).

But in closing comments at the penalty phase, trial counsel did not carry through this tack. When trial counsel tried to pursue Outten's actual innocence argument explicitly, the prosecution objected and the trial court disallowed it, stating "[t]hat's improper argument[,] . . . rearguing the issue of guilty or not guilty." *See* App. at 126. Counsel responded, "I'm not arguing the issue of guilty or not . . . . [Outten] was guilty." *Id*. When counsel again attempted to discuss "the testimony or evidence that [Outten] didn't do it," the trial judge unequivocally instructed that there was to be no further presentation of that issue. *Id*.

Ultimately, the innocence strategy was abandoned in closing. Counsel stated that it "wasn't too difficult to decide" that Outten and his co-defendants were responsible for the victim's death. *Id*. at 121. He mentioned Outten's "horrendous record," and then stated, "We're not here to decide what he did in this particular case. He's guilty." *Id*. at 122. Counsel described Outten's family as "the other victims in this case." *Id.* at 125. He stated that "they're here because Jack Outten put

35

them here.  He didn't have to go to that bar that evening.  He could have stayed home."  *Id.*

Counsel also failed in closing to focus on the positive aspects of Outten's character.  While he did mention that Outten had no convictions for violent crimes, he did so by referring to Outten's "long criminal record," and stated that "Jack Outten was on the street for a long time committing crimes, but there's no history of violence."  *Id.* at 124.  Indeed, any contention that Outten was non-violent was substantially undermined by the cross-examination testimony elicited by the prosecution from various family members describing Outten's assaults on his sister Amanda, his ex-girlfriend Julian, and other individuals. There was no mention of Outten being loving and generous or that he was capable of holding down a job.  The jury was not reminded of Outten's caring for his dying father or helping his sister Amanda with child care.  "When viewed in this light, the 'strategic decision' the state courts and [counsel] . . . invoke to justify counsel's limited pursuit of mitigating evidence resembles more of a *post hoc* rationalization of counsel's conduct than an accurate description of their deliberations prior to sentencing."  *Wiggins*, 539 U.S. at 526–27; *see also id*. at 526 (stating that "[t]he record of the actual sentencing proceedings underscores the unreasonableness of counsel's conduct by suggesting that their failure to investigate thoroughly resulted from inattention, not reasoned strategic judgment").

Counsel made clear they neither acquired nor reviewed

36

readily available school and medical health records. *See Outten II*, 1997 WL 855718 at *86 (reiterating that "[i]t is undisputed trial counsel did not examine these records"). They also explained that their decision to refrain from such an investigation stemmed entirely from conversations with Outten and his mother. Thus, similar to the attorneys in *Wiggins*, 539 U.S. at 537–38 (holding that counsel's decision not to expand their investigation beyond the perusal of limited government records and the arrangement of psychological testing for their client was unreasonable), Outten's trial counsel acquired whatever "rudimentary knowledge" of Outten's background they did have from a "narrow set of sources," *id*. at 524.

We need to resolve whether this limited investigation from a "narrow set of sources" was reasonable. The Supreme Court has explained the deference owed to strategic decisions of counsel by reference to the scope of the investigations supporting those decisions:

> [S]trategic choices made after thorough investigation of law and facts relevant to plausible options are virtually unchallengeable; and strategic choices made after less than complete investigation are reasonable precisely to the extent that reasonable professional judgments support the limitations on investigation. In other words, counsel has a duty to make reasonable investigations or to make a reasonable decision

37

> that makes particular investigations unnecessary. In any ineffectiveness case, a particular decision not to investigate must be directly assessed for reasonableness in all the circumstances, applying a heavy measure of deference to counsel's judgments.

*Strickland*, 466 U.S. at 690–91.  Put another way, the question before us is not whether counsel should have introduced mitigating evidence of Outten's background.  It is "whether the investigation supporting counsel's decision not to introduce mitigating evidence of [Outten's] background was *itself reasonable*." *Wiggins*, 539 U.S. at 511 (emphasis in original). Reasonableness in this context is assessed by looking to "[p]revailing norms of practice as reflected in [the] American Bar Association standards." *Strickland*, 466 U.S. at 688; *see also Rompilla v. Beard*, 545 U.S. 374, 375 (2005) (explaining that the Court has long "referred [to the ABA Standards for Criminal Justice] as guides to determining what is reasonable" (internal quotations omitted)); *Wiggins*, 539 U.S. at 522 (stating that "[i]n highlighting counsel's duty to investigate," the Court "refer[s] to the ABA Standards for Criminal Justice as guides"); *Marshall v. Cathel*, 428 F.3d 452, 463 (3d Cir. 2005) ("An attorney's duty to investigate is itself judged under a reasonableness standard based on 'prevailing professional norms[,]' such as those found in the ABA Standards for Criminal Justice.").

