# IN THE UNITED STATES DISTRICT COURT

# FOR THE DISTRICT OF DELAWARE

|                          |   |                          |
|--------------------------|---|--------------------------|
| **JACK FOSTER OUTTEN,**  | ) |                          |
|                          | ) |                          |
| Petitioner,              | ) |                          |
|                          | ) |                          |
|                          | ) | Civ. Act. No. 98-785-SLR |
|                          | ) |                          |
| **RICHARD KEARNEY, et al.,** | ) |                      |
|                          | ) |                          |
| Respondents.             | ) |                          |

## MOTION TO ENLARGE TIME FOR PENALTY HEARING

COME NOW the Respondents, Richard Kearney, et al., by and through undersigned

counsel, who move this Honorable Court to enlarge the time for the new penalty hearing to be

held in the instant matter. In support thereof, the Respondents submit the following:

1.    In February 1993, Jack Foster Outten was convicted jointly with Nelson and

Steven Shelton of two counts of First Degree Murder (intentional murder (DEL. CODE ANN. tit.

11, § 636(a)(1) and reckless felony murder (DEL. CODE ANN. tit. 11, § 636(a)(2)) and related

charges stemming from the killing of William Mannon. Following a penalty phase in March

1993, Outten received a death sentence. *Outten v. State*, 650 A.2d 1291 (Del. 1994).

2.    On September 26, 2006, the United States Court of Appeals for the Third Circuit

reversed this Court's denial of Outten's federal habeas petition. *Outten v. Kearney*, 464 F.3d 401

(3rd Cir. 2006). In turn, this Court granted Outten's habeas petition with respect to his death

sentence conditioned on the State of Delaware providing a new penalty hearing to Outten. *Outten*

*v. Kearney*, Civ. Act. No. 98-785-SLR (D. Del. Oct. 15, 2007) (Order) (Ex. A). This Court

further ordered that the new penalty hearing be conducted before June 2, 2008. *Id.*

3.      Upon return to the Delaware state courts, Outten filed a motion for post-conviction relief attacking his felony murder conviction under *Williams v. State,* 818 A.2d 906 (Del. 2002) and *Chao v. State,* 931 A.2d 1000 (Del. 2007).  The Superior Court entered an order dated January 9, 2008, vacating the felony murder conviction and subsequently denied the State's motion for reargument. (Exs. B and C).  The State filed an appeal of the Superior Court's decision with the Delaware Supreme Court on March 18, 2008.

4.      At present, however, there are several additional defense motions pending before the Superior Court for which, if relief were to be granted, either a new trial or penalty phase would be required.  Those motions include: a post-conviction motion attacking the validity of Outten's convictions (Ex. D); a motion to vacate Outten's robbery first degree conviction (Ex. E); a motion to strike non-statutory aggravators (Ex. F); and a motion to strike statutory aggravators. (Ex. G).  In the event of any decision adverse to the prosecution, the State has the ability to take an appeal as of right. *See* DEL. CODE. ANN. tit. 10, §§9902(a), (d).  Conversely, a decision denying Outten's motion to vacate his robbery conviction or denying his post-conviction motion is appealable. *Stevenson v. State,* 840 A.2d 594 (Del. 2003).  In order to allow the Superior Court to resolve these pending motions, the Delaware Supreme Court, on the State's motion, remanded the case to the Superior Court. *State v. Outten*, No. 142, 2008, Steele, C.J (Del. Supr. Apr. 14, 2008). (Ex. H).

5.      Because of the ongoing proceedings in the Superior Court, some of which will require that court to conduct an evidentiary hearing, there is no reasonable likelihood that Outten's penalty hearing can begin on or before June 2, 2008.  Further, the State's appeal of the Superior Court's decision vacating Outten's felony murder conviction must be resolved before any penalty hearing can begin, the prosecution needing to know the scope of its presentation at

the penalty hearing. In addition, any appeals stemming from the Superior Court's resolution of the various pending motions would likely be consolidated with the pending appeal filed by the prosecution. The pendency of these state appellate proceedings thus makes it virtually certain that Outten's penalty hearing can not begin by June 2, 2008.

     6.    In light of the foregoing, Respondents submit that an enlargement of time for the commencement of any penalty hearing is warranted.

STATE OF DELAWARE
DEPARTMENT OF JUSTICE

PAUL R. WALLACE (Bar No. 2926)
Chief of Appeals
Delaware Department of Justice
820 N. French Street, 7th Floor
Wilmington, Delaware 19801
(302)577-8500

DATE: April 16, 2008

## IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| **JACK FOSTER OUTTEN,** | ) | |
| | ) | |
| Petitioner, | ) | |
| | ) | |
| | ) | Civ. Act. No. 98-785-SLR |
| | ) | |
| **RICHARD KEARNEY, et al.,** | ) | |
| | ) | |
| Respondents. | ) | |

## STATEMENT OF COUNSEL PURSUANT TO LOCAL RULE 7.1.1

COMES NOW, Paul R. Wallace, Chief of Appeals, Counsel for Respondents, and

pursuant to D. Del. LR 7.1.1 does hereby make the following statement:

1. The undersigned has contacted Jennifer-Kate Aaronson, Esquire, Counsel for

Petitioner, and certifies that the instant Motion is unopposed.

STATE OF DELAWARE
DEPARTMENT OF JUSTICE

PAUL R. WALLACE (Bar No. 2926)
Chief of Appeals
Delaware Department of Justice
820 N. French Street, 7th Floor
Wilmington, Delaware 19801
(302)577-8500

DATE: April 16, 2008

**IN THE UNITED STATES DISTRICT COURT**

**FOR THE DISTRICT OF DELAWARE**

| | | |
|---|---|---|
| **JACK FOSTER OUTTEN,** | ) | |
| | ) | |
| Petitioner, | ) | |
| | ) | |
| | ) | Civ. Act. No. 98-785-SLR |
| | ) | |
| **RICHARD KEARNEY, et al.,** | ) | |
| | ) | |
| Respondents. | ) | |

**ORDER**

**WHEREAS,** the Respondents have submitted a Motion to Enlarge Time for Penalty Hearing;

**WHEREAS,** the Petitioner has consented to such enlargement of time; and

**WHEREAS,** there is good cause shown for the granting of such motion;

**IT IS HEREBY ORDERED** this _____ day of _____, 2008 that the time for the penalty hearing to be held in the instant matter case is enlarged;

**IT IS FURTHER ORDERED** that this Court shall withhold the setting of a new deadline for the conduct of a new penalty hearing until the issuance of a mandate by the Delaware Supreme Court its appeal No. 142, 2008, and any consolidated appeals.

By the Court:

_____
Sue L. Robinson
United States District Judge

**EXHIBIT A**

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF DELAWARE

JACK FOSTER OUTTEN,                    )
                                       )
            Petitioner,                )
                                       )
      v.                               )   Civ. No. 98-785-SLR
                                       )
RICHARD KEARNEY, et al.,               )
                                       )
            Respondent.                )

**O R D E R**

At Wilmington this    15th    day of October, pursuant to the mandate issued by
United States Court of Appeals for the Third Circuit on October 12, 2007,

IT IS ORDERED that:

1. Petitioner's writ of habeas corpus is granted with respect to petitioner's death
sentence conditioned on the State of Delaware's grant of a new sentencing hearing.

2. The State of Delaware shall conduct a new sentencing hearing before **June
2, 2008.**

_____
United States District Judge

**EXHIBIT B**

# IN THE SUPERIOR COURT OF THE STATE OF DELAWARE

## IN AND FOR NEW CASTLE COUNTY

| | | |
|---|---|---|
| STATE OF DELAWARE | ) | CRIMINAL ACTION NUMBERS |
| | ) | |
| v. | ) | IN-92-01-1144-R1 thru |
| | ) | IN-92-01-1148-R1 |
| JACK OUTTEN | ) | |
| | ) | ID NO. 92000786DI |

*Submitted: November 28, 2007*
*Decided: January 9, 2008*

### MEMORANDUM OPINION

*Upon Motion of the Defendant to*
*Vacate Felony Murder Conviction* **- GRANTED**

*Appearances:*

James B. Ropp, Esquire, and Ipek K. Medford, Esquire, Deputys Attorney General, Department of Justice, Wilmington, Delaware, attorney for State of Delaware

Jennifer-Kate Aaronson, Esquire, and Natalie S. Woloshin, Esquire, of Woloshin Lynch Natalie & Gagne, Wilmington, Delaware, attorney for defendant

HERLIHY, Judge

On February 24, 1993, defendant Jack Outten was convicted of murder first degree for the intentional killing of Wilson Mannon, Jr.[1] He was also convicted of murder first degree felony murder[2] in that, ". . . (he) did in the course of and in furtherance of the commission of a felony cause the death of Wilson Mannon, Jr., to wit: did beat him to death with a blunt object during the course of Robbery First Degree, as set forth in Count IV. . . ."[3] Outten was also convicted of robbery first degree (Count IV) in addition to other offenses.  On April 30, 1993, the Court sentenced him to death on each of the murder convictions.

All of the convictions have been upheld.[4]    While upholding his convictions, however, the Third Circuit in 2006 determined Outten had received ineffective assistance of counsel in the penalty hearing phase of these proceedings in 1993.[5]  It remanded the matter to this Court for a new penalty hearing currently scheduled for May 2008.  As originally remanded and scheduled that hearing was to determine the appropriate punishment, life imprisonment or death, for the two murder convictions.

---

[1] 11 *Del. C.* § 636(a)(1).

[2] 11 *Del. C.* § 636(a)(2).

[3] Indictment, Cr.A. No. IN-92-01-1145.

[4] *Outten v. State*, 650 A.2d 1291 (Del. 1994); *Outten v. State*, 720 A.2d 547 (Del. 1998); *Outten v. Snyder*, 2004 WL 4858384 (D.Del.); *Outten v. Kearney*, 464 F.3d 401 (3rd. Cir.  2006).

[5] *Outten v. Kearney*, Supra.

2

Outten now, however, asks this Court to vacate his felony murder conviction and the death sentence imposed for it. The basis of that request is straight forward. The Delaware Supreme Court in *Williams v. State*[6] revisited and reversed its prior interpretation of the "in furtherance of" language in the first degree felony murder statute. The statute under which Outten was prosecuted and convicted and which was re-interpreted in *Williams* read:

> (a)  A person is guilty of murder in the first degree when:
>     (2)   In the course of and in furtherance of the commission or attempted commission of a felony or immediate flight therefrom, the person recklessly causes the death of another person.[7]

The Supreme Court in *Chao v. State*[8] held that the "in furtherance of" portion of that statute meant the "killing need only accompany the commission of an underlying felony... (and the language) is solely (meant) to require that the killing be done by the felon, him or herself."[9] In addition to the statutory language itself, that was the operative interpretation when the evidence in this case was submitted to the jury. The statute and

---

[6] 818 A.2d 906 (Del. 2002).

[7] *11 Del. C.* § 636(a)(2).  As a result of *Williams*, it has been amended to read:
(a) A person is guilty of murder in the first degree when:
    (2)  While engaged in the commission of, or attempt to commit, or flight after committing or attempting to commit any felony, the person recklessly causes the death of another person.

[8] 604 A.2d 1351 (Del. 1972).

[9] *Id.* at 1363.

the interpretation in *Chao* formed the basis for this Court's jury instruction on felony

murder; an instruction which was identical to the one used in *Williams*.

When reversing *Chao*, the *Williams* Court held § 636(a)(2) now meant:

> In our view, the statutory language of the Delaware felony murder statute
> not only requires that the murder occur during the course of the felony but
> also that the murder occur to facilitate commission of the felony.
>
> * * * * *
>
> Accordingly, we adhere to the holding of *Weick* and hold that the felony
> murder language requires not only that the defendant, or his accomplices, if
> any, commit the killing but also that the murder helps to move the felony
> forward.[10]

The Supreme Court in a subsequent *Chao* opinion (*Chao* II) has held that this

reinterpretation must be applied retroactively.[11] It is the retroactive application of the

*Williams* holding which Outten contends compels this Court to vacate his felony murder

conviction. The State argues, on the other hand, that other language in *Williams* means

Outten's felony murder conviction remains valid:

> Williams burglarized the Charles home with the intent of murdering Mason.
> The murder was not committed to carry out the commission of the burglary.
> Had his purpose been to steal jewelry and Mason was killed to facilitate his
> thievery, a case for felony murder would exist.[12]

The holding in *Williams* and the door which the Supreme Court left open in the

above quoted language require that Outten's motion to vacate receive a factual re-

---

[10] *State v. Williams*, 818 A.2d at 913.

[11] *Chao v. State*, 931 A.2d 1000 (Del. 2007).

[12] *Williams*, 818 A.2d at 913.

4

examination. Despite all of the intervening opinions reciting some of the factual record,

this Court believes the most instructive is its 1993 sentencing decision. The portion

pertinent to the current motion is below:

> When Mr. Mannon, Gibbons and the defendants left the Green Door, a friend of Mr. Mannon's saw them standing in a small circle around the red Camaro. Defendant Nelson Shelton drove and Gibbons was in the front passenger seat. Mr. Mannon was in the back seat between defendants Jack Outten and Steven Shelton.
>
> Mr. Mannon commented about partying and Gibbons reminded him he had no money. Nelson Shelton drove directly to Plant Street. The area is some distance away from a bar known as the Boat Yard which the defendants Steven Shelton and Nelson Shelton, at least, are familiar.
>
> Once there, defendant Nelson Shelton got out of the car. Defendant Jack Outten pulled Mr. Mannon from the car after he got out. Mr. Mannon's hat was found in the back seat floor. Defendant Steven Shelton got out, too.
>
> All three defendants started punching Mr. Mannon. Gibbons yelled for them to stop. Nelson Shelton told her to shut up. Defendant Nelson Shelton retrieved the hammer from the front seat console area. Gibbons saw it in defendant Steven Shelton's hands but testified she never saw him strike Mr. Mannon with it. The brothers passed it back and forth. She saw defendant Nelson Shelton strike Mr. Mannon with the hammer in the back of the head causing him to fall to the ground on his back. This is consistent with the medical examiner's finding of the semicircular wound to the back of the head.
>
> Gibbons saw defendant Steven Shelton punch and kick Mr. Mannon after he had fallen. She saw his foot strike Mr. Mannon's face. All three defendants beat him while he was on the ground.
>
> Gibbons saw defendant Jack Outten repeatedly strike, perhaps in excess of ten times, Mr. Mannon's head while he was on the ground. She graphically described the pulp that was left. One of the defendants yelled, "Finish it. Finish it." (Gibbons' testimony varied as to which Shelton said

5

this but her ultimate testimony to the jury was that it was defendant Steven Shelton.)  After Mr. Mannon was murdered, his rings and wallet were removed.  All three went through his pockets.  The wallet may have been passed around among the three of them.[13]

The evidence also showed that Mr. Mannon, the victim, was wearing a gold colored chain around his neck the night he was murdered.  It was not recovered and it was not on his body.

An examination of the evidence set out above in the light of *Williams'* interpretation of "in furtherance of" tells this Court Outten's felony murder conviction cannot be sustained.  Gibbons announced in the confined circumstance of the car interior that Mr. Mannon had no money.  Based on Nelson Shelton's rebuke to her when she said it, he heard it; it is likely Outten heard it, too.  Such evidence would militate against the murder facilitating the robbery, or "moved it forward (whatever that means)."  Further, it is far from clear, as described above, that the murder was a necessary part of or a step needed by the three young men to rob an older, intoxicated person.

The State asserts, on the other hand, that the Supreme Court's opinion in *Hassan-El v. State*,[14] results in Outten's felony murder conviction remaining valid.  A comparison of the record in the two cases does not support the State's argument.  In *Hassan-El*, the defendant and his co-defendant approached an ice cream truck with their faces covered by

---

[13] *State v. Outten*, Cr.A. Nos. IN92-01-1144-1158, Herlihy, J., (April 30, 1993, pp 11-13).

[14] 911 A.2d 385 (Del. 2006).

6

shirts and carrying guns. Hassan-El and his co-defendant shot their weapons as soon as they got up to the truck. The Supreme Court held that Hassan-El was "clearly engaged in an attempted robbery" and "had taken [a] substantial step[ ] toward the robbery when the homicide occurred."[15]

There is no evidence here, on the other hand, that when the three defendants, Gibbons and Mr. Mannon got in the car at the Green Door, there existed an intent or an agreement to rob. In fact, the defendants were never indicted for conspiracy to commit robbery. Further, the fatal pummeling began as soon as Mr. Mannon was pulled from the car. Unlike *Hassan-El*, there were no substantial steps taken to unambiguously manifest an intention to rob. The only evidence is the pocket rifling after he was bashed to death.

*Hassan-El* provides another benchmark from which it can be determined that, under *Williams*, Outten's felony murder conviction cannot be sustained. As just noted, the Supreme Court found unambiguous steps taken towards a robbery. Further, as noted, this Court sees in this record no such unambiguous steps leading up to Mr. Mannon's murder. That can be contrasted to events earlier in the day when the three men and Gibbons were at (the former) Clemente's Bus Stop. At that time there was a conversation about robbing someone, potentially and using Gibbons as a "lure." As it turned out, a victim was picked and robbed or "ripped off." But he was not beaten and certainly not murdered.

---

[15] *Id.* at 392.

7

Candidly, the facts of this case fall between *Williams/Chao* and *Hassan-El*, but not close enough to allow Outten's felony murder conviction to stand.   In sum, this Court finds that the evidence in this case places Outten's felony murder conviction within the re-interpretation of § 636(a)(2) as proclaimed in *Williams*.   That conviction must be vacated.

Vacating Outten's felony murder conviction means the death sentence imposed for it must also be vacated.   The retroactive application of the *Williams* holding, as dictated by *Chao* II, leads to that result.

In this case, as a result of the felony murder conviction <u>and</u> the conviction for robbery first degree, the jury was instructed it had already found two statutory aggravating circumstances beyond a reasonable doubt:

> The murder was committed while the defendant was engaged in the commission of robbery,[16]
>
> and
>
> The murder was committed for pecuniary gain.[17]

---

[16] 11 *Del. C.* § 4209(e)(1)j.   The language of this aggravator is now also the new language of 11 *Del. C.* § 636(a)(2).

[17] 11 *Del. C.* § 4209(e)(1)o.   Candor compels the Court to say that in its Sentencing Decision, it said, "The evidence established beyond a reasonable doubt that the murder was committed by each defendant for pecuniary gain." *State v. Jack Outten*, Cr.A. No. IN92-01-1144-58, Herlihy, J. (April 30, 1993) at p. 16.   At first blush, that statement would seem to contradict the holding above that the felony murder conviction has to be vacated.   When the Court said this in 1993, it was operating under the law in *Chao* I.

8

The jury was further instructed in accordance with Delaware law[18] that its felony murder and robbery verdicts meant that it had to vote "Yes" 12 - 0 as to these two circumstances. The jury in *Williams* was given a similar instruction, namely its conviction of felony murder (burglary) meant that it had already unanimously found the existence of the statutory aggravating circumstance of murder while engaged in a burglary. This statutory aggravating circumstance - murder while engaged in committing specified other felonies - is the same one applied to Outten.