38

In 1989, four years prior to Outten's penalty-phase hearing, the ABA promulgated guidelines for defense attorneys in capital cases. *See* American Bar Association Guidelines for the Appointment and Performance of Counsel in Death Penalty Cases (1989) ("ABA Guidelines"). "Those Guidelines applied the clear requirements for investigation set forth in the earlier Standards to death penalty cases and imposed . . . similarly forceful directive[s]." *Rompilla*, 545 U.S. at 376 n.7. Concerning penalty-phase preparation and investigation, the Guidelines provide:

> A.   Counsel should conduct independent investigations relating to the guilt/innocence phase and to the penalty phase of a capital trial. Both investigations should begin immediately upon counsel's entry into the case and should be pursued expeditiously.
>
> . . .
>
> C.   The investigation for preparation of the sentencing phase should be conducted regardless of any initial assertion by the client that mitigation is not to be offered. *This investigation should comprise*

> *efforts to discover all reasonably*
> *available mitigating evidence and*
> *evidence to rebut any aggravating*
> *evidence that may be introduced by*
> *the prosecutor.*

ABA Guideline 11.4.1 (1989) (emphasis added). Counsel should explore, *inter alia*, "medical history," "family and social history," "educational history," "special educational needs," "employment and training history," "prior adult and juvenile records," and "prior correctional experience." ABA Guideline 11.4.1(D)(2)(C). The ABA Guidelines go on to explain that

> [t]he need for a standard mandating investigation for the sentencing phase is underscored by cases in which counsel failed to recognize the importance of this aspect of death penalty litigation. Inexperienced counsel — and even counsel experienced in non-capital cases — "may underestimate the importance of developing meaningful sources of mitigating evidence . . ." *See* Guideline 11.8 and commentary.

> Counsel's duty to investigate is not negated by the expressed desires of a client. Nor may counsel "sit idly by, thinking that the investigation would be futile." The attorney *must* first evaluate the potential avenues of action and then advise the

40

client on the merits of each. *Without investigation, counsel's evaluation and advice amount to little more than a guess.*

ABA Guideline 11.4.1, commentary (1989) (internal footnote omitted) (emphasis added); *see also* 1 ABA Standards for Criminal Justice 4–4.1, commentary (2d ed. 1982) (stating "[t]he lawyer . . . has a substantial and important role to perform in raising mitigating factors both to the prosecutor initially and to the court at sentencing . . . . Investigation is essential to fulfillment of these functions.").

"Despite these well-defined norms, however, counsel [here] abandoned their investigation of [Outten's] background after having acquired only rudimentary knowledge of his history from a narrow set of sources." *Wiggins*, 539 U.S. at 524. It was standard practice at the time of Outten's trial for a death-eligible defendant's penalty-phase investigation to include his medical history, educational history, family and social history, employment history, and adult and juvenile correctional records. Counsel's investigation, however, was limited solely to conversations with Outten and his mother—a woman who, as demonstrated by the unreviewed-by-counsel records, had not "shown great[] continued interest in [her son]." *See* Report of James-Monroe, App. at 180. We conclude that this effort fell well short of the national prevailing professional standards articulated by the American Bar Association and was, therefore, unreasonable. *See Wiggins*, 539 U.S. at 524 (holding that

41

counsel's decision not to expand their investigation to petitioner's life history, beyond review of a presentence report and social service records, failed to meet the prevailing standards of attorney conduct).

Counsel's cursory investigation was also unreasonable in light of what they presumably discovered from the conversations with Outten and his mother prior to sentencing: Outten's father was an abusive alcoholic; Outten had struggled in school and ultimately failed to graduate; he had run away from home; and he had a history of substance abuse.[6]  *Id*. at 527 (explaining that courts must consider whether the evidence known to counsel "would lead a reasonable attorney to investigate further").