The Court in *Williams* held the invalidation of the murder conviction meant the mandatory aggravator was also invalid.[19] This Court views that part of the *Williams* holding leads to the same result here: the mandatory instruction is invalid as it related to the felony murder conviction.

Nevertheless, there is a potential and important distinction between *Williams* and this case. According to the Supreme Court opinion, the mandatory instruction given tied the statutory aggravator of engaged in a felony only to the felony murder conviction. There is no mention that the mandatory instruction also recited the jury's burglary conviction. Here, however, as to the two statutory aggravators cited above, the jury was told its felony murder conviction and its robbery conviction meant that the two statutory aggravators had already been established beyond a reasonable doubt.

---

[18] *Dawson v. State*, 581 A.2d 1078, 1107 (Del. 1990).

[19] *Williams*, 818 A.2d at 914.

The potential distinction from *Williams* is that the statutory aggravator uses the language "while engaged in . . ." which is broader than "in furtherance of." The issue raised, but not briefed, is whether the new jury, when it is instructed on the penalty recommendation on the intentional murder, should or has to be told that the conviction for robbery means it has to vote "Yes" 12 - 0 on the "while engaged in" statutory aggravator. It is far less clear that this issue relates also the pecuniary gain aggravator.

### Conclusion

For the reasons stated herein, defendant Jack Outten's felony murder conviction, Count II of the indictment, Cr.A. No. IN92-01-1145, is vacated and the sentence of death imposed on that is also vacated. The defendant's motion to vacate is **GRANTED**.

—————————————————
                                                    J.

10

**EXHIBIT C**

# IN THE SUPERIOR COURT OF THE STATE OF DELAWARE

# IN AND FOR NEW CASTLE COUNTY

STATE OF DELAWARE )    CRIMINAL ACTION NUMBERS
                                                    )
         v. )    IN-92-01-1144-R1 thru
                                                    )    IN-92-01-1148-R1
JACK OUTTEN )
                                                    )
                                                    )    ID NO.  92000786DI

Submitted: February 1, 2008
Decided: February 29, 2008

### MEMORANDUM OPINION

*Upon Motion of the State Reargument - DENIED*

*Appearances:*

James B. Ropp, Esquire, and Ipek K. Medford, Esquire, Deputys Attorney General, Department of Justice, Wilmington, Delaware, attorney for State of Delaware

Jennifer-Kate Aaronson, Esquire, and Natalie S. Woloshin, Esquire, of Woloshin Lynch Natalie & Gagne, Wilmington, Delaware, attorney for defendant

HERLIHY, Judge

The State moves for reargument of the Court's decision granting defendant Jack

Outten's motion to vacate his felony murder conviction. In its January 9, 2008 opinion,

the Court held that Outten's conviction must be vacated in light of the Delaware Supreme

Court decision in *Williams v. State*[1] and its progeny.

### Applicable Standard

Under this Court's Criminal Rules, there is no provision regulating motions for

reargument. In that instance, therefore, the appropriate Civil Rule applies.[2] Necessarily

that means that the standards for motions for rearguments also apply. Under Civil Rule

59(e) motions for reargument, the "only issue is whether the court overlooked something

that would have changed the outcome of the underlying decision "[3] or made an error of

law.[4] Generally, reargument will be denied unless the underlying decision involved an

abuse of discretion.[5] Finally, "[a] motion for reargument is not intended to rehash the

arguments already decided by the court.[6]

---

[1] 818 A.2d 906 (Del. 2003).

[2] Superior Court Criminal Rule 57(d). That means that Civil Rule 59(e) applies also.

[3] *McElroy v. Shell Petroleum, Inc.*, 1992 WL 397468 (Del.).

[4] *Steadfast Ins. Co. v. Eon Labs Mfg., Inc.*, 1999 WL 743982 (Del. Super.).

[5] *McElroy*, 1992 WL 397468 (Del.).

[6] *Id.*

1

### *Parties' Contentions*

The State contends that Outten's felony murder conviction was proper under the law as set forth in *Williams*. First, the State takes issue with the Court's reliance on the facts as set forth in its 1993 Sentencing Decision. Specifically, the State argues that if permitted to expand the record with "specific transcript references" the facts in this case would clearly support the felony murder conviction. Second, the State contends that the Court applied "a standard of proof that was contrary to the standard set forth" in *Williams*.

The State alleges that in its opinion, the Court "requires proof, 'that the murder was a necessary part of or a step needed by the three young men to rob an older intoxicated person.'"[7] This language, according to the State, was used in *Hassan El v. State*[8] in the section of the opinion discussing the attempted robbery charge and, therefore, does not apply to felony murder. The State goes on to describe the correct standard in reviewing a felony murder conviction as "whether considering the evidence in the light most favorable to the prosecution, including all reasonable inferences to be drawn therefrom, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt."[9] The State points out that this standard is not mentioned in the Court's prior opinion. Finally, upon review of the facts surrounding Mannon's death as recalled

---

[7] Motion ¶ 2 *quoting State v. Outten*, 2008 WL 100117 at *3.

[8] 911 A.2d 385 (Del. 2006).

[9] Motion ¶ 4 citing, inter alia, *Williams*, 818 A.2d at 910.

2

by the State, it submits that under the above standard Outten's conviction should stand.

Outten responds by asserting that the Court's decision was appropriate in light of the *Williams* decision. First, he points out that the Court found the facts in its previous Sentencing Decision to be "instructive," that does not mean, as suggested by the State, that was the *only* portion of the factual record that the Court relied upon in making its decision. Second, Outten cites portions of the record which, he contends, supports the Court's finding that there was insufficient evidence to support a felony murder conviction in this case. Third, he contends that the State misread the Court's opinion with regards to whether the Court applied the correct legal standard and that, therefore, the legal standard applied was correct.

## Discussion

### A

The State initially takes issue with the Court's recitation and reliance upon the facts contained in its April 30, 1993 Sentencing Decision. The State contends that "[w]hile the facts recited in the Sentencing Order are accurate, the Order does not relate all the facts and circumstances in the voluminous record which were elicited over the multi-week trial."[10] It appears that the State is arguing that the Court "overlooked" relevant facts and circumstances which would have "changed the outcome of the underlying decision." Without actually providing any relevant portions of the record in support of this argument,

---

[10] State's motion ¶ 1.

3

the State conclusively states that the facts show "an intent to commit Robbery, and that the Murder was committed in the course of, and in furtherance of, the Robbery First Degree."[11] The State does not request the opportunity to "expand the record."

The Court deems it unnecessary to allow the State to "expand the record" for two reasons. First, it is unclear to the Court why the State would not indicate in its Motion what portions of the record, if considered, would have changed the Court's decision. Second, the State, nevertheless, does provide facts in the portion of their Motion arguing that the Court applied the wrong legal standard.[12] Those facts, it alleges, support the jury's felony murder conviction and, in turn, negate the Court's prior decision. Therefore, those facts will be considered with regard to the State's argument that the Court overlooked relevant facts and circumstances in rendering its initial decision, which, if considered, would have changed that decision.

The relevant facts, which the State alleges would have changed the outcome of the underlying decision, are: (1) evidence that Outten and the others discussed committing a robbery earlier in the day of Mannon's murder, (2) evidence that Outten had committed a robbery earlier in the day, (3) evidence that Mannon was "openly" wearing jewelry on the night of the murder that Outten must have seen, (3) evidence that Mannon's pockets had been turned out, that his wallet was found some distance from the body, and that

---

[11] State's Motion ¶ 1.

[12] State's Motion ¶ 4-5.

4

contents of the wallet were found some distance from the wallet, (4) no evidence, as recalled by the State, of any other motive to kill Outten besides to facilitate robbing him, and (5) evidence of Gibbon's statement that Mannon did not have money can be negated by the fact that he was wearing jewelry which presents a motive to rob.

It is important to point out that the only evidence now argued by the State which the Court did not expressly consider is the fact that Mannon was "openly" wearing jewelry on the night of the murder. As the State should have read in the underlying opinion, the Court considered the robbery committed earlier on the day of Mannon's murder to cut against a finding of felony murder. This is because Outten did not kill or harm the victim of the previous robbery, which negates that he would have needed to kill Mannon to rob him. It appears that the essence of the State's argument is that it simply does not agree with the inferences drawn by the Court from the evidence in the record. That, however, is not an appropriate consideration in a motion for reargument.[13] Therefore, the Court will not upset its underlying decision on that basis.

As mentioned above, the only fact asserted by the State not specifically addressed in the Court's opinion is that Mannon was wearing jewelry. This fact, even if "overlooked," would not change the Court's decision. This is because the other evidence in the record, as the State urges the Court must consider, suggests a lack of intent to rob

---

[13] See *Kennedy v. Invacare Corp.*, 2006 WL 488590 (Del. Super.).

5

Mannon.[14] The simple fact that he was wearing jewelry does not outweigh the other facts considered dispositive by this Court in making its decision. Therefore, the Court is not compelled by that fact to change its decision.

### B

The State's next argument is that the Court failed to apply the correct legal standard in its consideration of Outten's motion. The correct standard, according to the State, is "whether considering the evidence in the light most favorable to the prosecution, including all reasonable inferences to be drawn therefrom, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt."[15] The State contends that the standard applied by the Court was "contrary" to the correct standard as set forth above. To support its argument the State points to language in the opinion in which the Court allegedly "requires that the murder be a 'necessary' part or step..."[16] in the process of committing the felony.

The Court was not, as alleged by the State, applying a "contrary" legal standard when it used the above quoted language. In using that language, the Court was simply applying the analysis of *Hassan El* to the unique facts presented by this case. As the State is most likely aware, a case like this one, an "afterthought" robbery, is one which the

---

[14] The "lack of intent to rob" is discussed more fully in Section B of this opinion.

[15] State's motion ¶ 4.

[16] State's Motion ¶ 2 *quoting State v. Outten*, 2008 WL 100117 (Del. Super.).

Court has not been confronted until now. Based on that, the Court must do its best to extend the reasoning as used in previous cases, cases which do not present a perfect "fit" here because of the unique facts presented.

The Court is compelled to further clarify its application of *Hassan El* to this case. In that case, defendant was convicted of felony murder and the underlying felony was an attempted robbery. He challenged his conviction based on the holdings in *Williams* and *Chao* II.[17] The defendant argued that the killing could not have been "in furtherance" of a robbery that was not actually ever carried out. In upholding his conviction, the court found dispositive the fact that there was evidence in the record supporting a jury finding of an intent to rob *before* the killing occurred. Specifically, the Court relied on the fact that the defendant approached an ice cream truck with his face covered, was carrying a handgun, and had fired the weapon immediately upon reaching the ice cream truck. In finding such evidence of an intent to rob, the Court concluded that the killing was in furtherance of the intended robbery, even though the defendants had abandoned the scheme before actually completing such robbery.

In the present case, it is clear from the record that Outten robbed Mannon. There was evidence at the scene that Mannon's jewelry had been taken from his body and that his wallet had been gone through. However, the evidence the Court found lacking was that of an intent to rob Mannon *before* the killing occurred. As was stated in the facts of the

---

[17] *Chao v. State*, 931 A.2d 1000(Del. 2007)(applied *Williams* retroactively).

7

1993 Sentencing Order "[a]fter Mr. Mannon was murdered, his rings and wallet were removed."[18] The Court found that this, and other evidence in the record, compelled a reversal of the felony murder conviction. This is because, based on the unique facts of this case, a rational juror could not have found, beyond a reasonable doubt, that the murder of Mannon was to "move along" the robbery. The Court believes this result is not "rational" where, as here, the evidence so clearly compels the conclusion that an intent to rob was not formed until *after* Mannon was killed. Therefore, negating an essential element of felony murder, an intent to commit the underlying felony.

This Court in *State v. Outten*[19] explored a new facet of the felony murder "progeny" as begun in the *Williams* decision. The facts presented in this case represent a new situation in which a felony murder conviction cannot stand.

## Conclusion

In conclusion, for the reasons stated herein, the State's Motion for Reargument of the Court's opinion vacating Outten's felony murder conviction is **DENIED**.



---

[18] See *Outten v. State*, 2008 WL 100117 (Del. Super.).

[19] 2008 WL 100117 (Del. Super.).

**EXHIBIT D**

#312
copy

# IN THE SUPERIOR COURT OF THE STATE OF DELAWARE

## IN AND FOR NEW CASTLE COUNTY

| | | |
|---|---|---|
| STATE OF DELAWARE | ) | |
| | ) | |
| V. | ) | I.D. #92000786DI |
| | ) | |
| JACK OUTTEN | ) | |

## NOTICE OF MOTION

TO:    James Ropp, Esquire
       Loren Meyers, Esquire
       Department of Justice
       820 N. French Street
       Wilmington, DE   19801

PLEASE TAKE NOTICE that the within Motion for Postconviction Relief Pursuant to

Superior Court Criminal Rule 61 will be presented to the specially assigned trial judge, the

Honorable Jerome O. Herlihy, at the convenience of the Court.

RECEIVED 2007 OCT 26 P 6: 32 DELAWARE JUDICIARY

**LAW OFFICE OF JENNIFER-KATE
AARONSON, LLC**

_Jennifer Kate Aaronson_
Jennifer Kate Aaronson, ESQ #3478
8 E. 13th Street
P.O. Box 2865
Wilmington, DE   19805
(302) 655-4600
Attorney for Defendant Outten

October 26, 2007

**WOLOSHIN, LYNCH, NATALIE
& GAGNE, P.A.**

_Natalie S. Woloshin_
Natalie S. Woloshin, ESQ #3448
3200 Concord Pike
P O Box 7329
Wilmington, DE   19803
(302) 477-3200
Attorney for Defendant Outten

IN THE SUPERIOR COURT OF THE STATE OF DELAWARE

IN AND FOR NEW CASTLE COUNTY

| | | |
|---|---|---|
| STATE OF DELAWARE | ) | |
| | ) | |
| v. | ) | I.D. #92000786DI |
| | ) | |
| JACK OUTTEN, | ) | |
| | ) | |
| Defendant. | ) | |

## MOTION FOR POSTCONVICTION RELIEF PURSUANT TO SUPERIOR COURT CRIMINAL RULE 61

### I.    PROCEDURAL BACKGROUND

Jack Outten was arrested January 13, 1992 and subsequently indicted jointly with Nelson Shelton and Steven Shelton in the New Castle County Superior Court on two counts of First Degree Murder (intentional murder and felony murder), Robbery First Degree, Possession of a Deadly Weapon During the Commission of a Felony and Conspiracy First Degree. Following a jury trial which concluded on February 23, 1993, Outten was convicted of all indicted counts on February 24, 1993. Following a penalty phase which concluded on March 4, 1993, the jury voted seven to five in recommendation of the death penalty.[1] Outten was sentenced to death by lethal injection on April 30, 1993. The Delaware Supreme Court affirmed Outten's convictions and sentence on direct appeal. Outten v. State, 650 A.2d 1291 (Del. 1994), cert. denied, 515 U.S. 1145 (1995). Outten sought postconviction relief in the Delaware Courts which was denied. Outten v. State, 720 A.2d 547 (Del. 1998).

Outten filed a Petition for Habeas Corpus in the District Court on December 28, 1998.

---

1 The same jury voted eight to four in recommendation of the death penalty for codefendants, Steven Shelton and Nelson Shelton.

1

Outten was granted leave to file an Amended Petition on October 4, 1999. The District Court granted, in part, Outten's Motion for Leave to Expand the Record. An evidentiary hearing was held on June 25 and June 26, 2002. The District Court entered an Order denying Outten's Third Amended Petition for Writ of Habeas Corpus Pursuant to 28 U.S.C. § 2254. Outten v. Snyder, 2004 WL 4858384 (D. Del. 2004). The District Court granted a Certificate of Appealability on April 2, 2004. The Third Circuit Court of Appeals remanded the matter to the District Court for compliance with the requirements of 28 U.S.C. § 2253(c)(3). The District Court then granted a Certificate of Appealability as to three specific issues. On May 19, 2005, Outten applied to the Third Circuit Court of Appeals for a Certificate of Appealability on two remaining issues set forth in his 2254 Petition. The Third Circuit Court of Appeals denied the request.

On September 28, 2006, the Third Circuit reversed Outten's death sentence and remanded the case for re-sentencing. Outten v. Kearney, 464 F.3d 401 (3rd Cir. 2006). The Third Circuit held Outten's trial counsel ineffective for failing to properly investigate and present mitigation evidence in the penalty phase. A new penalty phase hearing is scheduled to commence on May 20, 2008.

On October 12, 2007, the Court set bail on the material witness warrant for Christine Gibbons in the amount of $50,000.00 cash.

## II. STATEMENT OF RELEVANT FACTS

**A.    Contact between Christine Gibbons, Jack Willard and Steven Shelton**

On January 8, 2007, James Haley, Esquire ("Haley"), then Counsel for Outten, contacted

Rebecca Blaskey , Esquire ("Blaskey") federal habeas counsel for Steven Shelton ("Steven") by

e-mail to obtain materials pertaining to Outten. (D-1). Blaskey responded by e-mail on January

10, 2007 that she was in possession of the files that she had received from Ricardo Palacio and

John Deckers, Habeas Counsel for Outten, and she would forward them to Haley as soon as all of

the documents were copied. (D-2). On or about January 17, 2007, Blaskey had nine (9) boxes

hand-delivered to Haley's office by her investigator Kitty Hailey. (D-3)[2]  Haley did not review

the documents contained in the boxes other than to inventory the trial and penalty phase

transcripts.

On June 29, 2007, Natalie S. Woloshin, Esquire was substituted as Counsel for Outten.

Shortly thereafter, the nine (9) boxes were delivered by Haley to Ms. Woloshin's office. On July

10, 2007, Counsel for Outten first reviewed the numerous boxes delivered to Ms. Woloshin's

office. Those boxes contained Steven's trial counsel's and appellate counsel's files. On July 20,

2007, pursuant to Delaware Professional Rules of Conduct Rule 4.4(b), Counsel for Outten

promptly notified Blaskey, the sender of the materials, that these materials may have been

inadvertently sent to Counsel for Outten. (D-4). By letter dated August 6, 2007, Counsel for

Outten provided to Blaskey a twenty-nine (29) page inventory of the documents contained in the

nine (9) boxes. (D-5-6). Counsel for Outten also enclosed a copy of the documents that Counsel

believed may be used during the course of representing Outten. (D-6). Finally, the letter

---

2 Ricardo Palacio, Esquire and John Deckers, Esquire, federal habeas counsel for Outten, forwarded twenty-four
(24) boxes comprising Outten's file in late December 2006 to Jennifer-Kate Aaronson, Esquire.

3

instructed Blaskey that if she or her client wished to assert a claim of privilege, notification should be made immediately. (D-6). Counsel for Outten have not received any communication from Blaskey asserting any privilege.