---

[6]The record does not reflect the content of counsel's conversations in this regard.  We presume that counsel discovered information concerning Outten's abusive father, struggles in school, and substance abuse during their conversations with Outten and his mother because they testified as to those facts on direct examination during the sentencing proceedings.  Moreover, in their affidavit, trial counsel noted that, prior to sentencing, they "determined that all negatives, abusive childhood, truancy and school problems would be counterproductive." Trial Counsel Aff., App. at 158.  Because counsel limited their sentencing investigation exclusively to Outten and his mother, either Outten or his mother—or both—must have been the source of counsel's information on those "negatives."  In any event, counsel acknowledge that they were aware of the abuse and school problems.

"[A]ny reasonably competent attorney would have realized that pursuing those leads was necessary to make an informed choice among possible [sentencing strategies]." *Id*. at 525. "Indeed, counsel uncovered no evidence in their investigation to suggest that a mitigation case, in its own right, would have been counterproductive, or that further investigation would have been fruitless . . . ." *Id*. Moreover, as in *Wiggins*, "[h]ad counsel investigated further [here], they might well have discovered the sexual abuse [Outten suffered at the hands of his foster mother] revealed during . . . postconviction proceedings." *Id*.

As noted above, the prevailing professional norms for capital cases at the time of Outten's trial instructed defense counsel "*to discover all reasonably available mitigating evidence and evidence to rebut any aggravating evidence that may be introduced by the prosecutor*." ABA Guideline 11.4.1 (emphasis added). Given the minimal investigation conducted here, trial counsel's evaluation of which defense strategy to pursue "amounted to little more than a[n] [uninformed] guess." *Id*.; *see also Wiggins*, 539 U.S. at 527. Simply stated, failing to present possibly mitigating evidence cannot be justified when counsel have not "fulfill[ed] their obligation to conduct a thorough investigation of the defendant's background." *Williams*, 529 U.S. at 396 (citing 1 ABA Standards for Criminal Justice 4–4.1, commentary). Accordingly, we hold the Delaware Supreme Court's 1998 ruling in *Outten III*—that the limited scope of trial counsel's investigation was adequate under the prevailing norms of professional conduct at the time of

43

Outten's trial—was an objectively unreasonable application of the first prong of the *Strickland* inquiry.

2.      Was Counsel's Unreasonable Investigation Prejudicial?

Because trial counsel's failure to investigate Outten's background was unreasonable, we proceed to whether that error was prejudicial—that is, whether "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland*, 466 U.S. at 694. "A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Id*. "In assessing prejudice, we reweigh the evidence in aggravation against the totality of available mitigating evidence." *Wiggins*, 539 U.S. at 534.

The James-Monroe report shows substantial evidence in mitigation that counsel failed to investigate and present at sentencing.     In particular, Outten experienced severe mistreatment as a child from his "abusive and scary" alcoholic father.   James-Monroe Report, App. at 176.   Outten's father physically assaulted and emotionally tormented his wife and children routinely, even "threaten[ing] on many occasions to kill [them]." *Id*.   When Mrs. Outten returned home from work, she often found the children huddled in a corner, afraid to move. *Id*. at 177.   "[M]any times the children would have been there all day and gone without food or completing their homework." *Id*.

44

Frequently, Mrs. Outten and her children were forced to "walk the streets or seek shelter in an abandoned home or apartment lobby" in order to avoid Mr. Outten's "rages or abusive actions." *Id*.

Outten's brother John related an incident where, because he had left the dog tied up, his father choked him to the point of unconsciousness so that he would know "how it feels to choke to death." *Id*. As Mr. Outten physically deteriorated, he became suicidal and often the children would find him passed out, having overdosed on medication and/or slit his wrists. *Id*. "Each of the Outten children has stories concerning the rage of their father and their mother's inability to protect them." *Id*. Neither Outten nor any of his siblings completed high school. *Id*. at 178. Moreover, they all suffered from alcoholism and/or drug addiction. *Id*. at 177–78.

In addition to the considerable evidence of child abuse, James-Monroe discovered "easily accessible" documented evidence of neurological damage, poor school performance, low IQ, learning disabilities, placement in foster homes, sexual abuse, and substance abuse. *Id*. at 176–81. Even a superficial investigation into Outten's school records reveals that he functioned during his developmental years at a below-average level of intelligence and, specifically, at a retarded level in the area of concentration. *Id*. at 180. Outten "thus has the kind of troubled history we have declared relevant to assessing a defendant's moral culpability." *Wiggins*, 539 U.S. at 535; *see*

45

*also Penry v. Lynaugh*, 492 U.S. 302, 319 (1989) (stating that
"evidence about the defendant's background and character is
relevant because of the belief, long held by society, that
defendants who commit criminal acts that are attributable to a
disadvantaged background . . . may be less culpable than
defendants who have no such excuse").