The documents relevant to this Motion include notes of Jack Willard's ("Willard") interviews and telephone calls with Christine Gibbons ("Gibbons"), correspondence to and from Willard and Gibbons, and correspondence to and from Steven. These documents are directly relevant to the pre-trial Motions to Disqualify Willard and to Sever and to the trial proceeding. The documents forming the basis of this motion were not and could not have been known to Outten's trial or appellate counsel. Anthony Figliola, Esquire, trial counsel, and habeas counsel, John Deckers, Esquire and Ricardo Pallacio, Esquire all attest by affidavits attached to this Motion that they had no knowledge of the existence or content of the documents, communications, meetings and correspondence between Willard and Gibbons. (Ex. E, F, & G). The only correspondence between Gibbons and Willard that counsel for Outten were aware of at or about the time of trial were two letters written to Gibbons by Willard dated July 7, 1992 and September 14, 1992. (Tr. Feb. 18, 1993 at 166, 172).

**B.    Motion to Disqualify Willard**

On November 4, 1992, during an office conference with the Court, defense counsel for Nelson Shelton ("Nelson") raised the issue of the possibility of filing a motion to disqualify Willard. This office conference was subsequent to Gibbons' deposition which took place in October, 1992. During the deposition, an issue arose concerning a statement that Willard had taken from Gibbons on February 19, 1992, about a month after the murder. In this statement to Willard, Gibbons specifically recanted significant portions of her statements to Wilmington Police Department ("WPD") and New Castle County Police Department ("NCCPD"). The most

4

significant portion that Gibbons recanted was the involvement of Steven in the murder. In her

statement to Willard, Gibbons indicated that she had substituted Nelson's name for Steven's;

meaning that Nelson was involved in the murder, but Steven was not. The statement from

Gibbons was recorded by Willard on February 19, 1992. However, the crux of Nelson's

argument was that the tape recorded statement referenced an unrecorded conversation between

Willard and Gibbons. During the deposition of Gibbons, Gibbons had no recollection of the

details of the unrecorded conversation. Further, according to Willard's representations to

Counsel, there were no witnesses that were present for either the taped statement or the

unrecorded conversation between Willard and Gibbons. Nelson argued that because that

conversation was not recorded and Gibbons had no recollection about it, Willard was now a

witness and counsel wished to question him at trial about that conversation. (Tr. Nov. 4, 1992 at

30-31).[3]

In response to Nelson's argument, the Court set deadlines for the filing of a Motion to

Disqualify Willard. On November 13, 1992, the State filed its Motion to Disqualify Willard and

on November 16, 1992, filed a supporting Memorandum of Law. (A-1-6). In its Motion to

Disqualify, the State wrote: "It is unclear from the record how many conversations between Mr.

Willard and Ms. Gibbons transpired, but he did take a formal recorded statement from her, which

significantly differed from her earlier statement to the police." (A-2). Willard filed his Response

on November 17, 1992 with a response to the State's Memorandum of Law on November 19,

1992. (A-7-11). In his Response, Willard wrote: "The State represents that it is unclear how

many conversations there were between Christina Gibbons and I, but that I took a formal

---

3 See also letter from the Court to Counsel dated November 6, 1992 ¶¶ 6 & 7.

statement that differed from a police statement. <u>Ms Gibbons and I have both represented that there was only one conversation that involved her statement to me.</u>" (A-8).

In response to both the State's Motion and Willard's response, on November 19, 1992, trial counsel for Outten, Anthony A. Figliola ("Figliola") filed a Response. Figliola took no position on the Motion for Disqualification but voiced strenuous opposition to any continuance of the trial. (A-12). On November 13, 1992, counsel for Nelson sent a letter to the Court regarding Willard. (A-13-14). In this letter, R. David Favata, Esquire ("Favata") wrote: "At the present time, counsel for Nelson Shelton do not feel they have sufficient grounds to request the disqualification of Mr. Willard but do notice the Court of their intention to call him for the limited purposes outlined herein." (A-14).

On December 1, 1992, the Court issued its ruling denying the State's Motion to Disqualify Willard. <u>State v. Outten</u>, Del. Super., 1992 WL 390660 (1992). (B). In its Order, the Court denied the Motion to Disqualify, finding no basis under the Rules of Professional Conduct to disqualify Willard; however, the Court left open the possibility of a party calling Willard as a witness at trial. (B-4). Additionally, the Court required Willard to submit an affidavit regarding his prior representation of Gibbons, and to obtain Steven's written consent for Willard's continued representation. (B-5; A-31-34).

It is important to note, at the November 4, 1992 office conference in which the Court set deadlines for the filing of any motions regarding the disqualification of Willard, the Court ordered as follows: "The motion to disqualify, basically. That's the extreme side of the motion. <u>It is based on what you now know, without prejudice to refile a motion or to renew the motion or whatever, if new information not now known becomes available.</u>" (Tr. Nov. 4, 1992 at 37)(emphasis added).

6

**C.**     <u>**Willard's Pre-trial Contact with Gibbons**</u>

Unbeknownst to counsel for Outten, Nelson, the State and the Court, at the time the

Motion to Disqualify was filed and decided, Willard and Gibbons had multiple conversations,

meetings and correspondence regarding the case. Between January 13, 1992 and October 20,

1992 , there were at least nine (9) telephone calls between Willard and Gibbons and there were at

least three (3) meetings with Gibbons.[4] (A-15-18). In his file, Willard kept notes of his meetings

and telephone calls with Gibbons. In a note to the file dated March 4, 1992, Willard detailed a

telephone conversation he had with Gibbons on the same date. (A-19). In this note, Willard

detailed Gibbons' court date for a new DUI, the fact that she had not retained counsel for that

DUI, and that she does not know what to do. <u>Id</u>. In addition, Gibbons explained to Willard that

she could not do the jail time. Finally, in his notes, Willard wrote "Make this note because she

seems to be getting flakier all the time sometimes. I do not know whether she is going to be

reliable at all." (<u>Id</u>.).

In a note of April 15, 1992 regarding a conference with Gibbons, Willard wrote "(3) She

knows where the jewelry is. (4) She knows something else about this case and so does Steve—

it's about Nelson? (5) She would like to get into a 9 mos. drug program: Talk to Jeff about rep

her." (A-20).

Gibbons sent Willard a letter dated June 10, 1992. In this letter, Gibbons wrote:

Dear Jack Willard
Hello, how are you? Well Jack I need to speak to you.
You are just about the only <u>one</u>, I trust here...
Well, I am going to get to the point....[sic]
I know where the sink is now, & other things to.[sic]
If Steve is telling the <u>truth,</u> than he willn't [sic] have to be worried about his finger prints

---

4 In a letter to Steven Shelton dated June 22, 1992, Willard advised Steven that he visited Gibbons at W.C.I. the
previous day and that Gibbons "is still very much on our side and is saying everything she said before." (A-24).

on it.
See I need your help to get a hold of my lawyer & get me out of here.
I need this Jack, look I am the only one who really knows what happened that night,
besides them all.
There is something else, that is very important.
I think you come and see, knowing that it relates to Steve.
Well, please take this matter in heart.
                       Thank you!
                       W.C.I.

(A-21-23). On the bottom of the letter it reads: "Signed—no name." However, on the back of the second page it reads: "To Jack Willard from Chris". (A-23).

On July 7, 1992, Willard sent a letter to Gibbons at the Women's Correctional Institution ("W.C.I.") asking her to contact him so that he could talk to her "about some things that have developed since our last conversation." (A-25). On September 14, 1992, Willard sent another letter to Gibbons at W.C.I. (A-26). In that letter, Willard asked Gibbons if anyone had written or spoken to her about the case. (Id).

On September 16, 1992, Gibbons wrote another letter to Willard. (A-27-28). In this letter, Gibbons asked Willard when she would be going to Court to make her statement because she was ready to go home. Gibbons signed the letter: "Respectfully submit [sic] Christina Gibbons." (A-28). In response to this letter, Willard wrote Gibbons a letter on September 22, 1992 and telephoned her. (A-17, 29). The last correspondence from Willard to Gibbons appears to be at the direction of the Superior Court following the November 4, 1992 Office Conference. (A-30).

### D.  <u>Motion to Sever</u>

Nelson filed a Motion for Severance. In Nelson's Memorandum in support of the Motion for Severance dated July 6, 1992, Nelson pointed to the "fundamental unfavorness to Nelson Shelton" with a joint trial given the shifts in the testimony of Gibbons. (A-36). The

8

Memorandum also stated: "It appears undisputed that antagonistic defenses exists among co-defendant's. Absent co-defendant confession's [sic] no practical way exists to assert a defense without blaming another participant or Christine Gibbons." (A-36). In addition to claims of antagonistic defenses, Nelson's counsel sought severance because Nelson gave a statement to the police.

In response to the Motion and Memorandum, Willard took no position regarding the Motion for Severance. (A-38). On July 8, 1992, Figliola wrote to the Court regarding the Motion for Severance. (A-39-40). Figliola put the Court on notice of Outten's defense that it was Nelson and Steven, not Outten that committed the murder. (A-39). Figliola also noted in his letter that he anticipated that a "Bradley Brittingham problem intentionally developing later on in the case." (A-40).

The State opposed severance by letter to the Court and subsequently filed an additional response on July 17, 1992. (A-41-53). On August 7, 1992, in a Memorandum Opinion, the Court denied the Motion to Sever. (C-1). The Court held that there was no question that inconsistent defenses exist between the Sheltons. (C-2). The Court noted that Nelson's statement to the police implicated Nelson in "a conspiracy to rob Mannon and aiding and abetting in its commission by driving Mannon to the deserted location." (C-2-3). In the Opinion denying severance, the Court was clear that Nelson's statement could not be used against Steven or Outten, but could be sanitized. (C-3). The Court ruled that "[e]ven if Nelson Shelton's participation were 'minimal,' that is, no intentional killing, Nelson Shelton faces conviction and the possibility of the death penalty under the felony-murder count. Cf. Chao v. State, Del. Supr., 604 A.2d 1351, 1360-61 (1992)." (C-3).

**E.     Antagonistic Defenses Both Pretrial and During Trial**

On January 13, 1992, only a couple of days after the arrest of Outten, Nelson and

Steven, Gibbons accompanied officers from the Wilmington Police Department along I95

to search for the kitchen sink that she had described to the police. (Tr. May 18, 1992 at

102-3). During the search, a washing machine top was found, but not collected, because

Gibbons was adamant that the "murder weapon" was a kitchen sink and not the washing

machine top found by the police. (Id.).[5] Nelson's Counsel insisted that the washing

machine top be collected by the police which was done in April, 1992, three (3) months

after the murder. (Id. at 103).

At the insistence of Willard, the washing machine top that was found by the

police was entered into evidence at trial. At her deposition and at trial, Gibbons testified

that the washing machine top was not the murder weapon. However, at trial, over

objection, Willard elicited testimony from Detective Moser that Nelson accompanied

police officers to the area where Gibbons went with officers on January 13, 1992. (Tr.

Feb. 3, 1992 at 175-177). Willard also called additional witnesses at trial to establish the

chain of custody for the washing machine top. The washing machine top was offered and

admitted into evidence by Willard.   In his closing, Willard argued the following:

> The washing machine top that Mr. Figliola said was too light. Ladies and
> gentlemen, just falling, it could hurt you. Imagine if it is held with two hands and
> pounded over and over again into his face. (Tr. Feb. 22, 1993 at 104).
>      . . . . . . . . . . . . . . . . . . . . . .
>
> Jack Outten killed him. She [Gibbons] testified how he repeatedly bashed Mr.
> Mannon in the face and the head over and over again with the washing machine
> top, 10 to 20 times. And surely, ladies and gentleman, it was this double-handed,

---

5 In the Memorandum Opinion denying severance, the Court noted in footnote 1: "The object used to strike Mannon, described as a kitchen sink, has apparently not been recovered." (C-3, fn.1).

vicious, violent attack on the front of Mr. Mannon's face which caused his skull to be crushed and caused his death. We know it happened that way, ladies and gentlemen, because there's no other way that makes sense. Surely, ladies and gentlemen, you must understand that the violence here was far in excess of the violence needed for a robbery. (Id. at 111-12).

. . . . . . . . . . . . . . . . .

What about Jack Outten's actions? Was his actions out of jealousy? No. Was his actions out of loyalty to Nelson Shelton? Partially, probably. What we have with Jack Outten is something perhaps more violent and contemptible that the acts of Nelson Shelton. Jack Outten, ladies and gentlemen, had a need to kill. He pummeled Mr. Mannon repeatedly in the face with a large, heavy object that crushed his skull. It was not done out of passion. It was done out of evil, perhaps with a - - even with the repeated hammer blows to the face, Mr. Mannon may have lived. But surely, Jack Outten beat the life out of him because of the blackness and wickedness and blood-thirstiness that was in his heart, and which I cannot even explain to you. (Id. at 112-13).

Figliola has described Willard as "the best prosecutor in the room" against Jack Outten. In the

District Court hearing on Outten's Petition for Habeas Relief, in response to a question posed by

Michael Modica, Esquire ("Modica"), Figliola testified: "My only recollection, Mr. Modica, of

the case, was I thought that as far as Jack Outten was concerned, I thought Willard was the best

prosecutor in the courtroom." (A-56).

### III. JURISDICTION

Outten presents colorable claims alleging that his convictions resulted from violations of

Article I, § 4, 7, 9, 11 and 12 of the Delaware Constitution and the Fifth, Sixth and Fourteenth

Amendments to the United States Constitution. Outten's convictions constitute a miscarriage of

justice. The constitutional violations in his case undermined the fundamental legality, reliability,

integrity and/or fairness of the proceedings resulting in his convictions.

### A.    NONE OF THE CLAIMS PRESENTED IN THIS POSTCONVICTION PETITION ARE PROCEDURALLY DEFAULTED.

None of the within claims can be deemed procedurally defaulted. This Motion is

11

pursuant to Superior Court Rule of Criminal Procedure 61 which states in relevant part;

> This rule governs the procedure on an application buy a person in custody or subject to future custody under a sentence of death on the ground that the court lacked jurisdiction or *any other found that is sufficient factual and legal basis for a collateral attack upon a criminal conviction or capital sentence.*

Super. Ct. Crim. R 61 (a)(1).

Rule 61 (i) sets forth possible bars to post-conviction relief:

(1)     *Time Limitation.* A motion for post conviction relief may not be filed more than one year after the judgment of conviction is final or, if it asserts a retroactively applicable right that is newly recognized after the right is first recognized by the Supreme Court of Delaware or by the United States Supreme Court.[6]

(2)     *Repetitive Motion.* Any ground for relief that was not asserted in a prior post conviction proceeding, as required by subdivision (b)(2) of this rule, is thereafter barred, unless consideration of the claim is warranted in the interest of justice.

(3)     *Procedural Default.*   Any ground for relief that was not asserted in the proceedings leading to the judgment of conviction, as required by the rules of this court, is thereafter barred, unless the movant shows

(A)     Cause for relief from the procedural default and

(B)     Prejudice from violation of the movant's rights.

(4)     *Former adjudication.* Any ground for relief that was formally adjudicated, whether in the proceedings leading to the judgment of conviction, in an appeal, in a post conviction proceeding, or in a federal habeas corpus proceeding, is thereafter barred, unless reconsideration of the claim is warranted in the interest of justice.

Rule 61 allows relief here. Rule 61(i)(5) expressly provides that:

> The bars to relief in paragraphs (1), (2), and (3) of this subdivision shall not apply to a claim that the court lacked jurisdiction or to a colorable claim that there was a **miscarriage of justice because of a constitutional violation that undermined the fundamental legality, reliability, integrity or fairness of the proceedings leading to the judgment of conviction.**

<u>Id.</u>    Accordingly, Rule 61(i)(5) provides exceptions to the procedural bars of Rule 61 where

the petitioner, as here, raises a "colorable" claim that the conviction or sentence constitute a

---

6 Neither the one-year filing provision of Rule 61(i)(1), nor any other potential bars are applicable to this case under Rule61(i)(5) as the basis of the motion was not known nor could it have been known by Counsel for Outten.

"miscarriage of justice" or deprivation of "fundamental fairness." Id. Rule 61(i)(5) "[i]s a general default provision, and permits a petitioner to seek relief if he or she was otherwise procedurally barred under Rules 61(i)(1)-(3)." Bailey v. State, 588 A.2d 1121, 1129 (Del.1991). See also Younger v. State, 580 A. 2d 552, 555 (Del. 1990) (fundamental fairness exception of Rule 61(i)(5) applies where petitioner shows he was deprived of a substantial constitutional right).

The "miscarriage of justice" provision is not limited solely to claims of actual innocence, but encompasses all instances of fundamental unfairness. Webster v. State, 604 A.2d 1364, 1366 (Del.1992) ("we believe [actual innocence] standard would be inappropriate in a case such as this"; mistaken waiver of constitutional right sufficient to meet the "miscarriage of justice" standard). See also Younger, 580 A2d 555 (newly recognized right qualifies under (i)(5) "fundamental fairness exception"); State v. Crawford, 2005 WL 2841652. (Del. Super. 2005) (where potentially exculpatory DNA evidence was lost or destroyed, destruction of evidence claim was colorable and warranted review of the substantive merits); State v. Hacket, 2005 WL 3060976, 1 n.10 (Del. Super.2005) (claim of ineffective assistance of counsel in violation of the Sixth Amendment, "by its very nature," qualifies under the (i)(5) exception); State v. Wilson, 2005 WL 3006781, 1 (Del. Super. 2005) (same); State v. White, 2004 WL 2750821 (Del. Super. 2004) (witness recantation evidence presents a "colorable claim that there was a miscarriage of justice" under Rule 61(i)(5)); State v. Briggs, 1998 WL 1029256 (Del. Super. 1998) (newly discovered evidence "potentially present[s] 'a colorable claim that there was a miscarriage of justice'"); Deputy v. State, 1993 WL 332667 (Del Super. 1993) (confrontation clause violation potentially "constitutional basis triggering the fundamental fairness exception under Rule

61(i)(5)"); State v. Rosa, 1992 WL 302295 (Del. Super. 1992) (jury instruction lessening state's

burden of proof colorable claim that there was a miscarriage of justice). As the Delaware Court

noted in a related context, "we decline to adopt a formal static test." Bailey v. State 588 A.2d

1121, 1128-29 (Del. 1991) (discussing "new rule" doctrine in miscarriage of justice cases).

All of Outten's claims fall under the bar-exception provisions of Rule 61(i)(5). Outten's

claims meet the requirement for the "miscarriage of justice" and "fundamental fairness"

exceptions contained in (i)(5) (bars inapplicable). Rule 61 relief is appropriate.

### B.    Petitioner's Claims are Colorable.

"Colorable" claims encompass any constitutional violation that if proven would arguably

require vacating the judgment of conviction or capital sentence. Webster, 604 A.2d at 1367

(where defendant alleged mistaken waiver of constitutional rights, merits review required where

constitutional violation appears "on the face of [the] petition" and claim was supported with

factual proffer).

Petitioner's claims are colorable. Petitioner here alleges constitutional violations

resulting in a miscarriage of justice and supports his submissions with detailed factual proffers

and citations to relevant precedent.

### C.    Petitioner's Claims Demonstrate Constitutional Violations resulting in a Miscarriage of Justice That Undermined a Fundamental Legality, Reliability, Integrity or Fairness of the Proceedings.