The Delaware Supreme Court held that Outten's
allegations concerning the limited scope of counsel's
investigation of his background failed to satisfy the prejudice
prong of *Strickland*. *Outten III*, 720 A.2d at 553. We disagree.
The Court's conclusion was premised on evidence that "counsel
made some effort to discover whether there was any useful
information in Outten's school records," and that "information
regarding [Outten's] substance abuse problem, truancy trouble
in school, appearances in Family Court, criminal activity, and
abusive and alcoholic father came out in the testimony during
the penalty phase hearing." *Id*.

In another context, we have rejected expressly the
Pennsylvania Supreme Court's conclusion that the failure to
present additional mitigating evidence was not prejudicial
simply because the jury had some awareness of a petitioner's
childhood and mental illness:

> [T]he Commonwealth fails to appreciate the fact
> that the only evidence specifically pertaining to
> Jermyn's childhood abuse came from Reverend

46

Falk, whose testimony, to which we have already
alluded, was limited, equivocal, and misleading.
While the jury was clearly aware that Jermyn
claimed that he suffered a mental illness, the lack
of directed and specific testimony about Jermyn's
childhood and its impact on Jermyn's mental
illness left the jury's awareness incomplete. We
therefore do not agree with the Pennsylvania
Supreme Court's characterization that the
evidence that could have been presented would
simply "have provided the jury with more detailed
incidents of his childhood trauma and mental
illness." Rather, the testimony would have
provided the jury with an entirely different view
of Jermyn's life and childhood which would have
both aided in understanding the seriousness and
origin of his mental illness and provided an
understanding of Jermyn's relationship with the
deceased.

*Jermyn v. Horn*, 266 F.3d 257, 310–11 (3d Cir. 2001) (internal
footnote and citations omitted).

The same logic applies here. Simply because some
mitigating evidence regarding Outten's abusive childhood was
introduced to the jury—despite defense counsel's contrary
intentions, *see* Trial Counsel Aff., App. at 158 (stating that the
defense strategy was not to introduce any evidence of Outten's

47

"abusive childhood" or "school problems")—it does not follow that the jury was provided a comprehensive understanding of Outten's abusive relationship with his father or other aspects of his troubled childhood. For example, while Outten's mother portrayed her husband as a "very, very strict parent," she did not relate to the jury the disturbing abuse she later described to James-Monroe in detail. In any event, the jury heard nothing regarding Outten's sexual abuse in foster care, possible neurological damage, learning disabilities, or low IQ.

Here, "counsel chose to abandon their investigation at an unreasonable juncture, making a fully informed decision with respect to sentencing strategy impossible." *Wiggins*, 539 U.S. at 527–28. As we have already explained, the state court's ruling that the scope of counsel's investigation was adequate was an unreasonable application of *Strickland*. Thus, its subsequent deference to counsel's decision not to "pursue all lines of investigation," *Outten III*, 720 A.2d at 553 (internal quotations omitted), "despite the fact that counsel based this alleged choice on what we have made clear was an unreasonable investigation, was also objectively unreasonable." *Wiggins*, 539 U.S. at 528. This is because "strategic choices made after less than complete investigations are [only] reasonable . . . to the extent that reasonable professional judgments support the limitations on investigations." *Strickland*, 466 U.S. at 690–91.

The State counters that trial counsel would have proceeded with their "reasonable" strategy of presenting Outten

48

as kind, caring, and ultimately innocent, notwithstanding the mitigating evidence they failed to discover.  In *Wiggins*, the State of Maryland offered a similar contention, "maintaining that Wiggins' counsel would not have altered their chosen strategy of focusing exclusively on Wiggins' direct responsibility for the murder."  539 U.S. at 536.  The Supreme Court flatly rejected this logic, explaining that

> counsel were not in a position to make a reasonable strategic choice as to whether to focus on Wiggins' direct responsibility, the sordid details of his life history, or both, because the investigation supporting their choice was unreasonable.