This Petition raises several claims of constitutional violations which individually and

cumulatively so undermined the fairness of the proceeding as to constitute a miscarriage of

justice as defined in Rule 61(i)(5) – violations which "undermine[] the fundamental legality,

reliability, integrity or fairness of the proceedings."

14

### IV.    CLAIMS FOR RELIEF

**A.    OUTTEN IS ENTITLED TO A NEW TRIAL AS EXTENSIVE UNDISCLOSED COMMUNICATION BETWEEN THE ONLY WITNESS TO THE MURDER AND CODEFENDANT'S TRIAL COUNSEL UNDERMINED THE FUNDAMENTAL FAIRNESS, INTEGRITY AND RELIABILITY OF THE PROCEEDINGS.**

**1.    Defendant Was Denied the Due Process Right to a Fair Trial.**

The essence of due process is what the Supreme Court has variously expressed as the "integrity of the fact-finding process," Ohio v. Roberts, 448 U.S. 56, 64 (1980), the "accuracy of the truth-determining process," Dutton v. Evan, 400 U.S. 74, 89 (1970), and the truth-seeking function of the trial process," United States v. Agurs, 427 U.S. 97, 104 (1976). *See also*, Schneckloth v. Bustamonte, 412 U.S. 218, 238-39 (1973). Outten was denied due process, the right to a fair trial and the right of cross-examination by the intentional misrepresentations of Steven's counsel, conduct tantamount to witness tampering and inflammatory remarks in closing argument. There can be no confidence in a jury verdict as Willard concealed material factual statements made by Gibbons thereby misleading the jury. Willard's misrepresentations of fact regarding contact/ communication with Gibbons resulted in the Court's denial of the motions for severance and disqualification of Willard. Since Outten's trial counsel's position on these motions and the Court's denial of the motions was premised on material misrepresentations of Willard, the integrity and validity of these motions are called seriously into question. In order for the Court fully to understand the magnitude of the impact that Willard's misrepresentations had on the outcome of Outten's case, it is necessary to review Willard's misconduct in the context of both the Motions for Disqualification of Willard and to Sever.

**2.    Willard's Material Misrepresentations to the Court and Counsel Regarding the Motion for Disqualification Irreparably Prejudiced Outten Entitling Outten to a New Trial**

15

A.    **Willard's Failure to Disclose and Produce Letters from Gibbons**

Gibbons was presented as a State's witness at trial. After her testimony for the State was completed, James Ropp, Esquire contacted Gibbons by telephone with Gibbons' attorney's knowledge. After that telephone call, Gibbons reappeared as a witness for the State. An extensive voir dire was conducted. After the voir dire, the Court took a recess. During the recess, Gibbons fled from the courthouse and was chased down in Rodney Square by the Wilmington Police Department. She was brought back to the courthouse and brought before the Court. The Court ordered that the State resume custody of Gibbons in order to ensure her appearance in Court.

During cross-examination of Gibbons, Willard questioned Gibbons about a poem, "Come Share My Life" that Gibbons allegedly incorporated into a letter to Steven. (Tr. Feb. 12, 1993 at 44-47). Willard objected to a request by the State for copies of the letters written by Gibbons referenced by Willard in his questioning. The Court initially refused to compel Willard to produce the letters; however, the Court subsequently Ordered **all** letters written by Gibbons must be produced. (Tr. Feb.12, 1993 at 58-60, 70-72). In addition, when the Court specifically asked to see the two (2) letters that had already been produced that had been written by Gibbons, Willard stated: **"Your Honor, I can state for the record I have no further letters nor have I seen any other letters."** (Tr. Feb. 12, 1993 at 70). Later, the Court Ordered "that if the defendant Steven Shelton has any other letters from Christine Gibbons they should be produced, whether or not they are the subject matter of cross-examination, any and all letters written by her. Are there any such letters." (Tr. Feb. 12, 1993 pp. 71-2). In response, the following exchange then took place:

16

**MR. WILLARD:**    Your Honor, my client indicates there isn't. Again, I have to take the position, Your Honor, I don't think he has to produce them. I understand your ruling, but he said that there are none.

**THE COURT:**    There is no applicable privilege as far as I can determine, attorney-client, work product, fifth amendment. They're not his property as such. They are not his words in writing or otherwise.

**MR. WILLARD:**    Your Honor, I think there was testimony that she only wrote two or three letters. I don't know. My client indicated there are no more.

**MR. GEORGE:**    I thought the testimony was ten letters, that she had written him ten times.

**THE COURT:**    I believe there is testimony that there are more than these two letters. I will accept that representation.

What the Court and Counsel did not know is that while Willard stood before the Court

and twice represented to the Court and Counsel that there were no other letters written by

Gibbons other than the two that he had produced by Order of the Court, sitting in Willard's file

were two **additional** letters written by Gibbons to Willard dated June 10, 1992 and September

16, 1992. In the letter dated June 10, 1992, Gibbons wrote that Willard was the only person she

trusted and that she knew where the sink was. (A-21). She also wrote that if Steven was telling

the truth, he would not have to worry that his fingerprints were on the sink. (Id.). Willard was

not candid with the Court and Counsel when he deliberately misrepresented the number of

handwritten letters he had and clearly knew about because they were in his file and addressed to

him. Willard also deliberately violated an order of the Court by failing to produce the two letters

in his file as directed by the Court. By hiding these letters, Willard unfairly and deliberately

prejudiced both Outten and Nelson because if these two letters had been disclosed and produced,

Counsel would have had the opportunity to cross-examine Gibbons on the factual issues

17

presented in the letter; namely, where the sink was, the extent to which Steven and Willard were

manipulating her testimony, and whether she even saw the murder or was relying upon

information provided by Willard and Steven. Willard's deliberate withholding of evidence that

was ordered to be produced and lying about the existence of such evidence makes a mockery of

the judicial system as a whole and renders the verdict in this case unreliable.

**B.** **Willard's Failure to Disclose Personal Contact with Gibbons Undermines Any Confidence in the Proceedings Thereby Entitling Outten to a New Trial.**

On February 18, 1993, just prior to the conclusion of Steven's defense

case, counsel for Nelson provided his witness list. Listed as a witness for Nelson was Willard.

(Tr. Feb. 18, 1993 at 96-97). Counsel for Nelson explained the intended purpose of Willard's

testimony:

| | |
|---|---|
| **MR. COLLINS:** | To have Mr. Willard recount what she told me she can't recollect before the trial went on. Also, I'm going to introduce a letter of Christine Gibbons in which she could verify or not verify, which indicates that he communicated to her knowledge about receiving a letter from Steve Outten [sic] in September prior to her deposition in October. |
| **MR. WILLARD:** | Can I see that letter? |
| **MR. COLLINS:** | Certainly. |
| **MR. WILLARD:** | For the record, I say in my letter (reading:) I'm curious now to ask you if anyone has written you or talked to you recently about this case. I would appreciate if you could drop me a quick line to let me know what is going on. **And I can represent to the Court, Your honor, that after the meeting in my office back in February, I don't think I ever saw her or talked to Christine Gibbons again.** |

**My letter sort of indicated that.**
I wrote another letter saying, I wanted to get together and talk with her. Like everyone else, Your Honor, she was gone and I really had no communication with her. (Tr. Feb. 18, 1993 at 98-99)(emphasis added).

Over Willard's objection, the Court ordered Willard to produce a copy of his handwritten notes relating to the "off-the-tape" conversation with Gibbons prior to her recorded statement pursuant to Rule 26. (Id. at 114-115). Following a review of the notes, Nelson's counsel continued to argue his right to call Willard as a witness:

MR. COLLINS:    Well, I just had an opportunity to review the notes. I thought I had a general idea of what was said. It's somewhat parallel to what is on the tape. There are some items in the notes that are contradictory as to what was on the tape and what was testified to during the course of this trial. I think we are entitled to explore the inconsistencies. He can relate them to us.
**Secondly, it has been insinuated during this trial, and I don't know to assess what level of assertion it has arisen, but that Steven Shelton obviated the testimony of Christine Gibbons prior to her Proof Positive Hearing, video deposition, and she continued to reiterate that obviated version during the first part of this trial, then she said she perjured herself - - to the extent that Steven Shelton utilized both his mother and Mr. Willard unwittingly to convey the information to Christine Gibbons in order to elicit perjury from her is also relevant.** (Id. at 115-116)(emphasis added).[7]

---

[7] After initially denying Mr. Collins' request to call Willard as a witness, the Court permitted voir dire to allow Mr. Collins to make a record. (Id. at 118). At the conclusion of the questioning, the Court ruled Willard's testimony would be cumulative; therefore, Nelson Shelton was not permitted to call Willard as a witness. (Id. at 124-125). Willard's dishonesty materially affected the Court's decision not to allow Nelson to call Willard as a witness.

The State and Nelson indicated their intention to call Willard as a witness at trial regarding the portion of his conversation with Gibbons prior to turning on the tape recorder. In an office conference November 4, 1992, Willard objected to his disqualification, stating that there was only one meeting with Gibbons.[8] The State filed a motion to disqualify Willard from representing Steven at trial. In its Motion, the State acknowledged it was "unclear from the record how many conversations between Mr. Willard and Ms. Gibbons transpired"; regardless, the State argued that that the Delaware Lawyer's Rules of Professional Responsibility prohibited a lawyer from assuming the dual role of advocate and witness. (A-2). Willard's opposed the motion stating: "I have no information beyond trial preparation and there is no disagreement with the evidence I have." (A-10). In direct response to the State's questions regarding the frequency of the contact between himself and Gibbons, Willard wrote, "Ms. Gibbons and I have both represented that there was only one conversation that involved her statement to me." (A-8). Figliola took no position on the motion. (A-12).

Willard's representations to the Court were not true. According to a timesheet submitted to the Court as well as letters from Gibbons and notes of telephone and personal conversations with Gibbons, Willard had numerous communications with Gibbons. (A-15-18). He had at least eleven (11) telephone conversations with her, two (2) letters from her, he sent two (2) letters to her, and there were at least two (2) personal meetings with Gibbons. Figliola relied upon the

---

8 Willard stated: "Two minutes before coming here Chrissy Gibbons called me on the phone and she wanted to know what is going on when is she getting out of jail, what is going on with the transcript. And I told her repeatedly, 'Chrissy, I'm not your lawyer. You really shouldn't be calling me. Call Larry.' And she said 'I can't get anything out of anybody and I just want to know, when I get out of here, what is going on.' And so everybody knows, there was nothing – no substantive matters were discussed. And all I kept saying to her is, 'Chrissy, I can't find out. I'm going to an office conference.' I said 'If your lawyer doesn't have some information for you and you call me back, I may be able to tell you when you might be released.' (Tr. November 4, 1992 at 18). Ironically, Willard indicated he brought the matter to the Court's attention because he didn't "want anyone here thinking there is anything going on." (Id. at 19).

representations of Willard that he only had one meeting with her which was recorded. The criminal justice system requires that attorneys and the Court rely on the word of another attorney especially with regard to contact with a material witness. That is the whole purpose behind Delaware Professional Conduct Rules 3.3 and 3.4. However, in this case, Figliola's reliance on Willard's word and his representations to the Court severely prejudiced Outten because Willard's representations were false. Figliola's decision to take "no position" on the Motion to Disqualify would have been very different if he had known the truth, that Willard was frequently communicating with the only alleged eyewitness to the crime and the only real evidence of who actually committed the murder. (Ex. E).

The Court denied the motion to disqualify, in part, based on its finding that even if Willard did testify during the joint trial, the subject matter of his testimony would be uncontested, "i.e., no one will testify to the contrary regarding the pre-recorded conversation with Ms. Gibbons." State v. Outten, 1992 WL 390660 (Del. Super. 1992). (Ex. B)[9]. At the time of the filing of the Motion to Disqualify, the only issue was Willard's pre-recorded conversation with Gibbons. This was due to Willard's deliberate misrepresentation of the frequency and content of his contact with Gibbons. The State raised the issue of the frequency of Willard's contact with Gibbons when it indicated that it was unclear how many conversations there were between Gibbons and Willard. In response, Willard represented to the Court and Counsel that there was only one conversation: February 19, 1992, before the recorded statement was taken. This, however, was wholly untrue as evidenced by the letters, telephone calls, and visits Willard

---

9 The Court's Memorandum Opinion was decided December 1, 1992. (Ex. B). Willard filed an Affidavit in the Superior Court on December 3, 1992 summarizing his contact and representation of Gibbons in the Court of Common Pleas in July1991(prior to the murder of Mannon). (Ex. A-31). The Affidavit makes no reference whatsoever to the letters, telephone calls or meetings during the pendency of Outten's case.

21

had with Gibbons. If Willard had been candid with the Court about the frequency and content of his communications with Gibbons, the Court can be assured that such communication would have been an issue raised by the State and Figliola in the context of the Motion to Disqualify. If Figliola had known about the number of communications Willard had with the only alleged eye-witness and that they were communicating specifically about the case, he would have moved to disqualify Willard. (Ex. E). However, Willard's misconduct and lack of candor foreclosed the State and Figliola from raising those relevant issues properly before the Court.

During the November 4, 1992 office conference, however, the Court indicated that if and when any party filed a motion to disqualify, the motion would be " based on what you now know, without prejudice to refile a motion or to renew the motion or whatever, if information not now known becomes available." (Tr. Nov. 4, 1992 at 37). The Court specifically left open the possibility of refiling if additional information was learned by any of the parties. This motion for post-conviction relief, therefore, is not barred because due to Willard's misconduct, counsel for Outten, Nelson, the State and the Court were completely unaware that at the time the motion to disqualify was filed and decided, Willard and Gibbons had multiple conversations, meetings and correspondence regarding the facts of the murder.

### C.     Collusion Between Willard and Gibbons Undermines the Reliability and Integrity of the Proceedings Thereby Entitling Outten to a New Trial.

Counsel for Nelson Shelton correctly discerned that there was collusion between Steven and Gibbons in the creation of Gibbons' story. What no one guessed, however, is that Steven's counsel was knowingly and directly involved. Willard intentionally misrepresented to counsel for Outten, Nelson, the State and the Court the extent and content of communications with

22

Gibbons prior to trial. A timesheet submitted to the Court by Willard documents telephone

conferences between Willard and Gibbons on January 23, 1992, February 3, 1992, February 12,

1992, February 18, 1992, February 21, 1992, February 28, 1992, March 5, 1992, March 6, 1992,

April 21, 1992, June 29, 1992, September 22, 1992. (A-15-18). The timesheets document a

"conference" with Gibbons on February 19, 1992 (dated of taped statement changing story) and

April 14, 1992. Willard received correspondence from Gibbons on June 10, 1992 and September

22, 1992; Willard sent correspondence to Gibbons on June 15, 1992 and September 11, 1992.

(Id.).[10] In addition, the whole issue raised by the Motion to Disqualify was the conversation that

occurred prior to the recorded statement that Willard took of Gibbons on February 19, 1992. The

substance of the State's argument for disqualification was that since no one was present for the

unrecorded statement and Gibbons had no recollection of the unrecorded statement, Willard

became a witness. However, what is remarkable about the meeting on February 19, 1992 is

despite Willard's assertions that no one was present for the meeting with Gibbons, his timesheets

clearly reflect that Vesta Shelton, Nelson's and Steven's mother was present. (A-15 – "2/19/92

Conference with Chris and Vesta"). However, Willard never disclosed to the Court or to Counsel

---

10 The timesheets cover the period from January 13, 1992 through October 16, 1992. It is unknown how much
contact Willard had with Gibbons either in person, via telephone or correspondence between October 17, 1993 and
the end of the trial, February 23, 1993. Willard, however, testified in the District Court in connection with
Outten/Shelton's habeas petition to repeated informal contact / meetings with Gibbons:
Q. When she showed up at your office unexpectedly and you were doing something else unlreated to the case, you
greeted her. Didn't tell her that she was busting into the middle of your day. You had to keep her in your good
graces?
A. Well, I don't recall her ever doing anything like that. I mean, as I recall, every time she ever spoke to me she
would call me up and say, Mr. Willard, can I come in and speak to you or something like that. I don't recall her ever
disrupting my office or coming in unannounced or anything like that.
Q. All right. I thought you had earlier said that she would drop in or call.
A. I'm saying, she might have, but she was never disruptive or anything. If she dropped in, she went into the office
downstairs and asked the secretary to speak to me, and then I would say, Who is it, and I would say, fine. Come up,
let's talk, that kind of thing. She was never a problem of any kind.
Q. And this is an ally in an [sic]a capital murder case, so you want to keep her in good graces; correct?
A. Yes. (A-55).

that Vesta Shelton was present for the conversation he had with Gibbons. Had he disclosed this

information, the State or Outten could have called Vesta Shelton as a witness, or interviewed her

prior to trial, to ascertain her knowledge of Gibbons' pre-recorded statement

In a letter to Willard dated June 10, 1992, Gibbons wrote, in pertinent part:

> **I know where the sink is now, & other things to [sic].**
> **If Steve is telling the <u>truth</u>, then he willn't [sic] have to be worried**
> **about his fingerprints on it…**

I think you should come and see me, knowing that it relates to Steve.

(A-21)(bold emphasis added). Willard's failure to disclose his extensive contact with Gibbons,

including correspondence regarding the facts of the case and the location of the murder weapon,

perpetrated a fraud on the Court and denied Outten a fair trial.

There is only one reasonable inference that can be drawn by Gibbons' statement in her

June 10th letter to Willard that reads "if Steve is telling the truth, then he willn't have to be

worried about his fingerprints on it." That inference is that Gibbons did not witness the murder

but Steve told her what to say in order to exculpate him. If Gibbons actually saw the beating and

killing of Mannon, why would Gibbons question the veracity of Steven's position to Steven's

attorney. If she saw the murder, presumably she would know the "truth". The only reason

Gibbons questions whether Steven's prints will be on the sink is because Gibbons, Steven and

Willard colluded to create a story when, in fact, Gibbons actually never saw who had the sink.

This information would have been critical in the defense of Outten because Gibbons was

adamant that Outten was the person who beat Mannon with the sink. Gibbons truly did not know

whose prints would be on the sink because she never saw Outten beating Mannon with the

object.

### D.    <u>Willard Interviewed Outten without Notifying Outten's Counsel, Learned</u>

### Outten's Factual Defense and Colluded with Gibbons and Steven to Deprive Outten of a Fair Trial.

Outten was arrested on murder charges on January 12, 1992. The case against Outten was filed in Superior Court on January 21, 1992. Outten was indicted on January 21, 1992. Outten's bail hearing was January 29, 1992. On January 27, 1992, Willard interviewed Outten at Gander Hill. During a meeting with Steven on the same date, Steven told Willard to talk to Outten. (A-58). Less than thirty (30) minutes after visiting Steven, Willard met with Outten and took a statement from Outten about the murder. (A-59-60). At the time of Willard's interview with Outten, Outten was entitled to counsel. While conflict counsel was not appointed until February, 1992, as soon as Outten was committed to jail, he would have automatically been represented by the public defender.