*Id*.  The same analysis applies here.  Counsel for Outten were not in a position to make a reasonable decision whether to focus on his innocence or positive characteristics, the details of his traumatic background, or both, as their investigation in preparation for sentencing was itself unreasonably deficient.

Moreover, as already discussed, counsel's presentation at sentencing hardly reflected their stated strategy.  The innocence argument was never presented to the jury because the trial judge disallowed it.  To make matters worse, counsel then did an "about face" by proclaiming to the jury in closing that "it wasn't too difficult to decide" that Outten had murdered Mannon.  To hammer home the point, counsel explicitly stated, "He's guilty."

49

Trial counsel's sentencing presentation also failed to focus on evidence indicating Outten's good character traits. As stated above, counsel did argue that Outten had no convictions for violent crimes, but he did so by referring to Outten's "long criminal record" and stated that "Jack Outten was on the street for a long time committing crimes, but there's no history of violence." In closing, counsel neglected to remind the jury that Outten was capable of holding down a job, had cared for his dying father, or had assisted his sister with child care. Worse yet, the contention that Outten was non-violent was considerably undermined by the cross-examination testimony of various family members describing Outten's physical attacks on his sister and ex-girlfriend—damaging testimony that could have been factored into trial counsel's strategic decision had counsel interviewed those witnesses prior to sentencing.

The State asserts, and we acknowledge, that not all of the evidence in the records counsel failed to investigate is favorable to Outten. This is nearly always the case. Indeed, the same was true of the evidence not investigated by counsel in *Williams*. There, the Supreme Court observed that "the failure to introduce the comparatively voluminous amount of evidence that did speak in Williams' favor was not justified by . . . [the] decision to focus on Williams' voluntary confession." *Williams*, 529 U.S. at 398. The same is true here; the failure to introduce considerable evidence that could have been helpful to Outten was not justified by counsel's belief, without an adequate investigation, that the net result of any investigation would be

50

negative.  In fact, much of the aggravating evidence in the records was either introduced or elicited on cross-examination by the State at sentencing.  The more important point here, however, is while it is true that trial counsel may not have introduced into evidence all of Outten's records at sentencing if they had procured them, the records most certainly would have informed counsel's preparation.  Moreover, given the jury's close vote in favor of death for Outten—7 to 5—counsel would have had the ability to argue a much broader range of mitigating factors than the four that were presented to the jury.[7]

In this context, we conclude that the Delaware Supreme Court unreasonably applied the second prong of *Strickland* in reaching the determination that Outten could not establish prejudice because Outten's records contained some harmful information.  *See Outten III*, 720 A.2d at 552 (approving the Superior Court's reasoning that Outten's " records contained both mitigating and aggravating information which, at best, cancel each other out . . . [; thus] trial counsel cannot be faulted for not investigating them [because,] in all likelihood, the

---

[7]For example, notwithstanding the emotional and physical abuse Outten suffered at the hands of his father, the record reflects that Outten forgave him and remained by his side during his final months of life.  In this context, it seems that revealing the severity of Mr. Outten's abuse of his children would have bolstered and complemented—rather than detracted from—the defense's portrait of Outten as caring and compassionate.

51

records would not have been used") (internal quotations omitted)). In effect, despite the fact that there was a wealth of readily accessible mitigating evidence here, the jury heard little of it. In evaluating the totality of the evidence, both introduced at trial and in the *habeas* proceedings, we conclude that "[h]ad the jury been able to place [Outten's] excruciating life history on the mitigating side of the scale, there is a reasonable probability that at least one juror [or more] would have struck a different balance." *Wiggins*, 539 U.S. at 537. Because the jury recommended death by the narrow margin of 7 to 5, persuading even one juror to vote for life imprisonment could have made all the difference. This without doubt satisfies *Strickland*'s prejudice prong.

*   *   *   *   *

For the reasons provided above, we hold that the state court's ruling that the limited scope of trial counsel's investigation did not constitute ineffective assistance of counsel was an objectively unreasonable application of *Strickland*. Because counsel's penalty-phase investigation was unreasonably deficient and prejudicial, Outten is entitled to *habeas* relief. We reverse and remand this case to the District Court with instructions to grant a provisional writ of *habeas corpus* directed to the penalty phase. Within 120 days of the judgment accompanying this opinion, the State of Delaware may conduct a new sentencing hearing in a manner consistent with this opinion or sentence Outten to life imprisonment.