Willard never told Figliola about his interview with Outten. (Ex. E). Based upon his conversation with Outten, Willard knew in January, 1992 what Outten's defense was going to be at trial. Willard's knowledge of Outten's defense certainly benefited Steven to the deteriment of Outten. This knowledge was very helpful to Willard in determining how Gibbons should testify. Also, had Outten chosen to testify, Willard could have used Outten's statement against Outten. If Figliola had known that Willard took a statement from Outten, he certainly would have moved to disqualify Willard. (Ex. E).

### E.    Prejudice to Outten

The denial of due process is "the failure to observe that fundamental fairness essential to the very concept of justice." Lisenba v. California, 314 U.S. 219, 236 (1941). Outten was deprived of the due process right to a fair trial and was denied the right to effectively cross-examine the only witness who put the murder weapon in his hands. Jackson v. State, 770 A.2d

506 (Del. 2001)(effective cross-examination is essential to defendant's right to a fair trial as it is

the principal means by which the believability of a witness and the truth of testimony are tested).

Outten was deprived of the constitutional right to confront the witness by Willard's

misrepresentations that there were no letters other than those disclosed. Willard's total disregard

of his ethical obligation of candor to the Court, in direct response to the Court's inquiry regarding

his contact and communication with Gibbons, deceived Outten's counsel, the Court and the jury.

Outtten's trial counsel was deprived of full adversarial testing of Gibbons. The outcome of the

trial, at least with respect to the intentional murder charge, could reasonably have been different

if the jury knew Gibbons never saw the murder of Mannon.[11]

In addition to the denial of the right to cross-examine Gibbons, Willard made

---

11 Willard's blatant denial of the existence of the letters and contact with Gibbons and the exculpatory nature of the letters violated Willard's duty of candor to the Court and obligation under Rule 26.2 and Jencks. Although the misconduct is not on the part of the State, the standard for prejudice/materiality articulated in Brady v. Maryland, 373 U.S. 83 (1963) and progeny is instructive:

> [A] showing of materiality does not require demonstration by a preponderance that disclosure of the suppressed evidence would have resulted ultimately in the defendant's acquittal (whether based on the presence of reasonable doubt or acceptance of an explanation for the crime that does not inculpate the defendant). [Instead, the] touchstone of materiality is a "reasonable probability of a different result, and the adjective is important. The question is not whether the defendant would more likely than not have received a different verdict with the evidence, but whether in its absence he received a fair trial, understood as a trial resulting in a verdict worthy of confidence. A "reasonable probability" of a different result is accordingly shown when the government's evidentiary suppression "undermines the confidence in the outcome of the trial." Kyles v. Whitley, 514 U.S. 419, 434 (1995)(citations omitted).

Outten also has a claim of actual innocence based on the newly discovered evidence. As one Court explained, the concept of "innocence of the crime" means that the constitutional violation resulted in the conviction of one who is innocent of at least one of the elements of capital murder:

> Although "[a] prototypical example of 'actual innocence' ... is the case where the State has convicted the wrong person of the crime," Sawyer, 505 U.S. at [340], one is also actually innocent if the State has the "right" person but he is not guilty of the crime with which he is charged. See Schlup, 513 U.S. at [321] (noting prisoner interest in relief "'if he is innocent of the charge for which he was incarcerated'" (quoting Kuhlmann v. Wilson, 477 U.S. 436, 452, 106 S.Ct. 2616, 2626, 91 L.Ed.2d 364 (1986) (plurality opinion))).

Jones v. Delo, 56 F.3d 878,883 (8th Cir. 1995) (some citations omitted). See also Johnson v. Hargett, 978 F.2d 855, 860 (5th Cir. 1992) (defendant is actually innocent if "a reasonable trier could not find all the elements necessary to convict the defendant"); Sawyer v. Whiteley, 505 U.S. 333, 345-46 (1992) (negation of element of intent); id. at 343 (noting that negation of an element of the offense accords with the "strictest definition of "actual innocence").

The claim of innocence more than adequately demonstrates that Outten's convictions are a miscarriage of justice , as set forth in Rule 61 (i)(5) and that the procedureal bars of Rule 61 (i)(1)-(3) should not apply.

representations and fabricated arguments that unduly prejudiced Outten regarding the alleged

murder weapon. At the insistence of Willard, the washing machine top that was found in a ditch

on I95 south was entered into evidence at trial. Outten and the State consistently took the

position that the washing machine top had no relevance whatsoever as Gibbons looked at it in a

ditch in the days after the murder and told Detective Brown that it was not the murder weapon.

(Tr. Feb. 3, 1993 at 153-54, 166-67, 171-74). [12]  Despite Gibbons' letter in which she confirms it

was a sink and that she knew the location of same, Willard was the proponent of evidence that

served no purpose other than to prejudice Outten and mislead the jury. Moreover, over objection,

Willard elicited testimony from Detective Moser that Nelson Shelton accompanied police

officers to the area where Gibbons took officers on I95. (Tr. Feb. 3 at 175-77). Willard

concealed the letter he received from Gibbons that confirmed her testimony at the proof positive

hearing and deposition that the washing machine top was not the murder weapon and then argued

to the jury:

> The washing machine top that Mr. Figliola said was too light. Ladies and
> gentlemen, just falling, it could hurt you. Imagine if it is held with two hands and
> pounded over and over again into his face. (Tr. Feb. 22, 1993 at 104).
>
> . . . . . . . . . . . . . . . . . . . . . .
>
> Jack Outten killed him. **She [Gibbons] testified how he repeatedly bashed Mr.**
> **Mannon in the face and the head over and over again with the washing**
> **machine top, 10 to 20 times.** And surely, ladies and gentleman, it was this
> double-handed, vicious, violent attack on the front of Mr. Mannon's face which
> caused his skull to be crushed and caused his death. We know it happened that
> way, ladies and gentlemen, because there's no other way that makes sense.
> Surely, ladies and gentlemen, you must understand that the violence here was far
> in excess of the violence needed for a robbery. (Tr. Feb. 22, 1993 at 111-

---

12 The State opposed Nelson's application for a <u>Lolly</u> instruction based on WPD's failure to timely collect the
washing machine top when first located the day after the murder. The State's position was that "it probably wasn't
the murder weapon" and that there was "no reliable evidence or indication it was related to the crime." (Tr. 19, 1993
at 67-69). The State called Detective Browne on voir dire in connection with Nelson's <u>Lolly</u> motion. Detective
Browne testified that no witness or person interviewed ever mentioned a washing machine top or that WPD should
be looking for a washing machine top. (<u>Id.</u> at 32)

12)(emphasis added).

In addition to letters from Gibbons, Willard's handwritten notes record what was presumably a conversation with Gibbons on June 15, 1992 and provide, in pertinent part: "She knows where the jewelry is. (A-20). This is direct evidence of Gibbons' involvement in the homicide, concealment of the fruits of the robbery and/or collusion with Steven Shelton. Outten argued that Gibbons was a co-conspirator and requested a jury instruction on accomplice testimony. The State argued Gibbons was merely a witness and the Court denied Outten's request.

Ironically, without knowing any of the details of the collusion between Willard and Gibbons, Figliola described Willard as "the best prosecutor in the room" against Jack Outten. In the District Court hearing on Outten's Petition for Habeas Relief, Figliola testified:

> My only recollection, Mr. Modica, of the case, was I thought that as far as Jack Outten was concerned, I thought Willard was the best prosecutor in the courtroom. (A-56).

The Court's ruling denying the disqualification of Willard was based on false information. Willard's letter to the Court dated November 17, 1992 misrepresented that there was only one conversation between Gibbons and Willard which preceded the taped statement on February 19, 1992. (Ex. C). This Court relied on Willard's false statement when it held that because Gibbons could not recall the content of the unrecorded portion of the interview, there was no disputed issue of fact about which Willard could or would have to testify. State v. Outten, 1992 WL 390660 (Del. Super. 1992)(Ex. B).

Figliola's position would have been different on the issue of Willard's disqualification had Willard been candid with the Court and counsel. (Ex. E). Figliola took no position on the matter because Gibbons pointed the finger at Outten in both her police statements and to Willard.

Had Figliola known that Gibbons made statements from which the only inference that could be drawn was that she never saw who physically beat Mannon with the sink (and killed him) and Steven provided her with the information needed to exculpate him, Figliola would sought to disqualify Willard for a multitude of reasons: (1) The collusion between Willard and Gibbons and Steven unfairly prejudiced Outten; (2) Figliola would have sought to admit the frequency and content of Gibbons' statements to Willard for which Willard was a direct witness; (3) if Gibbons denied making certain statements to Willard, Willard could be called a witness; (4) by speaking with Outten, Willard knew exactly what Outten's defense would be and exactly how to sabotage it and (5) at trial, Willard destroyed Figliola's defense by consistently rehabilitating Gibbons and arguing that the washing machine top, unconnected to this murder, was in the hands of Outten.

Willard's misconduct infected and contaminated the entire trial and deprived Outten's due process right to a fair trial. <u>Benson v. State,</u> 395 A.2d 361 (Del. 1978). Intentional misrepresentations regarding the contact with Gibbons pretrial guided Figliola's decision not to join in the severance motion or the motion to disqualify Willard. The direct and flagrant violation of the Court's Order to produce all letters from Gibbons denied Outten the right to effective cross-examination and the due process right to a fair trial. Willard's false statements on which the Court relied in its Opinion denying Willard's disqualification, coupled with Willard's misleading argument to the jury about the washing machine top as the murder weapon in the hands of the wicked and blood-thirsty Jack Outten, was outrageous. There can be no confidence in a jury verdict that results from collusion, dishonesty, flagrant defiance of Court orders, and utter lack of candor to the Court and attorneys. Willard's misconduct mandates that Outten is entitled to a new trial on all the charges.

29

3. **Willard's Material Misrepresentations to the Court and Counsel Regarding the Motion to Sever Affected Trial Counsel's Decision Not to Join in Severance Motion and Denied Defendant the Right to a Fair Trial.**

Nelson's Motion to Sever was based upon two (2) issues: (1) Nelson gave a taped statement to the police which implicated Steven and Outten in the murder; and possibly himself in the robbery; and (2) antagonistic defenses. Figliola's response to Nelson's Motion to Sever clearly brought the issue of the antagonistic defenses squarely before the Court. Not only did Figliola put the Court and Counsel on notice that Outten's defense was that Nelson and Steven, not Outten, committed the murder, but he also made the Court aware that a <u>Bradley Brittingham</u> problem would develop during the case.

The Court in its Order denying the Motion to Sever acknowledged that there were inconsistent defenses, but found that the taped statement by Nelson could be sanitized so as not to run afoul of <u>Bruton</u>.(C ) It is clear that given what transpired at trial including: (1) Gibbons' testimony including the second time she was called by the State and her fleeing from the Courthouse; (2) the Court's instruction that Gibbons could not discuss Nelson's Attempted Rape charge; (3) the Court's ruling that Willard could not be called as a witness; (4) Willard's outrageous closing argument; (5) Willard's admission of the washing machine top; and (6) the recently discovered extensive correspondence, meetings, telephone calls and collusion, between Willard and Gibbons, as well as allegations by Gibbons of a sexual relationship with Willard, the Motion to Sever should have been granted. (See Ex. H & I)

A. **Outten's Inability to Question Willard and Gibbons About Contact Between Them Denied Outten of a Fair Trial**

It is clear that Figliola did not know that Willard was having regular contact with Gibbons

30

prior to trial. The frequency of the contact between Willard and Gibbons was an issue that arose

in the context of the Motion for Disqualification. However, in a letter to the Court regarding that

exact issue Willard wrote: "The State represents that it is unclear how many conversations there

were between Christina Gibbons and I, but that I took a formal statement that differed from a

police statement. Ms. Gibbons and I have both represented that there was only one conversation

that involved her statement to me." (A-8). By this letter, Willard deliberately misled the Court

and Counsel into believing that the only contact he had had with Gibbons was February 19, 1992

when he took a tape-recorded statement from her.

   In addition, the issue of Willard's contact with Gibbons was also an issue that arose

during the Proof Positive Hearing. Willard represented to the Court the following:

> I haven't—I've been—haven't talked to her in a long time. She calls my
> office, or has. She—right after I first talked with her she called me once in
> a while. And she had never given me a phone number where I could get
> back to her and I kept missing her. And the same with this last time. I
> think I may have actually talked to her once about the DUIs or whatever
> she had pending and told her that I couldn't represent her. In fact, I
> offered to try to find her another attorney, if she wanted one, and she gave
> me the impression then that her aunt wouldn't release any of her trust
> funds or money for her, so she wasn't going to do that. But that's all—
> that's all there is to that.

(Tr. May 18, 1992 at 98-99). Willard made those representations to the Court and Counsel on

the record on May 18, 1992. However, the representations to the Court were not accurate.

Willard did not tell the Court that there was at least one meeting with Gibbons on April 14, 1992

which lasted close to 30 minutes. (A-16, 20). The handwritten notes Willard made to his file in

reference to the April 14th conference with Gibbons specifically related to the murder case, and

not DUIs. In fact, the notes indicate that (1) Gibbons told Willard that she knew where the

jewelry was: (2) She knew something about this case and so did Steven, and (3) That Detective

31

Brown called her to discuss some information which she told him she had. (A-20). The Court and Figliola relied upon Willard's representations regarding the frequency and nature of the contact he had with Gibbons. However, such reliance by Figliola turned out to be fatal to Outten. The impact and prejudice to Outten regarding Willard's lack of candor is substantial. \

First, Figliola did not have the necessary information to make an informed decision regarding the Motion to Sever. The only information that Figliola had was that: (1) Gibbons made conflicting statements about who was involved and to what extent; (2) Willard's only contact with Gibbons was on February 19, 1992 when he took a taped statement; and (3) Any other possible contact Willard and Gibbons may have had did not involve the facts of the case. If Figliola knew that there were telephone calls and meetings between Willard and Gibbons specifically regarding the facts of the case, he would have raised that issue with the Court and joined in the Motion to Sever. (Ex. E).

Second, as the Court is aware, Gibbons never wavered from her statement that Outten was the person who repeatedly struck Mannon with a sink. The consistency with that one statement is remarkable given that Gibbons contradicted herself with regard to every other alleged fact. A significant part of Outten's defense was that Gibbons and Nelson committed the murder. In fact, Figliola presented Lisa DeLude, who testified about statements made by Gibbons that implicated her in the murder. (Tr. Feb, 1993 at 24-27). However, what was missing from Outten's defense was an explanation regarding the consistency of Gibbons' statement that Outten was the person that struck Mannon with the sink. Gibbons had repeatedly changed who kicked or hit Mannon with a hammer, who took the jewelry, and who was sitting where in the car. It is now abundantly clear that the conferences that Willard had with Gibbons, as well as the letters and telephone calls, would have provided Figliola with the proverbial missing link in

32

Outten's defense. The reason that she never wavered in stating that Outten was the person who struck Mannon with the sink is that it had been orchestrated by Willard in all of their meetings, telephone calls and letters. As she wrote in her letter to Willard on June 10, 1992: **"If Steve is telling the truth, than he willn't [sic] have to be worried about his fingerprints on it."** This is in the same letter in which she wrote to Willard. "You are just about the only <u>one</u>, I trust here." (A-21). The questions that arise from this letter are manifold: (1) what truth; (2) to whom was this alleged truth told; (3) how would Gibbons know what Steven said about the sink; (4) what does she know about any fingerprint analysis; and (5) if Gibbons relied upon Steven to provide her information about the murder, did he tell her what to say about every aspect, including Outten's alleged role; and (6) did Gibbons really see anything? Figliola could not ask Gibbons these questions because he did not know about the letters and contact. Figliola could not ask Steven about it because he was a co-defendant in his trial. Figliola could not ask Willard about it because not only did he not know about the contact, the Court did not allow Nelson to call Willard as a witness. Therefore, Figliola's ability to explore any of these very pertinent and outcome altering questions was foreclosed by Willard's misconduct in his failure to provide candid responses to the Court.

During the trial on February 12, 1993, the Court Ordered Willard to produce all letters written by Gibbons. Not only did Willard lie to the Court when he represented that there were none, he failed to produce the letters sitting in his file in violation of a direct Order of the Court. The purpose for the Court's Order was to allow all Counsel to cross- examine Gibbons effectively. However, Willard's deliberate misrepresentations and flagrant defiance of a Court Order unfairly prejudiced Outten.

Gibbons testified at trial:

33

It just happened very quickly from the bar onto that. We were all drinking a lot that night, and I did see Nelson with the hammer. I did see Jack with the hammer. I did see Nelson swing and hit Mr. Mannon, **but I didn't see Jack do the rest**. I don't know what more I can tell you. I'm sorry that I lied to cover up for the two defendants.

(Tr. 2/12/93 pp. 126-7). Willard's deliberate withholding of the letters from Gibbons foreclosed Figliola's ability to prove the jury that Gibbons never saw Outten hit Mannon. The clear inference from the letter is that she continuously fingered Outten as the fall guy in order to protect Steve as orchestrated by Willard. Given the newly discovered evidence, it is only now abundantly clear that the two defendants for whom Gibbons lied were Steven and Nelson. At her deposition, Gibbons testified that in the hours after the murder, when she and Nelson were alone at 38 Mavista Drive, Nelson told her what to say. The jury heard that Steven had written to Gibbons. There was no evidence, whatsoever, that Outten ever tried to influence Gibbons' story or testimony. The statement at trial, "I didn't see Jack do the rest" when coupled with Gibbon's letter "if Steve is telling the truth, then he willn't [sic] have to be worried about his fingerprints on it" (A-21) should have been before the jury. However, since Figliola had no knowledge of the letter, he could not make a believable argument to the jury that Gibbons never saw the murder. As a result, Outten was denied a fair trial.

### B.    Outten's Inability to Question Gibbons about Nelson's Attempted Rape Charge Denied Outten of a Fair Trial.

The Court ruled that Nelson's Attempted Rape charge was inadmissible at trial. In the hours after the murder, Nelson attempted to rape the elderly mother of a friend in the process of trying to rob his friend. While it is clear that that the act of the Attempted Rape could not be admitted to show that Nelson was a bad person or that he committed the murder, it clearly became relevant with regard to the reasoning behind Gibbons' change of heart.

34

Just after the murder, Gibbons and Nelson were taken into custody outside of their home. During her initial statements to the police, Gibbons exculpated Nelson, but said that Steven and Outten committed the murder. After she gave her statement, Gibbons learned that in addition to the murder, Nelson was also arrested for the attempted rape of the elderly woman. It became evident at trial that Gibbons' knowledge of Nelson's attempted rape charge made her very upset and extremely angry at Nelson. In response to questioning by Favata of Gibbons on cross examination the following took place:

| | |
|---|---|
| **Mr. Favata**: | But it's also correct, is it not, that during that statement last January you told the police you didn't even care if Nelson went to jail, right? |
| **Gibbons**: | Not for what he had done. |
| **Mr. Favata**: | And you also told us that you were bitter towards Nelson because of his affair with Vicky, right? |
| **Gibbons**: | Well, -- |
| **Mr. Favata**: | Isn't that what you told us? |
| **Gibbons**: | I believe I said that I was bitter at him for what he has done, and that's something that we can not bring up. |
| **Mr. Favata**: | Did you also tell us during your testimony in this trial that you were bitter towards Nelson when you found out about his affair with your friend Vicky? |
| **Gibbons**: | I believe I said I was bitter at him for what he has done, and that's something that we can not bring up. I believe that I just said that. |

(Tr. Feb. 12, 1993 at 111-112). It is clear that what Gibbons was referring to was the attempted rape charge which she was instructed not to mention at trial. The jury heard testimony that Nelson had told Gibbons that if she were arrested, not to say anything about the murder. (Id. at 111). The jury also heard that in her first statements to the police, she exculpated Nelson from

35

involvement in the murder because she still cared for him. (Id. at 110). There was ample

testimony how Gibbons would change her story for whatever benefited her. However, because of

the Court's ruling, Outten could not question Gibbons that the real reason she changed her story

was out of bitterness to Nelson for the attempted rape charge because Nelson was a co-defendant

in the same trial. Had the Court severed the case, Outten would have been given the opportunity

to question Gibbons on that issue.

The prejudice to Outten was great. Gibbons was the only alleged eyewitness to the

murder. She consistently pointed to Outten as the person who hit Mannon with the sink. At trial,

Figliola had no real explanation for this consistency. Had Figliola been able to cross-examine

Gibbons about the change in her testimony because she was bitter towards Nelson about the

Attempted Rape charges, this would have shown the jury that even with a charge a serious as

murder, Gibbons allowed her emotions, not the truth, to control how she testified. This would

have provided a very reasonable explanation for Outten's defense because she had repeatedly

testified that she never like Outten. However, because Figliola could not question Gibbons about

the Attempted Rape, Figliola could not present that argument to the jury.

C.    Willard's Outrageous Closing Argument Denied Outten of a Fair Trial

There is no better proof of the antagonistic defenses between Steven and

Outten than Willard's closing argument. In his closing argument, Willard said "Jack Outten . . .

had a need to kill. . . It was done out of evil. . . But surely, Jack Outten beat the life out of him

because of the blackness and wickedness and blood-thirstiness that was in his heart, and which I

cannot even explain to you." (Feb. 22, 1993 at 112-3). These outrageous and highly

inflammatory and prejudicial statements by Willard show the depths of the antagonism between

the defendants. This antagonism exhibited by Willard could not be fixed with a curative

36

instruction. The only remedy at the front end was severance and, on the back end, a new trial. Throughout the pretrial phase of the case, Willard met with Counsel for Nelson and Outten to discuss trial strategies. Willard sent three (3) letters to Counsel for Nelson and Outten asking how they were going to approach certain pre-trial issues such as suppression motions, the motion to take Gibbons' deposition, and discovery. (A-61-63). This tactic of conciliation lasted up until trial when Willard took off the gloves and pointed fingers directly at Nelson and Outten. While it is clear that each client's defense was that someone, other than he, committed the murder, the extent to which Willard went, especially armed with how Gibbons was going to testify, was reckless, at best. If Figliola knew that while Willard was garnering support for a joint approach to pretrial issues, he was preparing and attempting to affect the outcome of the trial through Gibbons, he would have joined in the Motion to Sever. (Ex. E).

### D.    Willard's Alleged Sexual Relations with Gibbons

On October 11, 2007, Gibbons told Thomas Monahan, investigator for Outten, that she had engaged in sexual relations with Willard. (Ex.I ). Gibbons also stated that she had sexual relations with Willard when he was representing her on her DUI charges. (Id.) Gibbons explained that she exchanged sexual favors with Willard in order to reduce the legal fees she owed to Willard. (Id.) This was not the first time that Gibbons had alleged sexual relations with Willard. Sometime in 2000 or 2001, Gibbons told Modica that she had engaged in sexual relations with Willard. (Ex. H ). Certainly, Figliola knew nothing about these allegations. If Figliola had known, he would have joined the Motion to Sever and the Motion to Disqualify Willard.

### E.    Antagonistic Defenses

The issue of antagonistic defenses arose in the context of Nelson's Motion to Sever. As

the Court noted:

> The Court must examine the facts of the particular case. <u>Younger v. State</u>, Del.
> Supr., 496 A.2d 546, 550 (1985). Factors to be considered in weighing a
> severance motion include: (1) absence of other substantiated, competent evidence
> of the movant's guilt; (2) antagonistic defenses as between the codefendant and
> the movant; and (3) difficulty of segregating the evidence as between the
> codefendant [and]the movant. <u>Jenkins v. State</u>, Del. Supr., 230 A. 2d 262, 272
> (1967).

<u>State v. Outten</u>, 1992 WL 208294 (Del. Super.1992) (C ). The movant in the Motion to Sever

was Nelson, not Outten. Therefore, the Court in addressing the issue of severance only dealt

with it antagonistic defenses as they related to Nelson. The Court held that there was no question

that there were inconsistent defenses between the brothers Shelton. The Court reviewed the

testimony of Gibbons at the Proof Positive Hearing in which she exculpated Steven and

inculpated Nelson against the statements she gave to the police. The Court held that "for Nelson

Shelton's defense to be believed, a central core of Steve Shelton's defense need not be rejected."

<u>(C-3)</u>. The Court, however, noted that "the defendant who should be pursing this motion is

Steven Shelton. He has taken no position." <u>Id</u>. The Court, in its decision, never addressed the

effect a joint trial would have on Outten, presumably because Figliola took no position on

severance.

The Delaware Supreme Court did not find that the Superior Court abused its discretion in

denying the motion to sever because the Court found that "neither Steven nor Outten had met his

burden of demonstrating substantial injustice and unfair prejudice requisite for showing the

necessity of separate trials." <u>Outten v. State</u>, 650 A.2d 1291, 1298 (Del. 1994). In rendering its

decision, the Court distinguished this case from <u>Bradley v. State</u>, Del. Supr., 465 A.2d 785, 794

(1983) where the Court found that the antagonistic defenses mandated separate trials. <u>Id</u>. The

38

Court in <u>Bradley</u> determined that the co-defendants' cases were incompatible:

> In this case, each defendant presented an alibi defense. Their two defenses as they unfolded in this case were so antagonistic that the jury could not accept one defendant's defense without rejected a central part of the other defendant's defense. Moreover, throughout the trial, the jury was witness to repeated attempts by each defendant to incriminate the other. A fair trial is not possible under these circumstances, and a severance should have been granted.

<u>Bradley</u>, 559 A.2d at 1241. The holding in <u>Bradley</u> distinguished between antagonistic defense warranting severance and mere inconsistencies in trial strategies or hostility between the defendants. <u>Id</u>. The Court held that since neither Outten nor Steven took the stand or presented evidence that implicated each other, their defenses were not mutually exclusive. <u>Outten,</u> 650 A. 2d at 1298. This holding and the Superior Court's holding, however, never contemplated the situation where, as here, the attorney for one co-defendant lied to the Court, deliberately withheld evidence that the Court ordered to be produced, interviewed a codefendant when he was represented, and engaged in sexual relations with the State's alleged eye-witness. It seems that given the level of misconduct by an attorney which clearly adversely affected the rights of a co-defendant and severely impacted his ability to obtain a fair trial, it could hardly be said that the defenses were not antagonistic to warrant severance.

Willard's misconduct points the brightest light on how antagonistic Steven was against Outten. However, Willard's misconduct does not stand alone in proving the level and depth of antagonism, although that should certainly suffice. In addition to Willard's misconduct are Willard's closing argument as reviewed above, and the dark cloud that fell over Outten's head when it became evident that Steven had manipulated Gibbons' testimony through promises of affection.

From February 19, 1992 when Gibbons gave a statement to Willard, Gibbons maintained

39

that Steven had nothing to do with the murder, but was off in the woods getting sick. However, after she was recalled as a witness by the State, Gibbons told another tale: Steven participated in the murder. The clear inference that is drawn by her reappearance is that Steven had manipulated her testimony. The jury had already heard evidence of how Nelson tried to manipulate Gibbons back in January, 1992 to prevent her from implicating him in statements to the police. Both brothers were successful in their manipulation, for a time. However, there was no manipulation of Gibbons by Outten. The stench of the brothers' manipulation of Gibbons so permeated the case that it affected and prejudiced Outten. The clear implication in the jury's mind must have been that the only reason the Shelton brothers were manipulating Gibbons was because they were guilty. However, Outten could not distance himself from that implication of guilt because he sitting in a chair next to them charged with the same crimes.

Outten also had no ability to question Nelson and Steven about their manipulation of Gibbons because they were co-defendants in the same trial. Outten also could not call Willard at trial as the possible mastermind behind Steven's manipulation because not only was Figliola unaware of Willard's involvement due to his misrepresentations and disregard for Court's orders, but also because the Court denied the application to call Willard at trial.

**F.**     **Willard's Admission of the Washing Machine Top as "the Murder Weapon"**

Another example of the antagonistic defenses is Willard's presentation of the washing machine top as the murder weapon to prejudice Outten. As argued above in Paragraph 2E, Gibbons had consistently denied that the washing machine top was the weapon that was used to kill Mannon. In fact, she had been shown the washing machine top while with the police on I 95, and denied that it was the murder weapon. Gibbons was so sure that the police did not collect it.

40

It was only collected at the request of Nelson's Counsel. Gibbons testified in every pre-trial

hearing that the weapon that killed Mannon was a sink. Even in a letter to Willard in June, 1992,

which he concealed, Gibbons told Willard that she knew where the sink was. (A-21). Yet, despite

knowing all of this, Willard argued in his closing that the washing machine top was in fact the

murder weapon that was used by Outten: "She [Gibbons] testified how he [Outten] repeatedly

bashed Mr. Mannon in the face and head over and over again with the washing machine top, 10

to 20 times." (Tr. Feb. 22, 1993 at 111-12). Despite the fact that Willard knew from secret

correspondence with Gibbons that she knew the murder weapon was a sink, he used the washing

machine top to destroy Outten.

> **B.    OUTTEN'S CONVICTION FOR FELONY MURDER WAS
> IMPROPER AS THE THE JURY INSTRUCTIONON FELONY
> MURDER INADEQUATELY DEFINED THE ELEMENT OF "IN
> FURTHERANCE OF" AND THE EVIDENCE PRESENTED AT
> TRIAL WAS INSUFFICIENT TO ESTABLISH THE ELEMENTS
> OF FELONY MURDER <u>BEYOND A REASONABLE DOUBT.</u>**

Defendant incorporates by reference the Motion to Vacate Felony Murder

Conviction filed October 4, 2007.

## CONCLUSION

A unique jurisprudence has developed especially for cases where the State seeks the death penalty. In short, a case involving the death penalty is prepared and tried differently than other criminal cases, even other murders, in which the death penalty is not sought. In short, the United States Supreme Court has consistently held that "death is different." Zant v. Stephens, 462 U.S. 862, 884-85 (1983); Woodson v. North Carolina, 428 U.S. 280, 305 (1976); Gardner v. Florida, 430 U.S. 349, 357 (1977); Ring v. Arizona, 536 U.S. 584, 605-06 (2002); California v. Ramos, 463 U.S. 992, 998-99 (1983); Lockett v. Ohio, 438 U.S. 586, 604-05 (1978); Ford v. Wainwright, 477 U.S. 399, 411 (1986) (plurality opinion); Enmund v. Florida, 458 U.S. 782, 827-28 (1982) (quoting Lockett v. Ohio, 438 U.S. 586, 605 (1978)); Doering v. Fader, 316 Md. 351, 360 (1989) (quoting Woodson v. North Carolina, 420 U.S. 280, 305 (1976)); see Gilmore v. Taylor, 508 U.S. 333, 342 (1993) (in capital case, "the Eighth Amendment requires a greater degree of accuracy and fact finding than would be true in a non-capital case"); Sawyer v. Smith, 497 U.S. 227, 243 (1990) (stating that "[a]ll of [the Court's] Eighth Amendment jurisprudence concerning capital sentencing is directed toward the enhancement of reliability and accuracy in some sense"); Spaziano v. Florida, 468 U.S. 447, 456 (1984) ("we reaffirm our commitment to the demands of reliability in decisions involving death"). See also Miller v. State, 380 Md. 1, 78 (2004) (Raker, J., concurring and dissenting); Evans v. State, 304 Md. 487, 552 (1985) (McAuliffe, J., concurring and dissenting).

It is clear that due to Willard's misconduct, Outten was deprived of his due process right to a fair trial. Willard's nefarious conduct undermined the fundamental integrity and reliability of the jury verdict in the guilt phase. Therefore, Outten is entitled to a new trial.

**WHEREFORE** Outten respectfully requests that the Court schedule an evidentiary

hearing to develop the factual record, or in the alternative, summarily grant Outten a new trial.


**LAW OFFICE OF JENNIFER-KATE AARONSON, LLC**


Jennifer Kate Aaronson, Esquire, ID# 3478
8 E. 13th Street
P.O. Box 2865
Wilmington, DE   19805
(302) 655-4600


AND

**WOLOSHIN, LYNCH, NATALIE & GAGNE, P.A.**


Natalie Woloshin, Esquire, ID#3448
3200 Concord Pike
P.O. Box 7329
Wilmington, DE 19803
(302) 477-3200


Attorneys for Defendant

**EXHIBIT E**

# IN THE SUPERIOR COURT OF THE STATE OF DELAWARE

## IN AND FOR NEW CASTLE COUNTY

| | | |
|---|---|---|
| STATE OF DELAWARE | ) | |
| | ) | |
| v. | ) | I.D. #92000786DI |
| | ) | |
| JACK OUTTEN, | ) | |
| | ) | |
| Defendant. | ) | |

## NOTICE OF MOTION

TO:    James Ropp, Esquire
        Ipek Medford, Esquire
        Department of Justice
        820 N. French Street
        Wilmington, DE  19801

       PLEASE TAKE NOTICE that the within Motion to Vacate Robbery First

Degree Conviction will be presented to the specially assigned trial judge, the

Honorable Jerome O. Herlihy, at the convenience of the Court.

LAW OFFICE OF JENNIFER-KATE        WOLOSHIN, LYNCH, NATALIE &
AARONSON, LLC                         GAGNE, P.A.


_____           _____
Jennifer Kate Aaronson, Esq. (#3478)      Natalie S. Woloshin, Esq (#3448)
8 E. 13th Street, P.O. Box 2865           3200 Concord Pike, P.O. Box 7329
Wilmington, DE  19805                Wilmington, DE  19803
(302) 655-4600                      (302) 477-3200
Attorney for Defendant              Attorney for Defendant

DATED:  March 25, 2008

IN THE SUPERIOR COURT OF THE STATE OF DELAWARE

IN AND FOR NEW CASTLE COUNTY

| | |
|---|---|
| STATE OF DELAWARE | ) |
| | ) |
| v. | )    I.D. #92000786DI |
| | ) |
| JACK OUTTEN, | ) |
| | ) |
| Defendant. | ) |

## MOTION TO VACATE ROBBERY FIRST DEGREE CONVICTION

Jack Outten, by and through his attorneys, Jennifer-Kate Aaronson,

Esquire and Natalie S. Woloshin, Esquire, hereby moves this Honorable Court for

an Order vacating his 1993 Robbery First Degree conviction. The grounds

thereof are as follows:

1. Jack Outten was arrested January 13, 1992 and subsequently indicted

jointly with Nelson Shelton and Steven Shelton on two counts of First Degree

Murder (intentional murder and felony murder), Robbery First Degree, Possession

of a Deadly Weapon During the Commission of a Felony and Conspiracy First

Degree. Following a jury trial which concluded on February 23, 1993, Outten

was convicted of all indicted counts on February 24, 1993. Following a penalty

phase which concluded on March 4, 1993, the jury voted seven to five in

recommendation of the death penalty.[1]

2. On September 28, 2006, the Third Circuit reversed Outten's death

sentence and remanded the case for re-sentencing. Outten v. Kearney, 464 F.3d

401 (3rd Cir. 2006). The Third Circuit held Outten's trial counsel ineffective for

---

[1] The same jury voted eight to four in recommendation of the death penalty for both codefendants,
Steven Shelton and Nelson Shelton.

failing to properly investigate and present mitigation evidence in the penalty

phase. A new penalty phase hearing is scheduled to commence on May 20, 2008.

    3.   On January 9, 2008, this Court vacated Outten's felony murder

conviction finding:

> There is no evidence here . . . that when the three defendants,
> Gibbons and Mr. Mannon got in the car at the Green Door, there
> existed an intent or an agreement to rob. In fact, the defendants
> were never indicted for conspiracy to commit robbery. Further,
> the fatal pummeling began as soon as Mr. Mannon was pulled
> from the car. Unlike *Hassan-El*, there were no substantial steps
> taken to unambiguously manifest an intention to rob. **The only
> evidence is the pocket rifling after he was bashed to death.**

State v. Outten, ID No. 92000786DI, Herlihy, J., *Mem. Op.* *7 (January 9,

2008)(Ex. A)(emphasis added).

    4.   In a Memorandum Opinion denying the State's Motion for

Reargument, the Court further explained its decision to vacate the felony murder

conviction by describing this case as "an 'afterthought' robbery." State v. Outten,

ID No. 92000786DI, Herlihy, J., *Mem. Op.* *6 (February 29, 2008)(Ex. B).

"[T]he evidence the Court found lacking was that of an intent to rob Mannon

*before* the killing occurred. As was stated in the facts of the 1993 Sentencing

Order '[after] Mr. Mannon was murdered, his rings and wallet were removed.'"

Id. at *7-8 (citations omitted).

    5.   This Court vacated Outten's felony murder conviction as a rational

juror could not have found, beyond a reasonable doubt, that the murder of

Mannon was to "move along" the robbery. (Ex. B-8).

    6.   Count IV of the Indictment, Robbery First Degree, alleged:

JACK FOSTER OUTTEN, JR., STEVEN W. SHELTON and NELSON WALTER SHELTON, on or about the 12th day of January 1992, in the County of New Castle, State of Delaware, **when in the course of committing theft**, did threaten the immediate use of force upon Wilson Mannon, Jr., **with intent to compel the said Wilson Mannon, Jr., to deliver property** consisting of United States Currency and Jewelry, and when in the course of the commission of the crime, he **caused physical injury to him, to wit: did beat him with a blunt object.** (Ex. C)(emphasis added).[2]

8.    The phrase, "in the course of committing theft," requires a causal connection between the use of force and the theft. <u>Winborne v. State</u>, 455 A.2d 357, 359 (Del. 1982). See also, <u>Dixon v. State</u>, 673 A.2d 1220 (Del. 1996). In order to sustain a robbery charge, the force must be "applied to facilitate the commission of the taking or the retention of the property after it has been appropriated." <u>Winborne</u>, 455 A.2d at 359.

9.    In this case, the Court has already found that here was no intent to rob Mannon at the time the beating began. Mannon was pulled from the car and the beating immediately started. The taking of Mannon's jewelry was an "afterthought." (Ex. B-6, 8). In other words, Mannon was already dead at the time of the taking. Therefore, no force needed to be or was applied to facilitate the taking or the retention of the property because Mannon was already dead.

10. Courts in other jurisdictions confronted with relatively similar fact patterns have held that that the taking of property after a murder, where, as is here, the motive for the murder was not the taking, does not support a robbery

---

[2] Count III of the Indictment alleged Conspiracy first degree: that Outten and the co-defendants agreed to commit intentional murder first degree in violation of 11 Del. C. §636. (Ex. C-2). Outten was not charged with conspiracy second degree or conspiracy to commit robbery

conviction. <u>Francis v. State</u>, 808 So. 2d 110, 133 (Fla. 2001).[3]  See also <u>Knowles v. State</u>, 632 So. 2d 62, 66  (Fla. 1993) (Court struck "during the course of a felony" (robbery) statutory aggravator where evidence did not indicate that the defendant who shot his father and then drove off in his father's truck intended to take the truck prior to the shooting, and it did not indicate that the defendant shot his father in order to take his truck).

11. In addition, the State's indictment requires that in order for the jury to find the defendant guilty of robbery, the State must prove beyond a reasonable doubt: (1) Outten did threaten the immediate use of force upon Mannon; (2) A causal connection between the use or threat of force and the theft; (3) The threat of immediate use of force was with intent to compel Mannon to deliver up property consisting of United States Currency and Jewelry; and (4) During the commission of all of this, Outten caused physical injury to Mannon by beating him with a blunt object. (See Exhibit C).

12. Since the Court has already found that (1) Mannon was dead at the time of the taking; and (2) There was no intent to rob Mannon before the killing occurred, the State is unable to meet the burden of proving their own indictment.

13. Since no rational juror could have found all the essential elements of Robbery first degree beyond a reasonable doubt, [4] the Court is required to vacate Outten's Robbery first degree conviction.

---

[3] Florida defines robbery as "the taking of money or other property which may be the subject of larceny from the person or custody of another when in the course of the taking there is use of force, violence, assault, or putting in fear." <u>Francis</u>, 808 So. 2d at 133-4  (citing §812.13 (1), Fla. Stat. (1997)).

[4] <u>Williams v. State</u>, 818 A.2d 906, 910 (Del. 2002).

WHEREFORE, based on the foregoing, defendant respectfully requests this Court enter an Order vacating the 1993 Robbery First Degree conviction.

**LAW OFFICE OF JENNIFER-KATE AARONSON, LLC**

Jennifer Kate Aaronson, Esquire, ID# 3478
8 E. 13th Street
P.O. Box 2865
Wilmington, DE   19805
(302) 655-4600

AND

**WOLOSHIN, LYNCH, NATALIE & GAGNE, P.A.**

Natalie Woloshin, Esquire, ID#3448
Woloshin, Lynch, Natalie & Gagne, P.A.
3200 Concord Pike
P.O. Box 7329
Wilmington, DE 19803
(302) 477-3200

Attorneys for Defendant

**IN THE SUPERIOR COURT OF THE STATE OF DELAWARE**

**IN AND FOR NEW CASTLE COUNTY**

| | | |
|---|---|---|
| STATE OF DELAWARE | ) | |
| | ) | |
| v. | ) | I.D. #92000786DI |
| | ) | |
| JACK OUTTEN, | ) | |
| | ) | |
| Defendant. | ) | |

## <u>ORDER</u>

AND NOW TO WIT, this          day of                , 2008, the Court

having heard and considered Defendant's Motion to Vacate Robbery First Degree

it is hereby

ORDERED:_____

_____

_____

_____ .


_____

The Honorable Jerome O. Herlihy

# IN THE SUPERIOR COURT OF THE STATE OF DELAWARE

## IN AND FOR NEW CASTLE COUNTY

STATE OF DELAWARE     )
                                )

      v.                )     I.D. #92000786DI
                                )

JACK OUTTEN,          )
                                )

        Defendant.    )

## AFFIDAVIT OF SERVICE

I hereby certify that I have served two (2) copies of the foregoing on the below listed individuals by hand delivery to their address at:

> James Ropp, Esquire
> Ipek Medford, Esquire
> Department of Justice
> 820 N. French Street
> Wilmington, DE   19801

Jennifer/Kate Aaronson, Esquire, #3478
8 E. 13th Street
P.O. Box 2865
Wilmington, DE   19805
(302) 655-4600

**EXHIBIT F**

## IN THE SUPERIOR COURT OF THE STATE OF DELAWARE

## IN AND FOR NEW CASTLE COUNTY

| | | |
|---|---|---|
| STATE OF DELAWARE | ) | |
| | ) | |
| v. | ) | I.D. #92000786DI |
| | ) | |
| JACK OUTTEN, | ) | |
| | ) | |
| Defendant. | ) | |

```
┌──────────────────────┐
│  SECURITIES          │
│  DIVISION            │
│                      │
│  MAR 25 2008         │
│                      │
│  DELAWARE            │
└──────────────────────┘
```

## NOTICE OF MOTION

TO:    James Ropp, Esquire
       Ipek Medford, Esquire
       Department of Justice
       820 N. French Street
       Wilmington, DE 19801


PLEASE TAKE NOTICE that the within Motion to Strike Non-Statutory

Aggravators will be presented to the specially assigned trial judge, the Honorable Jerome

O. Herlihy, at the convenience of the Court.


**LAW OFFICE OF JENNIFER-KATE**
**AARONSON, LLC**


_____
Jennifer Kate Aaronson, Esq. (#3478)
8 E. 13th Street, P.O. Box 2865
Wilmington, DE 19805
(302) 655-4600
Attorney for Defendant

**WOLOSHIN, LYNCH, NATALIE &**
**GAGNE, P.A.**


_____
Natalie S. Woloshin, Esq (#3448)
3200 Concord Pike, P.O. Box 7329
Wilmington, DE 19803
(302) 477-3200
Attorney for Defendant


DATED:  March 24, 2008

IN THE SUPERIOR COURT OF THE STATE OF DELAWARE

IN AND FOR NEW CASTLE COUNTY

| | | |
|---|---|---|
| STATE OF DELAWARE | ) | |
| | ) | |
| v. | ) | I.D. #92000786DI |
| | ) | |
| JACK OUTTEN, | ) | |
| | ) | |
| Defendant. | ) | |

## MOTION TO STRIKE NON-STATUTORY AGGRAVATORS

Jack Outten, by and through his attorneys, Jennifer-Kate Aaronson, Esquire and Natalie S. Woloshin, Esquire, hereby move this Honorable Court for an Order striking the State's non-statutory aggravators as unconstitutionally vague, overbroad, irrelevant and/or duplicative. The grounds thereof are as follows:

1. By letter dated April 13, 2007, the State provided its Notice of Intent to Seek the Death Penalty ("Notice"). In this Notice the State listed three (3) statutory aggravating circumstances. A copy of the Notice is attached hereto as Exhibit "A".[1]

2. In addition, in the Notice, the State provided the following with respect to non-statutory aggravating factors:

> In addition to the above enumerated statutory aggravating circumstances, the State intends to rely on the criminal record of crimes as an adult and juvenile, which will include the details of those convictions, and status while on probation or parole. We will also present evidence of his failure to take advantage of programs and drug/alcohol treatment, his history while incarcerated and that this offense was committed while on probation.

---

[1] This Motion is a Motion to Strike certain non-statutory aggravators listed in the State's Notice. By filing this Motion, the defense does not intend to waive any rights to object or strike the statutory aggravators listed in the State's Notice. However, it was agreed at the office-conference dated March 11, 2008, that due to the Court's decision to vacate the felony murder conviction and the State's pending appeal of that decision, motions related to the statutory aggravators cannot be filed until the resolution of the State's appeal.

The State will present evidence that the victim was vulnerable and defenseless at the time of the murder and that the resulting beating was without justification.

Finally, the State also intends to produce evidence of the impact that the crime has had on the victim's family. (Ex. A).

3.    The defendant seeks to strike the following non-statutory aggravators as either unconstitutionally vague, overbroad and/or unconstitutionally irrelevant or duplicative: (1) details of the convictions; (2) status while on probation or parole and the offense was committed while on probation; (3) defendant's failure to take advantage of programs and drug/alcohol treatment; and (4) the victim was defenseless and beaten without justification.

4.    The United States Supreme Court held that "the Eight and Fourteenth Amendments cannot tolerate the infliction of a sentence of death under legal systems that permit this unique penalty to be . . . wantonly . . .and freakishly imposed." Lewis v. Jeffers, 497 U.S. 764, 111 L.Ed. 606, 110 S.Ct 3092 (1990) (citing Gregg v. Georgia, 428 U.S. 153, 188, 49 L.Ed. 2d 859, 96 S.Ct. 2909 (1976)). Therefore, it is necessary that a capital sentencing body's discretion "be suitably directed and limited so as to minimize the risk of wholly arbitrary and capricious action." Id. (quoting Gregg, 428 U.S. at 189). In this regard, the Court plays a vital role "in ensuring that sentencing is carried out in a manner consistent with the requirements of the Constitution." United States v. Juarez-Cisneros, 363 F. Supp. 2d 827, 833 (E.D. Va. 2005). This means that the "Court's screening of aggravating factors is essential in channeling, directing and limiting the sentencer's discretion to prevent arbitrary and capricious imposition of the death penalty." Id. There are limits to what information may be presented to the jury during a penalty phase. Courts have set standards for assessing the adequacy of aggravating

factors in order to minimize the risk that the weighing process will be "impermissibly skewed" if the sentencing jury considers an invalid factor. <u>Jones v. United States</u>, 527 U.S. 373, 398, 144 L.Ed. 2d 370, 119 S.Ct. 2090 (1999). In order for an aggravating factor to be presented to the sentencer, the Courts have dictated that such factor cannot be unconstitutionally vague, overbroad, duplicative or irrelevant. See <u>Tuilaepa v. California</u>, 512 U.S. 967, 128 L.Ed. 2d 750, 114 S.Ct. 2630 (1994) (vagueness); <u>Arave v. Creech</u>, 507 U.S. 463, 123 L.3d 188, 113 S.Ct. 1534 (1993) (overbreadth); <u>Gregg</u>, 428 U.S. at 192 (relevance); <u>United States v. Lentz</u>, 225 F. Supp. 2d 666 (E.D. Va. 2002) (vagueness, overbreadth, double-counting and relevance).

5. In the context of a death penalty case, the "controlling objective for assessing eligibility and selection facts for vagueness is whether the statutory scheme provides a process that 'is neutral and principled so as to guard against bias or caprice in the sentencing decision.'" <u>United States v. Friend</u>, 92 F. Supp. 2d 534, 542 (E.D. Va. 2000) (citing <u>Tuilaepa</u>, 512 U.S at 973). An aggravator is considered vague if it lacks "some 'common-sense core of meaning. . . that criminal juries should be capable of understanding." <u>Tuilaepa</u>, 512 U.S. at 973 (citing <u>Jurek v. Texas</u>, 428 U.S. 262, 279, 49 L.Ed. 2d 929, 96 S.Ct. 3047 (1990). Vagueness is determined by "assessing whether an aggravating factor is defined in terms too vague to provide sufficient guidance to the sentencer." <u>United States v. Johnson</u>, 136 F. Supp. 2d 553, 558 (W.D. Va. 2001).

6. An aggravating factor must be "sufficiently relevant to the inquiry of who should live and who should die" to be considered by the sentencer. <u>Id</u>. An aggravating factor must be "focused on circumstances that are considered by civilized society to be 'particularly relevant to the sentencing decision'" <u>Friend</u>, 92 F. Supp. 2d at 541 (citing

Gregg, 428 U.S. at 192). An aggravator must be excluded from review by the sentencing jury if it only has a tangential relationship to the determination of who is more worthy of receiving a sentence of death. United States v. Rivera, 405 F. Supp. 2d 662, 668 (E.D. Va. 2005).

7. Since the death sentence is "qualitatively different" from any other sentence, it is necessary that an aggravating factor "be measured in perspective of the fundamental requirement of *heightened reliability* that is the keystone in making 'the determination that death is the appropriate punishment in a specific case.'" Friend, 92 F. Supp. 2d at 541-2 (citing Woodson v. North Carolina, 428 U.S. 280, 305, 96 S.Ct. 2978, 49 L.Ed. 2d 944 (1976)(emphasis in original). Heightened reliability bolsters the constitutional requirements of vagueness and relevance. Id. at 542. Heightened reliability plays an essential role regarding non-statutory aggravating factors because these factors, by their definition, lack "the stamp of approval that [the legislature] has bestowed upon the statutory aggravating factors." Id. In determining whether a non-statutory aggravating factor passes the high bar set, "heightened reliability is the key to a constitutionally defensible "determination that death is the appropriate punishment in a specific case." Id. (citing Woodson, 428 U.S. at 305).

8. When applying the heightened reliability requirement to vagueness, it serves to "underscore the requirement that the [aggravating] factor must genuinely narrow those eligible for the death penalty . . . and it also serves to foreclose an unacceptable risk of randomness in the sentencing process." Id. See also Zant v. Stephens, 462 U.S. 862, 878, 103 S.Ct. 2733, 77 L. Ed. 2d 235 (1983); Tuilaepa, 512 U.S. at 974-5. With regard to relevance, "heightened reliability controls the quality of the information given to the

jury in the sentencing proceeding by assuring that the sentencer receives evidence that, in logic and law, bears on the selection of who, among those eligible for death, should die and who should live. Id. See also Gregg, 428 U.S. at 192; United States v. Davis, 912 F. Supp. 938, 943-44 (E.D. La. 1996). Relevance and heightened reliability "assure the twin constitutional prerequisites of affording a rational basis for deciding that in a particular case death is the appropriate punishment and of providing measured guidance for making that determination. Id. These two objections "can only be accomplished if the proposed aggravating factor raises an issue which (a) is of sufficient seriousness in the scale of societal values to be weighted in selecting who is to live or die; and (b) is imbued with a sufficient degree of logical and legal probity to permit the weighing process to produce a reliable outcome." Id.

9. Duplicative aggravating factors are prohibited because "a submission [of multiple overlapping aggravating circumstances]. . . that permits and results in cumulative findings of more than one of the . . . circumstances as an aggravating factor is constitutional error." United States v. Tipton, 90 F.3d 861, 899 (4th Cir. 1996). The concern with aggravating factors that duplicate each other is that it "may impermissibly skew a jury in favor of imposing the death penalty." United States v. Regan, 228 F. Supp. 2d 742, 751 (E.D. Va. 2002) (quoting United States v. Allen, 247 F.3d 741, 789-90 (8th Cir. 2001).

10. Courts, in deciding whether to admit information concerning aggravating factors at sentencing, "must ensure that it is relevant, reliable and less prejudicial than probative." Juarez-Cisneros, 363 F. Supp. 2d at 834. Evidence submitted in a penalty phase "must be relevant to the aggravating factors, and its probative value may not be

outweighed by the danger of creating unfair prejudice." Id. at 835. Even within the broad range of evidence admissible in a penalty hearing, undue prejudice to the defendant must be avoided. State v. Cohen, 634 A.2d 380 (Del. Super., 1992).

11. With respect to the non-statutory aggravating factors articulated by the State in its Notice, it is clear that the challenged factors should be stricken as vague, irrelevant and/or duplicative.

a.    Non-statutory aggravating factor of details of the convictions

This factor is clearly unconstitutionally vague because it does not provide guidance to the sentencer and it does not have a "common-sense core meaning" that a jury is capable of understanding as required under heightened reliability. This factor also fails to narrow those eligible for the death penalty. This factor, as written, makes no sense. The details of convictions, i.e. whether the defendant took a plea or went to trial, offers no relevant information on which the jury should rely in making the decision to impose the death penalty or not. There is no explanation as to what "details" the State intends to offer and/or how the State intends to prove the convictions.

Further, the defendant's status while on probation or parole is not relevant to the jury's determination of whether the defendant should receive a death sentence. Given the heightened reliability afforded in this case, this factor is not sufficiently serious in the scale of societal values to be weighted in selecting who is to live or die. Further, any probative value in this factor is outweighed by its prejudicial effect.

Since this factor is not relevant and is unconstitutionally vague, it must be stricken.

b. Non-statutory aggravating factor of defendant's failure of programs and drug/alcohol treatment

This factor is also unconstitutionally vague and irrelevant. This factor must be stricken as vague because it fails to provide any guidance to the jury. It is completely unclear from the Notice the time frame in which the State is referring. This factor fails to provide the defense sufficient notice of the facts on which the State will rely which renders it unconstitutionally vague.

It must also be stricken as irrelevant because if the State is referring to the defendant's non-participation in programs prior to the murder, that is over sixteen (16) years ago. There is absolutely no relevance between the defendant's participation in programs 16 years ago and whether a jury in 2008 should impose the death penalty or not. If the State is trying to suggest that the defendant has not participated in programs since his arrest and conviction, this factor must be stricken as misleading. As the Court knows, the defendant has been in SHU for at least eight (8) years. As the Court also is keenly aware, SHU offers no programs.

c. Non-statutory aggravating factors that this "offense was committed while the defendant was on probation" and "status while on probation"

These two non-statutory aggravating factor should be stricken as duplicative and irrelevant.

Duplicative aggravating factors are prohibited as "a submission [of multiple overlapping aggravating circumstances]…that permits and results in cumulative findings of more than one of the circumstances as an aggravating factor is constitutional error." United States v. Tipton, 90 F.3d at 861, 899 (4th Cir. 1996). (adopting the Tenth Circuit

reasoning in United States v. McCullah, 76 F.3d 1087, 1111 (10th Cir. 1996). The concern is that aggravating factors "that duplicate each other may impermissibly skew a jury in favor of imposing the death penalty." United States v. Cisneros, 363 F.Supp.2d 827 (E.D. Va. 2002; United States v. Allen 247 F.3d 741, 789-90 (8th Cir. 2001).

Such double counting of aggravating factors, especially under a weighing scheme, has a tendency to skew the weighing process and creates the risk that the death sentence will be imposed arbitrarily and thus, unconstitutionally. Cf. Stringer v. Black, 503 U.S. 222, 112 S. Ct. 1130, 1137, 117 L. Ed. 2d 367 (1992). As the Supreme Court of Utah pointed out, when the same aggravating factor is counted twice, the "defendant is essentially condemned 'twice for the same culpable act," which is inherently unfair. Parsons v. Barnes, 871 P.2d 516, 529 (Utah) (quoting Cook v. State, 369 So. 2d 1251, 1256 (Ala. 1979)), cert. denied, 115 S. Ct. 431 (1994).

Moreover, Outten's probationary status sixteen years ago is totally irrelevant. While the defense concedes Outten's conduct in prison over the last sixteen years may be relevant, Outten's "status" in 1992 is so tangential to the issue of whether the defendant should receive the death penalty that it must be stricken.

d. Non-statutory aggravating factor that the "victim was vulnerable and defenseless at the time of the murder and that the resulting beating was without justification"

This factor should be stricken as vague and duplicative. In its Notice, the State fails to provide any basis for its claim that the victim was vulnerable and defenseless at the time of the murder. If the State is going to argue to the jury that the victim was vulnerable and defenseless due to his age, this factor should be stricken as duplicative

because the State already provided notice of its intent to seek the death penalty based upon the statutory aggravating factor that at the time of the offense, the victim was 62 years of age or older. See Notice at ¶ b. Courts in other jurisdictions have upheld this factor on vagueness grounds only when there was an explanation attached to the vulnerability claim. See United States v. Pretlow, 779 F. Supp. 758, 774 (D. N.J. 1991) (holding that "particularly vulnerable due to youth aggravator was not unconstitutionally vague because it did not stand in isolation because it was qualified by "due to youth"). In this case, there is no explanation of how Mannon's age made him particularly vulnerable. In determining whether this factor is appropriate, courts have held that the vulnerability must contribute to the victim's injury or death. *See* United States v. Johnson, 136 F.Supp.2d 553 (W.D. Va 2001); State v. Virden, 1999 Del. Super. LEXIS 358 (Del. Super. Aug. 20 1999); Garner v. State, 729 So. 2d 990, 992 (Fla. App. 1999); State v. Artis, 342 S.E. 2d 847, 852 (N.C. 1986). In this case, the State has failed to link the victim's vulnerability to his death, and therefore, the factor must be stricken.

The term "defenseless" itself is vague. In State v. White, 395 A.2d 1082, 1090 (Del. 1978), the Delaware Supreme Court struck down as unconstitutional the statutory aggravators (subsection (e)(1)(r) and (s)) of "elderly" and "defenseless" as on the grounds that they were vague. The Court ruled that the then statutory aggravators failed to sufficiently "guide and channel the discretion of the sentencing authority." Id. at 1091. For the same reasons, "defenseless" should be stricken as a non-statutory aggravator.

Moreover, the State intends to offer the "particular circumstances or details" of the crime pursuant to 11 Del.C. §4209(c)(3)(a)(1). Through the presentation of evidence from the guilty phase, the jury will hear that Mannon was sixty (64) years old and had

been drinking at a bar earlier. There were four of them (three co-defendants and Gibbons) and Mannon. The jury will also hear that Nelson Shelton was armed with a hammer. Labeling Mannon as "defenseless" and arguing that his "beating was without justification" is impermissibly duplicative of the ""particular circumstances or details" of the crime and is unduly prejudicial to Outten. To allow the State to rely on the "vulnerable" statutory aggravator of Mannon's age and the non-statutory aggravators of vulnerable, defenseless and beating without justification is triple counting.

Sentencing procedures in capital cases are designed to serve the "need for reliability in the determination that death is the appropriate punishment in a specific case." Woodson v. North Carolina, 428 U.S. 280, 305 (1976). If evidence does not serve that need, because it is irrelevant or unduly prejudicial, it should not be introduced. This Court has broad discretion to exclude evidence when its probative value is outweighed by the danger of unfair prejudice, confusion of issues or misleading the jury. D.R.E. 403. Evidence is considered unfairly prejudicial to the degree that it has "an undue tendency to suggest decision on an improper basis, commonly . . . an emotional one." Fed. R. Evid. 403 advisory committee's notes (1972). The emotionally charged descriptions of Mannon as "vulnerable" and "defenseless" who was "beaten without justification" serve no purpose other than to inflame the passion and prejudice of the jury. Therefore, the vague, duplicative, irrelevant and prejudicial non-statutory aggravator must be stricken.

WHEREFORE, based on the foregoing, defendant respectfully requests this

Honorable Court grant defendant's Motion to Strike the Non-Statutory Aggravators.


**LAW OFFICE OF JENNIFER-KATE AARONSON, LLC**


Jennifer Kate Aaronson, Esquire, ID# 3478
8 E. 13th Street
P.O. Box 2865
Wilmington, DE   19805
(302) 655-4600


AND

**WOLOSHIN, LYNCH, NATALIE & GAGNE, P.A.**


Natalie Woloshin, Esquire, ID#3448
Woloshin, Lynch, Natalie & Gagne, P.A.
3200 Concord Pike
P.O. Box 7329
Wilmington, DE 19803
(302) 477-3200

Attorneys for Defendant

## IN THE SUPERIOR COURT OF THE STATE OF DELAWARE

## IN AND FOR NEW CASTLE COUNTY

STATE OF DELAWARE       )
                            )
       v.                 )    I.D. #92000786DI
                            )
JACK OUTTEN,          )
                            )
          Defendant.     )

## AFFIDAVIT OF SERVICE

I hereby certify that I have served two (2) copies of the foregoing on the below listed individuals by hand delivery to their address at:

> James Ropp, Esquire
> Ipek Medford, Esquire
> Department of Justice
> 820 N. French Street
> Wilmington, DE   19801

Jennifer Kate Aaronson, Esquire, #3478
8 E. 13th Street
P.O. Box 2865
Wilmington, DE   19805
(302) 655-4600

Attorney for Defendant

**EXHIBIT G**

## IN THE SUPERIOR COURT OF THE STATE OF DELAWARE

## IN AND FOR NEW CASTLE COUNTY

| | | |
|---|---|---|
| STATE OF DELAWARE | ) | |
| | ) | |
| v. | ) | I.D. #92000786DI |
| | ) | |
| JACK OUTTEN, | ) | |
| | ) | |
| Defendant. | ) | |

### NOTICE OF MOTION

TO:    James Ropp, Esquire
       Ipek Medford, Esquire
       Paul Wallace, Esquire
       Department of Justice
       820 N. French Street
       Wilmington, DE  19801


PLEASE TAKE NOTICE that the within Motion to Strike Statutory

Aggravators will be presented to the specially assigned trial judge, the Honorable

Jerome O. Herlihy, at the convenience of the Court.


LAW OFFICE OF JENNIFER-KATE          WOLOSHIN, LYNCH, NATALIE &
AARONSON, LLC                        GAGNE, P.A.


_____      _____
Jennifer Kate Aaronson, Esq. (#3478)  Natalie S. Woloshin, Esq (#3448)
8 E. 13th Street, P.O. Box 2865      3200 Concord Pike, P.O. Box 7329
Wilmington, DE  19805                Wilmington, DE  19803
(302) 655-4600                       (302) 477-3200
Attorney for Defendant               Attorney for Defendant


DATED:  March 28, 2008

# IN THE SUPERIOR COURT OF THE STATE OF DELAWARE

## IN AND FOR NEW CASTLE COUNTY

| | | |
|---|---|---|
| STATE OF DELAWARE | ) | |
| | ) | |
| v. | ) | I.D. #92000786DI |
| | ) | |
| JACK OUTTEN, | ) | |
| | ) | |
| Defendant. | ) | |

## MOTION TO STRIKE STATUTORY AGGRAVATORS

Defendant, by and through counsel, Jennifer-Kate Aaronson, Esquire and Natalie S. Woloshin, Esquire, hereby moves this Honorable Court for an Order Striking Statutory Aggravators. The grounds thereof are as follows:

1. Jack Outten was arrested January 13, 1992 and subsequently indicted jointly with Nelson Shelton and Steven Shelton on two counts of First Degree Murder (intentional murder and felony murder), Robbery First Degree, Possession of a Deadly Weapon During the Commission of a Felony and Conspiracy First Degree. Following a jury trial which concluded on February 23, 1993, Outten was convicted of all indicted counts on February 24, 1993. Following a penalty phase which concluded on March 4, 1993, the jury voted seven to five in recommendation of the death penalty.

2. On September 28, 2006, the Third Circuit reversed Outten's death sentence and remanded the case for re-sentencing. Outten v. Kearney, 464 F.3d 401 (3rd Cir. 2006). The Third Circuit held Outten's trial counsel ineffective for failing to properly investigate and present mitigation evidence in the penalty phase.

3. The State relied on three statutory aggravating factors with respect to Outten: (1) the murder was committed while the defendant was engaged in the commission of robbery; (2) the murder was committed for pecuniary gain; and (3) Wilson Mannon, Jr. was 62 years of age or older.

### A.    The Age > 62 Statutory Aggravator

4. The Due Process Clause requires the State to prove beyond a reasonable doubt every element of the charged criminal offense. *See, In re Winship,* 397 U.S. 358, 364, 90 S. Ct. 1068, 25 L. Ed. 2d 368 (1970); *Sandstrom v. Montana,* 442 U.S. 510, 520, 61 L. Ed. 2d 39, 99 S. Ct. 2450 (1979). This fundamental rule is also incorporated in 11 <u>Del. C.</u> §301 (b) ("no person may be convicted of an offense unless each element of the offense is proved beyond a reasonable doubt"). Delaware law further provides that proof of the defendant's state of mind is required in every criminal case. 11 <u>Del. C.</u> §251 (a). Also, under 11 <u>Del. C.</u> §252, the state of mind requirement "applies to all elements of the offense unless a contrary legislative purpose plainly appears."

5. In this case, as explained in *Ring v. Arizona,* supra, proof of the existence of a statutory aggravating circumstance is an "element" of the offense of "capital murder," i.e. "intentional murder" plus one or more statutory aggravating circumstances. See, *Capano v. State,* 889 A.2d 968, 972 (2006) (In *Ring,* the court held a statutory aggravating circumstance operated as "the functional equivalent of an element of a greater offense" and that the Sixth Amendment required that this element be found by a jury).

6. 11 <u>Del. C.</u> §4209(e), which enumerates the statutory aggravating circumstances, does not, however, include a particular "state of mind" requirement. Nevertheless, under *Winship* and Section 301(b), in order to prove the existence of a statutory aggravating circumstance, the State was required to prove that Outten acted knowingly with respect to murdering an individual over the age of 62. *See,* 11 <u>Del. C.</u> §251 (b); *Manley v. State,* 918 A.2d 321, 329-330 (Del.2007)(State had to prove beyond a reasonable doubt that Manley knew of victim's status as a witness).

7. There was no evidence whatsoever introduced in the guilt or penalty phase to prove that Outten knew Mannon's age or that Outten knew Mannon was over the age of 62 at the time of the murder. The State did not and cannot prove beyond a reasonable doubt that Outten knew Mannon's age. The jury instructions in the penalty phase did not require the State to prove Outten's knowledge of Mannon's age beyond a reasonable doubt. (Tr. 3/4/93 at 65-66). Therefore, the statutory aggravator that "Wilson Mannon, Jr., was 62 years of age or older must be stricken.

### B. The Pecuniary Gain Statutory Aggravator

8. On January 9, 2008, this Court vacated Outten's felony murder conviction finding:

> There is no evidence here . . . that when the three defendants, Gibbons and Mr. Mannon got in the car at the Green Door, there existed an intent or an agreement to rob. In fact, the defendants were never indicted for conspiracy to commit robbery. Further, the fatal pummeling began as soon as Mr. Mannon was pulled from the car. Unlike *Hassan-El*, there were no substantial steps taken to unambiguously manifest an intention to rob. **The only evidence is the pocket rifling after he was bashed to death.**

State v. Outten, ID No. 92000786DI, Herlihy, J., *Mem. Op.* *7 (January 9, 2008).

9.  In a Memorandum Opinion denying the State's Motion for Reargument, the Court further explained its decision to vacate the felony murder conviction by describing this case as "an 'afterthought' robbery." State v. Outten, ID No. 92000786DI, Herlihy, J., *Mem. Op.* *6 (February 29, 2008). "[T]he evidence the Court found lacking was that of an intent to rob Mannon *before* the killing occurred. As was stated in the facts of the 1993 Sentencing Order '[after] Mr. Mannon was murdered, his rings and wallet were removed.'" Id. at *7-8 (citations omitted).

10.  This Court vacated Outten's felony murder conviction as a rational juror could not have found, beyond a reasonable doubt, that the murder of Mannon was to "move along" the robbery. State v. Outten, ID No. 92000786DI, Herlihy, J., *Mem. Op.* *8 (February 29, 2008).

11.  Because the taking of property was an "afterthought," not in any way the motivation for the murder, the statutory aggravator of pecuniary gain must be stricken.

### C. While the Defendant Was Engaged in the Commission of a Robbery Aggravator

11.  Outten filed a Motion to Vacate Robbery First Degree Conviction on March 25, 2008. Outten incorporates by reference all factual and legal arguments contained in said Motion in support of Outten's motion to strike the "while engaged in the commission of a robbery" statutory aggravator.

12. The State appealed this Court's decision vacating Outten's conviction for felony murder. Pending before the Court is Outten's Motion to Vacate Robbery Conviction. Outten seeks leave of the Court to supplement this Motion, if necessary, pending the appeal and this Court's decision on the Motion to Vacate Robbery Conviction.

WHEREFORE, based on the foregoing, defendant respectfully requests this Court enter an Order striking the statutory aggravators.

**LAW OFFICE OF JENNIFER-KATE AARONSON, LLC**

Jennifer Kate Aaronson, Esquire, ID# 3478
8 E. 13th Street
P.O. Box 2865
Wilmington, DE   19805
(302) 655-4600

AND

**WOLOSHIN, LYNCH, NATALIE & GAGNE, P.A.**

Natalie Woloshin, Esquire, ID#3448
Woloshin, Lynch, Natalie & Gagne, P.A.
3200 Concord Pike
P.O. Box 7329
Wilmington, DE 19803
(302) 477-3200

Attorneys for Defendant

# IN THE SUPERIOR COURT OF THE STATE OF DELAWARE

## IN AND FOR NEW CASTLE COUNTY

STATE OF DELAWARE    )
                   )
      v.             )    I.D. #92000786DI
                   )
JACK OUTTEN,         )
                   )
        Defendant.    )

## ORDER

AND NOW TO WIT, this      day of          , 2008, the Court

having heard and considered Defendant's Motion to Strike Statutory Aggravators

it is hereby

ORDERED:_____

_____

_____

_____.


                                   _____
                                   The Honorable Jerome O. Herlihy

## IN THE SUPERIOR COURT OF THE STATE OF DELAWARE

## IN AND FOR NEW CASTLE COUNTY

| | | |
|---|---|---|
| STATE OF DELAWARE | ) | |
| | ) | |
| v. | ) | I.D. #92000786DI |
| | ) | |
| JACK OUTTEN, | ) | |
| | ) | |
| Defendant. | ) | |

## AFFIDAVIT OF SERVICE

I hereby certify that I have served two (2) copies of the foregoing on the below listed individuals by hand delivery to their address at:

>James Ropp, Esquire
>Ipek Medford, Esquire
>Paul Wallace, Esquire
>Department of Justice
>820 N. French Street
>Wilmington, DE   19801

Jennifer Kate Aaronson, Esquire, #3478
8 E. 13th Street
P.O. Box 2865
Wilmington, DE   19805
(302) 655-4600

**EXHIBIT H**



EFiled: Apr 15 2008 11:32AM
Filing ID 19409078
Case Number 142,2008

## IN THE SUPREME COURT OF THE STATE OF DELAWARE

| | | |
|---|---|---|
| STATE OF DELAWARE | § | No. 142, 2008 |
| | § | |
| v. | § | Superior Court |
| | § | |
| JACK OUTTEN | § | New Castle County |
| | § | |
| | § | Cr. ID No. 92000786DI |
| | § | |
| | § | Cr. A. Nos. IN-92-01-1144-R1 |
| | § | thru IN-92-01-1148 R1 |

The following docket entry has been efiled in the above cause.

April 15, 2008.

Certified copy of Order e-filed April 14, 2008, to Clerk of Court Below. **Jurisdiction is retained**. The case is due to be returned by **June 16, 2008.**

cc:  The Honorable Jerome O. Herlihy
Paul R. Wallace, Esquire
Jennifer-Kate Aaronson, Esquire
Natalie S. Woloshin, Esquire

Prothonotary
Received Above

By _____

Date _____

Date:  April 15, 2008

_____
/s/ Audrey F. Bacino
Assistant Clerk of Supreme Court



So Ordered    EFiled: Apr 14 2008 3:41PM
Filing ID 19397284
~~Case Number 142,2008~~

IN THE SUPREME COURT OF THE STATE OF DELAWARE

STATE OF DELAWARE,                    )
                                      )
            Plaintiff-below,          )
            Appellant,                )
                                      )
                                      )    No. 142, 2008
                                      )
JACK OUTTEN,                          )
                                      )
            Defendant-below,          )
            Appellee.                 )

### MOTION TO REMAND

The State of Delaware moves to remand the instant appeal to the Superior Court with directions to conduct proceedings related to certain pending post-conviction or pre-penalty phase motions. In support thereof, the State submits the following:

1. In February 1993, Jack Outten was convicted jointly with Nelson and Steven Shelton of two counts of First Degree Murder (intentional - DEL. CODE ANN. tit. 11, § 636(a)(1); and felony murder DEL. CODE ANN. tit. 11, § 636(a)(2)) and related charges stemming from the killing of William Mannon. Following a penalty phase in March 1993, Outten received a death sentence. *Outten v. State*, 650 A.2d 1291 (Del. 1994).

2. On September 26, 2006, the United States Court of Appeals for the Third Circuit reversed the United States District Court's denial of Outten's federal habeas petition. *Outten v. Kearney*, 464 F.3d 401 (3rd Cir. 2006). In turn, the District Court granted Outten's habeas petition with respect to his death

IN THE SUPREME COURT OF THE STATE OF DELAWARE

STATE OF DELAWARE,                    )
                                      )
            Plaintiff-below,          )
                    Appellant,)       )
                                      )
                                      )    No. 142, 2008
                                      )
JACK OUTTEN,                          )
                                      )
            Defendant-below,          )
                    Appellee. )

### ORDER

This _____ day of _____, 2008, upon consideration of the Motion for Remand filed by the State of Delaware, **IT IS HEREBY ORDERED** that the case is remanded to the Superior Court with directions to consider the following of Outten's pending motions:

        (1) the post-conviction motion attacking the validity of Outten's convictions that was filed on October 26, 2008;

        (2) the motion to vacate Outten's robbery first degree conviction that was filed on March 25, 2008;

        (3) the motion to strike non-statutory aggravators that was filed on March 24, 2008;

        (4) the motion to strike statutory aggravators that was filed on March 28, 2008; and

        (5) any other motion the Superior Court deems relevant to this appeal or for which appropriate relief may be the grant of a new trial.

Jurisdiction is retained.

                              By the Court:


                              _____
                                      Justice

## CERTIFICATION OF SERVICE

The undersigned certifies that on April 16, 2008, he caused to be electronically filed the

attached *Motion To Enlarge Time For Penalty Hearing* with the Clerk of Court using CM/ECF

which will send notification of such filing to the following registered participants:

JENNIFER-KATE AARONSON, ESQUIRE
Law Office of Jennifer-Kate Aaronson, LLC
8 East 13th Street
P.O. Box 2865
Wilmington, DE 19805

&

NATALIE S. WOLOSHIN, ESQUIRE
Woloshin, Lynch, Natalie & Gagne, P.A.
3200 Concord Pike
P.O. Box 7329
Wilmington, DE 19803

Attorneys for Petitioner

STATE OF DELAWARE
DEPARTMENT OF JUSTICE

PAUL R. WALLACE (Bar No. 2926)
Chief of Appeals
Delaware Department of Justice
820 N. French Street, 7th Floor
Wilmington, Delaware 19801
(302)577-8500

DATE: April 16, 2008